Enrique G. Serna ISB No. 12114
Serna & Associates PLLC
950 W. Bannock St., Suite 1100
Boise, Idaho 83702
Tel: (210) 865-5800
Email: enrique@serna-associates.com
Lead Counsel

Jane Gordon, ISB No. 9243
Jane Gordon Law
1004 West Fort Street
Boise ID 83702
Tel: (208) 391-4747
Email: Jane@JaneGordonLaw.com
Co-Counsel
Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| NANCY XOL RAX, individually, and on behalf of her minor daughter DS, ZULEYMA R. LOPEZ on behalf of her minor son JS, GLORIA TZI, and PEDRO SONTAY, JUAN SONTAY, and MARTHA SONTAY, as individual heirs of MARIO SONTAY,<br><br>and<br><br>INGRID SUSANA BOTZOC TZI, DOROTEA OCH, EMILIANO COC CHUB, and EMILIANO COC OCH, as individual heirs of MARIANO COC,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>BIG D BUILDERS, INC., STEEL BUILDING SYSTEMS, LLC, INLAND CRANE, INC., and SPECK STEEL, LLC,<br><br>　　　　Defendants. | CASE NO. _____<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

For their Complaint against Defendants, Plaintiffs allege as follows:

## **INTRODUCTION**

1.       Plaintiffs bring this action for the wrongful deaths of Mariano Coc Och ("Mariano") and Mario Sontay Tsi ("Mario"). Mario and Mariano were working on the Jackson Jet Center's prefabricated metal hangar ("the Hangar") in Boise, Idaho adjacent to the Boise airport. The Hangar collapsed on January 31, 2024, killing Mario, Mariano, Craig Durrant and injuring at least nine other site workers.

2.       Mario was a citizen of Guatemala who was working in Boise, Idaho. He grew up in Carchá, Guatemala. Mario learned construction from a very early age, working on building houses and warehouses. Mario came to work in the United States to seek a better future and support his family, arriving in Idaho in November of 2020 and started working for Big D Builders, Inc. soon thereafter.

3.       Mariano was a citizen of Guatemala. He worked for Big D Builders, Inc. and supported his family in Guatemala. He was born in Carchá, Guatemala and worked in construction before coming to the United States in 2021.

4.       Defendant Big D Builders, Inc. was the general contractor for the Hangar.

5.       Defendant Steel Building Systems, LLC along with Walker Structural Engineering, P.C designed and engineered the Hangar.

6.       Defendant Speck Steel, LLC provided certain materials for the Hangar.

7.       Defendant Inland Crane, Inc. provided erection support.

8.       Defendant Big D Builders, Inc. hired Defendant Steel Building Systems, LLC to draw and engineer the Hangar. Defendant Steel Building Systems, LLC retained Walker Structural Engineering, P.C to prepare, draft, validate, and present the Hangar blueprints. Walker Structural

Engineering, P.C drafted and engineered the construction plans for the Hangar that were submitted in early 2023 and approved by the City of Boise on December 4, 2023 ("Approved Hangar Plans"). See Exhibit A, Approved Plans and Exhibit B, Approved Permit.

9.      Defendant Steel Building Systems, LLC, at the behest of Defendant Big D Builders, Inc., drew a second set of blueprints that on information and belief were never fully submitted to the City of Boise and did not have an engineer stamp ("SBS Install Set"). See Exhibit C, SBS Install Set.

10.     There is a significant reduction in bracing and structural support in the modified SBS Install Set from the Approved Hangar Plans. In essence, the SBS Install Set modified all the bracing and bracing lines; calling for 25% to 30% less bracing requirements than the Approved Hangar Plans. The SBS Install Set engineered the connections of the cable bracing to be secured at an angle that created a "knife type edge" and when under a certain weight and pressure, would cut through the cables rather than hold the cables in place.

11.     On January 30, 2024, the day prior to the Hangar collapse, workers at the Hangar site reported bowing beams and snapping cables and bracing. See Exhibit D, Witness Statements to Boise Police. Rather than stop work at the Hangar site to ensure everyone's safety, all Defendants pressed on. Defendant Inland Crane, Inc. removed three of the four support cranes despite high gusts and dangerous wind conditions on January 31, 2024. That afternoon at 4:54pm, the Hangar collapsed, killing Mario and Mariano.

## PARTIES

12.     Plaintiff Nancy Xol Rax ("Nancy") is Mario's widow and heir. She is a citizen of Guatemala.

13.     Plaintiff Nancy Xoi Rax on behalf of her minor child DS. DS is Mario's daughter and heir. DS lives in and is a citizen of Guatemala.

14.     Plaintiff Zuleyma R. Lopez on behalf of her minor child JS. JS is Mario's son and heir and lives with his mother in El Salvador.

15.     Plaintiff Gloria Tzi ("Gloria") is Mario's mother and heir. She lives in and is a citizen of Guatemala.

16.     Plaintiff Pedro Sontay ("Pedro") is Mario's father and heir. He lives in and is a citizen of Guatemala.

17.     Plaintiff Juan Sontay ("Juan") is Mario's brother and heir. He lives in and is a citizen of Guatemala.

18.     Plaintiff Martha Sontay ("Martha") is Mario's brother and heir. She lives in and is a citizen of Guatemala.

19.     Nancy, DS, Gloria, Pedro, Juan, and Martha live together in Carchá, Guatemala. JS lives with his mother Zuleyma in El Salvador (collectively, "Mario's Heirs"). Mario sent money to them on a regular and frequent basis. Mario's Heirs depended on Mario financially. Mario's Heirs are persons entitled to succeed to Mario's property according to Idaho Code § 15-1-201. Mario's Heirs are entitled to recover damages against Defendants for Mario's wrongful death.

20.     Plaintiff Ingrid Susana Botzoc Tzi ("Ingrid") is Mariano's widow and heir. She lives in and is a citizen of Guatemala.

21.     Plaintiff Dorotea Och Chub ("Dorotea") is Mariano's mother and heir. She lives in and is a citizen of Guatemala.

22.     Plaintiff Emiliano Coc Chub ("Emiliano Chub") is Mariano's father and heir. He lives in and is a citizen of Guatemala.

23.     Plaintiff Emiliano Coc Och ("Emiliano Och") is Mariano's brother and heir. He lives in and is a citizen of Guatemala.

24.     Ingrid, Dorotea, Emiliano Chub and Emiliano Och (collectively "Mariano's Heirs") all live in Carchá, Guatemala. Mariano sent money to Mariano's Heirs on a frequent and regular basis. Mariano's Heirs financially depended on Mariano. Mariano's Heirs are persons entitled to succeed to Mariano's property according to Idaho Code § 15-1-201. Mariano's Heirs are entitled to recover damages against Defendants for Mariano's wrongful death.

25.     Defendant Inland Crane, Inc. is a corporation registered under the laws of and has its principal place of business in the State of Idaho.

26.     Defendant Big D Builders, Inc. is a corporation registered under the laws of and has its principal place of business in the State of Idaho.

27.     Defendant Steel Building Systems, LLC is a limited liability company registered under the laws of and has its principal place of business in the State of Idaho.

28.     Defendant Speck Steel, LLC is a limited liability company registered under the laws of and has its principal place of business in the State of Idaho.

## JURISDICTION AND VENUE

29.     This court has jurisdiction over this action pursuant to 28 USC section 1332 (a) (2), because the amount in controversy as to Plaintiffs exceeds $75,000, exclusive of interest and costs, and because Plaintiffs are citizens of the country of Guatemala and El Salvador, all Defendants are incorporated in Idaho.

30.     Venue is proper in the district of Idaho pursuant to 28 USC §1391(b)(2) as this district is where a substantial part of all the events or omissions giving rise to the claim occurred.

**FACTS**

31.     Jackson Jet hired Big D in 2023 as the general contractor of the Hangar and to oversee the project. Hangar construction started in 2023. It was expected to be completed in early 2024.

32.     Big D hired SBS to draw and engineer the Hangar. SBS retained Walker Structural to prepare, draft, validate, and present the Hangar blueprints. On information and belief, Walker Structural drafted and engineered the Approved Hangar Plans which were submitted in early 2023 and approved by the City of Boise on December 4, 2023. See Exhibit A, Approved Hangar Plans.

33.     The Approved Hangar Plans specifically state: "*IN THE EVENT THAT THESE DRAWINGS ARE USED AS APPROVAL DRAWINGS: IT IS IMPERATIVE THAT ANY CHANGES TO THESE DRAWINGS BE MADE IN CONTRASTING INK (PREFERABLY RED INK), HAVE ALL INSTANCES OF CHANGE CLEARLY INDICATED, AND BE LEGIBLE AND UNAMBIGUOUS.*" *Id.*, p 1.

34.     Big D obtained a City of Boise permit ("Approved Permit") to build the Hangar using the Approved Hangar Plans on December 4, 2023. See Exhibit B.

35.     On information and belief, a meeting was held at Jackson Jet Center where the principals of Jackson Jet threatened to impose penalties under the construction contract against Big D for failure to timely complete the Hangar. Soon thereafter, Defendants conspired and proceeded with the Hangar erection using the SBS Install Set which was not approved by the City of Boise.

36.     Big D ordered the modified SBS Install Set from SBS and Speck Steel. The modified plans affected the stability and bracing integrity of the structure. See Exhibit C.

37.     On information and belief, the SBS Install Set was never fully submitted to the City of Boise nor was it approved by the City of Boise's Planning and Development Services. Defendants conspired to erect the Hangar using the modified and unapproved SBS Install Set.

38.     In an effort to speed up construction on the project, Big D, SBS and Speck Steel followed the modified SBS Install Set for Hangar construction, and knowingly and recklessly manufactured all key and pivotal cross bracing in non- authorized OSHA welding labs.

39.     MBCI, the supplier of the prefabricated steel building, did not provide any of the pivotal and necessary cross bracing according to MBCI Order Number 50794-01 (dated 11/07/23) and MBCI Order Number 55597-01 (dated 12/28/23). See Exhibit E.

40.     The difference between Big D, SBS, and Speck Steel's non-conforming and unauthorized manufactured parts versus those parts provided by MBCI is enormous and monumental. MBCI parts are all primer red in color, are manufactured using top quality metal alloys and use high-quality welding materials that are precisely machine-welded and are manufactured in authorized facilities. In contrast, the Big D, SBS and Speck Steel manufactured parts were not of a conforming size to fit the MBCI pre-fabricated structure, were manufactured in unauthorized welding labs, were rushed, were improperly and poorly welded, and are marked by a different color. See Exhibit F (MBCI vs Non-MBCI parts).

41.     Defendants applied to the City of Boise for certain plan modifications on January 17, 2024. These certain plan modifications included, but were not limited to fire wall construction and other associated changes. The application for modification did not include any changes to bracing and structural supports (as called by the SBS Install Set). The modifications were never

approved by the City of Boise prior to the Hangar collapse and were ultimately denied on March 26, 2024. See Exhibit G.

42.     Defendants were grossly negligent and reckless in the administration of the construction site and the erection of the Hangar. Defendants rushed Hangar Construction and conspired to build the hangar on the modified and unapproved SBS Install Set. See Exhibit C and G.

43.     Mario and Mariano were pulled from a different construction project and told to report to the Hangar on January 26, 2024. Mario was told that the Hangar was significantly delayed and Big D needed more employees to finish erecting the Hangar on time. Mario and Mariano were told that from January 29, 2024, to January 31, 2024, they would work overtime because the Hangar's shell needed to be complete by January 31, 2024.

44.     The modifed and unapproved SBS Install Set contained significant modifications that had serious design and engineering defects.

45.     The changes in the modified and unapproved SBS Install Set included, but is not limited to, a lack of proper bracing, improper and incomplete erection of the rafters, the lack of any side flange, lack of proper cable support, lack of "x" bracing through all the available bays, and lack of proper joint support of the columns and the rafters.

46.     There is a significant reduction in bracing and structural support in the modified SBS Install Set from the Approved Hangar Plans See Exhibit A and C. In essence, the SBS Install Set modified all the bracing and bracing lines; <u>calling for 25% to 30% less bracing requirements than the Approved Hangar Plans</u>. The modified SBS Install Set engineered the connections of the cable bracing to be secured at an angle that created a "knife type edge" and when under a certain weight and pressure, it would cut through the cables rather than hold the cables in place.

47.    Defendants proceeded to rush the erection of the Hangar without following proper engineering and erection protocols.

48.    Big D, SBS, Speck Steel allowed for the fabrication and installation of the non-MBCI metal braces, X braces, support cables and bolts, all of which were manufactured in non-authorized and non-certified OSHA welding labs.  See Exhibit E (MBCI vs Non-MBCI parts).

49.    Big D, SBS, and Speck Steel conspired and knew the non-MBCI  manufactured replacement parts were not ordered and fabricated to MBCI's specifications. The non-MBCI  parts were a different color, had inadequate welding finishes, and did not properly fit the Hangar's existing MBCI manufactured parts. Defendants conspired to erect the Hangar on a set of modified and unapproved plans (SBS Install Set) using non-conforming braces and replacement parts See Exhibits C, E and F.

50.    As a proximate result of the erection of the Hangar using the modified SBS Install Set and non-MBCI confirming braces and parts, on January 30, 2024 (the day before the collapse), the Hangar started to shift, bow, and lean. Witnesses reported that "cables were heard popping and bracing started to come apart." Braces and cables were breaking and popping as a result of the design and engineering defects in the modifed and unapproved SBS Install Set.

51.     Inland Crane provided cranes and crane operators for the Hangar. The cranes provided support for the rafters as the Hangar was constructed.

52.    The wind conditions at the Boise Airport on January 31, 2024 were unsafe. Gusts were recorded over 25-35 miles per hour, rendering crane operations unsafe. See Exhibit H, NOAA Wind Report. Crane operation at the Arthur Building in Downtown Boise stopped at 10:00 am on January 31, 2024 because of the wind conditions. The cranes working on the Micron expansion

project also halted all crane operations on January 31, 2024 at 10:00 am because of the unsafe wind conditions.

53.     Inland Crane removed three out of the four cranes at the Hangar on January 31, 2024, despite the high winds and operating in dangerously windy conditions all which contributed to the Hangar collapse and Plaintiffs' deaths.

54.     Inland Crane used an old Grove model TM 9120 crane (USDOT 550133) as the remaining erection support crane on January 31, 2024. The Grove model TM 9120 was not rated for high wind speeds and did not have an anemometer installed. Moreover, the Grove crane was improperly tied to the structure in addition to not being rated to operate in such acute wind conditions.

55.     Inland Crane, Big D, and SBS knew that the wind conditions on January 31, 2024 were extremely dangerous to erect the Hangar using the modified and unapproved SBS Install Set and non-conforming and unapproved braces and replacement parts.

56.     Big D, SBS, Inland Crane, and Speck Steel should have halted all operations on January 30 and 31, 2024, and properly submitted and validated the SBS Install Set to obtain City of Boise approval before continuing on with construction. Instead, Big D, SBS, Speck Steel, and Inland Crane disregarded these obvious risks and conspired to continue the Hangar erection.

57.     Despite all warnings and in violation of all safety and engineering principles, Defendants proceeded negligently, willingly, knowingly and maliciously to erect the Hangar in extremely unsafe conditions, using modified and unapproved plans and non-MBCI manufactured parts. Defendants knew that as a result of their illicit and illegal practices, injury or death to the employees was substantially likely to occur.

58.     On January 31, 2024, Mariano and Mario were in the basket of a manlift approximately 40 feet in the air. They both wore harnesses and proper safety equipment. They were installing bolts to secure the rafter that was being held up and in place by the old Inland Grove TM9120 crane. The manlift Plaintiffs were working on was not rated for the wind speeds at the Hangar that day, See Exhibit H. Big D knew and disregarded the fact that the manlift was not rated for safe operations for the wind speeds recorded on January 31, 2024. See Exhibit H NOAA Wind Conditions at Boise Airport.

59.     On January 31, 2024, around 4:55 pm, the Hangar collapsed. Mario and Mariano were slammed into the ground as a falling rafter caught the arm of their manlift. Mariano was killed instantly and Mario survived 5 to 6 minutes after the impact.

60.     During Hangar erection under the modified and unapproved SBS Install Set, many subcontractors were critical of the rushed schedule. They cited "cutting of corners," reported "bowing of beams," snapping cables, a lack of key cross bracing, flange bracing, and cable bracing. See Exhibit D.

61.     "Inland was there to help straighten out the Hangar because portions of it were bending." – Ricky Pierce, Inland Crane Employee. See Exhibit D.

62.     "The structure collapsed because of an engineering problem." – Joshua Ratto, Inland Crane mechanic. See Exhibit D.

63.     "Inland was told to work fast on January 31, 2024, because it was expensive to rent the equipment." - Tommy Estuardo.  See Exhibit D.

64.     Edgar Garcia works for Inland Crane and was the supervisor at the Hangar. He told the Boise Police ("BPD") that he received a call from Jesse Cooper that the building collapsed. Garcia drove back to the scene after getting the collapse call. Garcia stated that he noticed a "bow"

in a beam and told Craig Durant several times that it did not look right. Garcia further added that he has worked on other types of sites and the bow of the beam did not look right to him. Garcia further told BPD that Craig Durant told Garcia he called an engineer twice and that it was fine for Big D put some straps and the come-along on the beam. Garcia also reported that the structure did not look right to him, and he has never seen that before. Garcia stated that wires were popping on January 30th, 2024, it was not normal as it was the first time he has seen beams sag or wires pop. See Exhibit D.

65.     Chadwick Crawford an employee of Firehawk Aviation stated that "several of the employees were standing around his office and talked to him about how difficult that job had been, the structure was not lining up correctly and they were having to fight the wind." See Exhibit D.

66.     "Kenneth Miller an employee of Inland told a first responder that the Hangars [sic] overhead beams were not straight. He attributed that to poor assembly. Miller added that there were not enough cross sections to support the overhead beams. He added this was very uncommon and there were corners being cut. Miller said the cable braces were breaking since January 30th, 2024. He said he advised site supervisors of the issues, and they should contact engineers to re-evaluate their construction. He added the oversight was shit." See Exhibit D.

67.     "Connor Elliott said he noticed the stiffener cables were snapping. I asked why they would snap. Elliot informed the first responder the snap caused too much tension. Elliot added the overhead beams looked like snakes. Elliott said that on January 31, 2024, at approximately 2:00pm in the afternoon he noticed that cables were skewing. He added the beams were initially plum but began to shift within 45 minutes of installation. I asked Elliot what caused his beams to skew, he replied, too much tension." See Exhibit D.

68.     "Anthony Bongiovanso, a safety officer for Inland Crane. He stated that several employees from Inland advised them there were structural integrity concerns for the Hangar. He also confirmed multiple crane operators from Inland reported curved beams and snapped stiffener cables." See Exhibit D.

69.     Dennis Durant stated upon being interviewed by the responding officer that "they had problems with the steel frames they were installing that would consist of essentially the roof and outside wall, footprint of the Hangar. He stated that the day prior they had noticed them bowing. He also stated that some support cables had broken. He stated they had reached out to the manufacturer about the supports not being adequate. He stated that he also reached out to an engineer and had received guidance from the engineer on reinforcing the building." See Exhibit D.

70.     Each and every Defendant named in this Complaint should have halted all work on January 31, 2024. Instead, they conspired to continue construction, using modified, unapproved and flawed plans, unapproved non-conforming structural braces and other metal parts and working in dangerous wind speeds violating all erection protocols, and engineering accepted practices.

71.     The day before the collapse, the Hangar's rafters were bowing and steel cables were popping and snapping due to structural instability. Defendants disregarded that notice and continued construction. Defendants knew the reason for the structural instability on January 30, 2024, and decided to carry on with the unapproved and unauthorized assembly of the Hangar structure on January 31, 2024, knowing that the loss of human life was inevitable. The continuation of work caused the Hangar's collapse and Mario and Mariano's wrongful deaths.

## FIRST CAUSE OF ACTION – NEGLIGENCE
### Big D, Speck Steel, SBS

72.     Big D had a duty to ensure the Hangar was constructed in a safe manner in

accordance with engineering and construction best practices and principals.

73.     Big D breached its duty when it failed to properly brace the columns and rafters during erection, in total breach of published and established safe pre-fabricated metal building erection protocols.

74.     Big D breached its duty by engaging in reckless and negligent project management. Big D allowed for multiple designs (both the Approved Hangar Plans and the modified unapproved SBS Install Set) to be used, creating workplace confusion and acting illicitly and recklessly. See Exhibits A, B, C, D, E, F, G and H.

75.     Big D failed to follow known safe and published erection protocols by failing to implement proper bracing, permitted the improper and incomplete erection of the rafters, failing to implement any side flange, failed to implement proper cable support, failing to implement X-bracing through all available bays, and failing to use proper joint support of the columns and the rafters.

76.     Big D failed to follow published pre-fabricated metal building erection protocols by raising and assembling sections of the structure without the proper structural support and in dangerous wind conditions.

77.     Big D permitted the use of nonconforming and unapproved defective bracing, bolts, screws, plates, and other pieces fabricated by SBS and Speck Steel. The nonconforming parts were a proximate and direct cause of the Hangar collapse.

78.     The MBCI-manufactured parts have an identification marker for assembly purposes and were manufactured using proper metal alloys and to precise specifications and were machine welded. See Exhibit E. In contrast, the unauthorized, nonconforming pieces that SBS and Speck Steel (with Big D's knowledge and consent) manufactured using man welds were off-color,

not marked, not the same material or material structural integrity, and not designed, manufactured, or welded in accordance to the approved blueprints and plans. See Exhibit E and F.

79.     On January 30 and 31, 2024, Big D's, Speck Steel's and SBS's employees were joking about and criticizing the non-conforming braces and parts' welds, poor quality of the metal, and the lack of detail in the bracing.

80.     Big D, Speck Steel, and SBS failed to follow applicable OSHA workplace safety rules.

81.     Big D failed to properly monitor the weather and failed to halt work while the winds were at dangerous speeds. See Exhibit H.

82.     Big D erected the Hangar without a valid permit. See Exhibit G. SBS drafted and provided the engineering support to the first set of Approved Hangar Plans. Defendants conspired and continued erecting the Hangar using the modified and unapproved SBS Install Set and using unauthorized braces and parts. This unlawful and fraudulent practice lead to the Hangar collapse on January 31, 2024.

83.     Facing project delays, Big D asked SBS to engineer and draft the modified and unapproved SBS Install Set for the Hangar. The unapproved SBS Install Set provided for a significant reduction in key structural x-bracing, cable bracing, flange bracing, and other support structures for the Hangar columns and rafters. This reduction of structural bracing and support was a design flaw and an engineering defect. Big D knew about it.

84.     Big D failed to follow published pre-fabricated metal steel erection protocols when it proceeded using the modified and unapproved SBS Install Set. Big D and SBS deliberately continued construction of the rafters and columns on modified plans that were not approved, on a design that was flawed and not validated.

85.     Defendants' intentional, willful, and wanton choices lead to Mario and Mariano's deaths as well as the death of one of Big D's owners who was decapitated as he tried to escape the collapsing structure. Big D acted intentionally, negligently, and with reckless disregard for human life.

86.     Defendants' breach of their duties caused the wrongful deaths of Mario and Mariano.

87.     Defendants' acts and omissions were willful, wanton, malicious, and reckless.

88.     Defendants are responsible for their employees' conduct under the doctrine of *respondeat superior*.

## SECOND CAUSE OF ACTION – ENGINEERING DEFECT
### Speck Steel, and SBS

89.     SBS and Speck Steel engineered the modified and unapproved SBS Install Set for the Hangar. The unapproved SBS Install Set provided for a significant reduction in key structural x-bracing, cable bracing, flange bracing, and other support structures for the Hangar columns and rafters. This reduction of structural bracing and support was a design flaw and an engineering defect. See Exhibit C.

90.     SBS had a duty to ensure the plans followed proper engineering principals.

91.     Speck Steel had a duty to ensure the plans followed proper engineering principals.

92.     SBS and Speck Steel had a duty to ensure the plans were submitted to the proper engineers and City of Boise departments for approval.

93.     SBS and Speck Steel had a duty to ensure the modified plans were submitted to the proper engineers and City of Boise departments for approval.

94.     The design flaw and engineering defect was a proximate and direct cause of the Hangar collapsing and Mario and Mariano's deaths.

## THIRD CAUSE OF ACTION – NEGLIGENCE
### Inland Crane

95.     Inland Crane had a duty to ensure the site was safe and to operate its cranes in a safe manner. Inland Crane's operators are trained and have the right and authority under federal OSHA guidelines to stop all work when conditions are unsafe. Inland Crane employees ignored all training, the Grove TM 9120 Crane's safety manual, the Grove TM 9120 Crane's operational manual, and workplace safety. Crane operators have the responsibility, duty, and the power to call a project off or adjourn for the day when conditions are unsafe. See Exhibit H.

96.     Inland Crane had a duty to operate its cranes in accordance with engineering and construction best practices and principals.

97.     Inland Crane had a duty to ensure the plans that were being used to construct the Hangar were approved by engineers. There was no engineering stamp on the modified and unapproved SBS Install Set, which in contrast, was on every page of the Approved Hangar Plans. See Exhibits A & C.

98.     Inland Crane had a duty to ensure the plans that were being used to construct the Hangar were approved by the City of Boise's Planning and Development Services. There was no City of Boise Planning and Development Services stamp on the modified and unapproved SBS Install Set, which was on every page of the Approved Hangar Plans. See Exhibits A & C.

99.     Inland Crane breached its duties as it failed to call off and halt crane operations on January 31, 2024 at the Hangar because of the dangerous wind conditions.

100.     Inland Crane knew about the Hangar's instability, evidenced by popping structural and support cables which were disconnecting from the other rafters and braces on January 30, 2024. See Exhibit D, Witness Statements to Boise Police. Inland Crane personnel knew that it was unsafe to operate under and around the Hangar and may be a contributing reason as to why Inland

Crane moved three of the four cranes from underneath the Hangar on January 31, 2024. See Exhibit D, Witness Statements to Boise Police.

101.    Inland Crane employees and crane operators should have stopped any and all work on January 30, 2024, as they knew or should have known that the Hangar was unstable, their equipment was at risk, the safety of the workers was at risk, and the safety of the crane operators was at risk. Inland Crane's supervisors and employees ignored the risks and proceeded to work when the Hangar was structurally unsafe on January 31, 2024. See Exhibit D, Witness Statements to Boise Police.

102.    Inland Crane breached its duties when it was using an old TM 9120 Grove crane that did not have an anemometer and continued to operate its cranes at the hangar on January 31, 2024, while the wind gusts ranged from 25 to 35 miles per hour, even though other crane operators ceased crane operation at both the Arthur Building in downtown Boise and the Micron site near the Boise Airport. See Exhibit H.

103.    Inland Crane failed to follow their own operating procedures and best practices. Inland Crane's operators at the Hangar were negligent and acted with reckless disregard as they permitted the operation of the old TM 9120 Grove Crane through the day (January 31, 2024) despite the fact that it was not equipped with an anemometer and the wind was too strong for the TM 9120 Grove Crane to operate safely.

104.    Inland Crane breached its duties by removing three out of four cranes from the Hangar. One old Grove TM 9120 crane was not sufficient for the project and the remaining crane's boom was tied to a rafter that had been erected, a practice that is prohibited.

105.    Inland Crane's operators and ground personnel had the independent ability to stop work on the Hangar as conditions were dangerous. Their failure to stop work on the Hangar

proximately and directly caused the Hangar's collapse. Inland Crane was negligent and acted with reckless disregard for Mario and Mariano's life by not stopping all work on January 30 and 31st, 2024, and by removing three of the four support cranes on the dangerously windy day of the collapse.

106.    Inland Crane breached its duties by not ensuring that Big D was building using engineer-approved and City of Boise approved plans and not performing due diligence to make sure the plans were properly approved, in addition to operating in dangerous wind conditions on January 31, 2024, after knowing that the structure was instable on January 30, 2024.

107.    Inland Crane's breach of its duties proximately and directly caused the Hangar collapse and the wrongful deaths of Mario and Mairano.

108.    Inland Crane's acts and omissions were willful, wanton, malicious, and reckless.

109.    Inland Crane is responsible for its employees' conduct under the doctrine of *respondeat superior*.

### FOURTH CAUSE OF ACTION - PRODUCT LIABILITY – DESIGN & MANUFACTURING DEFECT
### SBS and Speck Steel

110.    SBS and Speck Steel owed a duty to design and manufacture its product to avoid the unreasonable risk of foreseeable injury to persons using the product with ordinary care.

111.    Speck Steel was a manufacturer and product seller of metal components. This includes, but is not limited to, metal bracing, bolts, flanges, cables, and plates, among others.

112.    SBS was a manufacturer, designer, and product seller of metal components. This include, but is not limited to, metal bracing, bolts, flanges, cables, and plates, among others.

113.    These metal components were not manufactured or approved by MBCI and were a departure from what MBCI designed to be used with its prefabricated metal buildings. See Exhibit

E and F.

114.    The product was in a defective and unreasonably dangerous condition when it left Speck Steel and SBS's manufacturing floor, see Exhibit F.

115.    SBS and Speck Steel knew or should have known that danger and death to others could result from using pieces manufactured in unauthorized facilities and unapproved metal components unapproved metal components.

116.    SBS and Speck Steel failed to adequately warn of the danger of using pieces manufactured in unauthorized facilities and unapproved metal components.

117.    The defective condition was a proximate cause of Mario and Mariano's wrongful deaths.

118.    SBS and Speck Steel are responsible for its employees' conduct under the doctrine of *respondeat superior.*

**FIFTH CAUSE OF ACTION – INFLICTION OF EMOTIONAL DISTRESS**
**All Defendants**

119.    Defendants behaved intentionally and recklessly.

120.    Defendants' behavior was extreme and outrageous.

121.    Due to Defendants' acts and omission, as set forth Mario and Mariano's heirs suffered emotional distress.

122.    Mario and Mariano's heirs have suffered physical symptoms from their emotional distress, including tearfulness, nausa, accelerated heartbeats, and other stress reactions.

**SIXTH CAUSE OF ACTION – NEGLIGENT INFLICTION**
**OF EMOTIONAL DISTRESS**
**All Defendants**

123.    Due to Defendants' acts, omissions, and breaches of duties, as set forth, Mario's Heirs and Mariano's Heirs have suffered emotional distress.

124.    Mario's Heirs and Mariano's heirs have suffered physical symptoms from their emotional distress, including tearfulness, nausa, accelerated heartbeats, and other stress reactions.

## JOINT AND SEVERAL LIABILITY

125.    Defendants are jointly and severally liable pursuant to Idaho Code § 6-803.

126.    Defendants were acting in conspiracy and concert to build the Hangar, using pieces manufactured in unauthorized facilities, and unapproved metal components, and using building plans that were modified and not approved by an engineer or the City of Boise. See Exhibits A, B, C, D, E, F, G and H.

## PUNITIVE DAMAGES

127.    Defendants' misconduct was willful, reckless, and they acted with a bad state of mind. At the appropriate time, Plaintiffs will seek to amend this Complaint to add a claim for punitive damages pursuant to Idaho Code §6-160.

DATED July 9, 2024.

**SERNA & ASSOCIATES PLLC**

*/s/ Enrique G.Serna*
Enrique G. Serna
Lead Counsel

**JANE GORDON LAW**

*/s/ Jane Gordon*
Jane Gordon
Co-Counsel
Attorneys for Plaintiffs