# EXHIBIT A

Enrique Serna ISB No. 12114
Serna and Associates, PLLC
950 W. Bannock St., Suite 1100
Boise, Idaho 83702
Tel: (210) 865-5800
Email: enrique@serna-associates.com

Jane Gordon, ISB # 9243
Jane Gordon Law
1004 West Fort Street
Boise, Idaho 83702
Tel: (208) 391-4747
Email: Jane@JaneGordonLaw.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| NANCY XOL RAX, individually, and on behalf of her minor daughter DS, ZULEYMA R. LOPEZ on behalf of her minor son JS, GLORIA TZI, and PEDRO SONTAY, JUAN SONTAY, MARTHA SONTAY, as individual heirs of MARIO SONTAY, <br><br> and <br><br> INGRID SUSANA BOTZOC TZI, DOROTEA OCH, and EMILIANO COC, MAXIMILIANO COC, as individual heirs of MARIANO COC, <br><br>        Plaintiffs, <br><br> vs. <br><br> BIG D BUILDERS, INC., STEEL BUILDING SYSTEMS, LLC, INLAND CRANE, INC., SPECK STEEL, LLC, WALKER STRUCTURAL ENGINEERING, P.C. and NCI GROUP, INC. d/b/a/ METAL BUILDING COMPONENTS, <br><br>        Defendants. | CASE NO. 1:24-cv-00319-BLW <br><br> SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL |

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL  - 1

I, Steven Call, pursuant to 28 U.S.C. §1746, declare as follows:

1.    I am over the age of eighteen and submit this expert declaration based on my personal knowledge.

2.    I am a Licensed Structural Engineer with over 35 years of experience in structural design, code compliance, and failure analysis spanning commercial, institutional, residential, and industrial projects across multiple high-load and seismic environments. I have directed design of complex and multi-story structures using steel, concrete, masonry, and wood systems. Recognized for exceptional technical acumen, code-compliance, and analytical rigor. A true and correct copy of my curriculum vitae is attached hereto as Exhibit A.

3.    I have been retained by counsel for Plaintiffs in the above captioned lawsuit to provide an expert opinion on the cause of the collapse of the Jackson Jet Hangar on January 31, 2024.

4.    I have not provided any testimony at trial or depositions.

5.    If called to testify in this matter, I would testify truthfully and based on my expert opinion. The opinions and conclusions I express herein are based on a reasonable degree of scientific and industry standards for crane operations.

6.    My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide. My billing rate is $300/hour.

7.    I personally inspected the Hangar site three times after it collapsed.

8.    My opinions contained in this declaration are based on my formal education and my experience in structural engineering as a licensed professional engineer.

9.    In writing my report, I relied on the depositions testimony from SBS, Big D, and Inland Crane, including all exhibits introduced in the deposition.  I  also reviewed the Second

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL - 2

Amended Complaint and all attached exhibits.  I  relied on the OSHA findings and photographs for the structure.

10.     I referenced ASCE 37-14, "Design Loads on Structures during Construction" published by the American Society of Civil Engineers in writing my report.

11.     In writing my report, I also reviewed:

a.   Deposition testimony from Andy Speck, Dennis Durant, and Jeremy Haener and the exhibits to those depositions; the Second Amended Complaint and all attached exhibits; Defendants' Initial Disclosures and Supplemental Disclosures; Defendants' Answers to Interrogatories, Responses to Requests for Production, and Responses to Requests for Admissions.

b.   Two sets of drawings for the PEMB structure: the set submitted to the city and dated 8/6/23, stamped by the engineer Joseph P. Speck and also by Planning & Development Services – City of Boise and the Install Set dated 12-5-23 and marked as INSTALL SET.

c.   OSHA communications, reports, and fines;

d.   Boise Police Department reports and witness statements;

e.

f.   Communication between MBCI and SBS prior to the collapse;

g.   Communications regarding rods or cables breaking in the days leading to the collapse;

h.   Emails between SBS, MBCI, Inland Crane, Walker Engineering, and Big D prior to February 1, 2024;

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL  - 3

i.

j. Documents produced in response to subpoena by Jackson Jet Center;

k.  Hangar pictures and videos taken from Mike McCullough;

l. Personal pictures that were taken during my on-site inspections of the collapsed Hangar;

m. Pictures provided by Plaintiffs showing the collapsed Hangar.

12. The materials I have relied upon in preparing this declaration are the same types of materials that licensed professional engineers use to evaluate proper engineering methods and structural soundness of a building.

13. The opinions and conclusions of my report are as follows:

**Summary of the results of an investigation of the Jackson Jet Hangar collapse**

The Jackson Jet Hangar structure, located at 3201 W. Airport Way, Boise, Idaho was under construction when the collapse occurred on January 31, 2024 at about 4:54 PM MST. These findings are the result of a thorough review of the construction documents of the Jackson Jet Hangar as well as extensive on-site investigation of the collapsed structure, both performed by Steven M. Call, PE, SE. Additional information was obtained from copies of texts, emails, statements, and the depositions of Steel Building Systems (SBS), Big D Builders (Big D), and Inland Crane (Inland).

a. Based on the shape of the collapsed structure, it is clearly evident that the main rafters buckled sideways which greatly reduced their load carrying capacity and the structure became unstable, resulting in a total building collapse. The rafters buckled due to a lack of adequate bracing.

b. SBS prepared two sets of drawings for the building. The first set, dated 8/6/23, was the Permit Set which was stamped by the engineer of record and submitted to Boise City to obtain a building permit. The second set, dated 12/5/23, was the Install Set which was not stamped by the engineer of record, nor was it sent to

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL - 4

Boise City for review. Many of the differences between the two sets deal with the bracing members. The building structure supplied by SBS and MBCI and erected by Big D was significantly different than the building approved by the City of Boise in the permitting process and thus was not in compliance with the building permit which was issued.

c.  In the Install Set, SBS and Walker Engineering provided a Lifting Support Detail (on page 6 of 12). The purpose of the detail is to keep a pair of rafters plumb during the erection process. It consists of two diagonal cables which run from each rafter bottom chord to the top chord of the other rafter in the pair as well as a compression strut connecting the bottom flanges of the rafters. The high end of each cable was attached to the corresponding rafter by threading the cable through a hole in a knife plate welded to the top flange and web of the rafter. This connection configuration resulted in the cable bearing against the hard corner of the hole and caused a stress concentration in the cable at that point. The cable failures observed on site resulted from the cable breaking at the knife plate due to the connection configuration. This deficient design resulted in numerous cables breaking during the erection process which allowed the rafters to shift out of plumb and was a significant factor in the collapse.

d.  On the evening prior to the collapse, SBS participated in a series of texts regarding the failure of at least five cables in lifting supports. SBS knew of the critical nature of these bracing elements. They did not communicate to Big D the need to stop the erection until the problems could be corrected and that failure to do so could result in collapse of the structure. Further, they knew or should have known that erecting the final rafter would impose more load on the braces which remained thus increasing the likelihood of a collapse.

e.  At the time of the collapse, Big D had not installed a significant portion of the rod bracing members. No complete bay of horizontal rod X-bracing along the top flanges of the rafters (the main bracing required to prevent lateral buckling of the rafters) was installed prior to the collapse. Vertical rod X-bracing between the main frame columns had been installed to near mid height of the columns but the second level of bracing was not installed. The second level of bracing was to

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL - 5

extend from mid height of the column up to the top of the rafter. Without the second level of bracing, a complete, direct load path to the foundation did not exist for the bracing forces. This lack of bracing was typical throughout the building and was in my professional opinion, a major factor in the collapse of the structure.

f. In the days prior to the collapse, several bracing elements broke. Two horizontal, diagonal rod X-braces and at least five cable braces in the lift bracing snapped. The rod braces were not replaced. Some of the broken cable braces were replaced with nylon straps and come-alongs while others were simply ignored. The tension resulting in the straps and come-alongs due to efforts to bring the rafters into plumb resulted in increased stress in the remaining cables, braces, and rafters. Prior to the collapse, an additional bracing member failed, allowing the rafters to buckle and resulting in the collapse. Big D was responsible for all temporary bracing as well as for the stability of the structure throughout the erection of the building. They were aware of the failed bracing members and that the horizontal and vertical X-bracing installation was incomplete. They also knew that the rafters were out of plumb. These deficiencies rendered the structure in a very dangerous condition; a fact known by the contractor due to their years of experience in the industry. Rather than correcting the dangerous conditions caused by the bracing issues, they opted to increase the load on the bracing members already in place by erecting the final rafter. As a result of Big D's failure to adequately brace and stabilize the structure, lateral buckling occurred resulting in the building collapse.

g. Big D was cited by OSHA for their actions which failed to maintain the structural stability at all times during the erection process. The citation indicated the violation was willful and serious.

h. In my professional opinion and to a reasonable degree of engineering certainty, the collapse was the result of the willful, intentional, and negligent actions of Walker Structural Engineering as described in the report.

i. In my professional opinion and to a reasonable degree of engineering certainty, the collapse was the result of the willful, intentional, and reckless actions of Steel

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL - 6

Building Systems as described in the report and that the death of the plaintiffs was proximately caused by the willful and reckless acts of Steel Building Systems. This report contains clear and convincing evidence that Steel Building Systems' officers and employees engaged in conduct knowing that injury or death to the plaintiffs was substantially likely to occur.

j.  In my professional opinion and to a reasonable degree of engineering certainty, the collapse was the result of the willful, intentional, and reckless actions of Big D Builders as described above and that the death of the plaintiffs was proximately caused by the willful and reckless acts of Big D Builders. This report contains clear and convincing evidence that Big D Builders' officers and employees engaged in conduct knowing that injury or death to the plaintiffs was substantially likely to occur.

k.  All opinions in this report are rendered to within a reasonable degree of engineering certainty and are based on my knowledge, experience and education in the field of engineering. In addition, all opinions are supported by records generally accepted by the professional engineering community.

l.  I reserve the right to change my conclusions or amend my report should additional information become available after the preparation of this report.

14.  A true and correct copy of my final report is attached to this declaration as Exhibit B.

Dated June 30, 2025.

Steven Call

SUPPLEMENTAL EXPERT DECLARATION OF STEVEN CALL - 7

# S t e v e n   C a l l

**S t r u c t u r a l   E n g i n e e r**

**Boise, ID || (208) - 571 - 4855 || scall@callengineering.com**

| | |
|---|---|
| **PROFILE SUMMARY** | Licensed Structural Engineer with over 35 years of experience in structural design, code compliance, and failure analysis spanning commercial, institutional, residential, and industrial projects across multiple high-load and seismic environments. Has directed design of complex and multi-story structures using steel, concrete, masonry, and wood systems. Recognized for exceptional technical acumen, code-compliance, and analytical rigor. |

Selected by the Idaho Board of Professional Engineers to conduct investigations into engineering negligence, code non-compliance, and insurance-disputed structural design work including analysis and design for commercial and residential structures.

Brings a history of contributing to and expanding the advancement of engineering through academic instruction.  A former faculty member at Boise State University who taught advanced structural design courses covering masonry, steel, wood, seismic design, and diaphragm systems – always grounding academic theory in real-world practice.

Participated in evaluating the readiness of upcoming engineers nationally through two years on the NCEES grading committee evaluating responses on national exam for professional engineering licensure.  Served two years as a committee member on the AISI Committee on Specifications, contributing to light-gage steel construction code provisions adopted by the International Building Code.

**PROFESSIONAL EXPERIENCE**

### PRESIDENT & OWNER
### Call Engineering, PA | Boise, ID | 1997 - Present

- Manage and perform structural design for commercial, institutional, residential, and industrial projects using steel, concrete, masonry, and wood systems.

- Conduct structural failure evaluations and forensic reviews for insurance disputes, private clients, and regulatory inquiries.

- Perform technical and investigative reviews of engineering work as part of formal complaints to the Idaho Board of Professional Engineers involving potential design errors, performance issues, or code compliance concerns.

- Collaborate with architects, contractors, engineers from other disciplines, and regulatory authorities to provide documents which conform with building codes, are constructable, and meet client objectives.

- Oversee all aspects of firm operations including client consulting, project oversight, reviews, and documentation for both internal efficiency and statutory compliance.



PLAINTIFF'S EXHIBIT

**A**

**PROFESSIONAL EXPERIENCE (CONT.)**

**ENGINEERING LECTURER & ADJUNCT FACULTY**
**Boise State University | Boise, ID | 2011 - 2015**

- Served as full-time faculty (2012–2015) and adjunct instructor (2011–2012) for upper-division structural engineering curriculum.

- Taught a range of engineering courses including mechanics of materials, building codes, diaphragm design, and structural design in masonry, steel, wood, and seismic systems.

- Designed and implemented coursework and curriculum to integrate theoretical foundations with real-world case studies and professional practice insights.

**STRUCTURAL ENGINEER**
**Stapley Engineering | Boise, ID | 1993 - 1997**

- Delivered structural analysis and design services for commercial and light-industrial facilities throughout Idaho and surrounding regions.

- Produced code-compliant documentation and calculations for submittal and permitting in coordination with local building departments.

- Coordinated closely with multidisciplinary teams to optimize constructability, structural efficiency, and cost-effectiveness.

**STRUCTURAL ENGINEER**
**ABJK | Seattle, WA | 1989 - 1993**

- Provided engineering design and detailing support on a variety of commercial, institutional, and mixed-use developments.

- Gained foundational experience in steel and concrete structural systems, seismic load path development, and early applications of performance-based design.

**NOTABLE INVESTIGATIONS**

**Structural Design Deficiencies – Sun Valley, ID**

Reviewed calculations and structural documentation for a large hotel to determine whether stamped plans met standards of care and code requirements. Determined numerous instances where structural design was not code compliant. Worked with engineer of record to determine appropriate remediation work to resolve deficiencies.

**Insurance Dispute – Boise, ID**

Conducted third-party analysis of a structural investigation related to a foundation failure, evaluating the validity and methodology of a previous engineer's findings on behalf of an insurance provider. Determined that the complaint was without merit and that the previous engineer's findings were valid.

**City of Boise Structural Building Permit Reviews – Boise, ID**

Performed detailed reviews of structural plans and calculations submitted as part of the building permit process to verify compliance with building codes – four years.

| | |
|---|---|
| **SELECT DESIGN PROJECTS** | **Kenworth Sales and Service Facilities – Las Vegas, NV & Ashland, VA** |

A 64,000 square sq. ft., two-story steel frame building in Las Vegas and an 80,000 sq. ft. two-story two building complex in Ashland with open-web steel joist roofs and composite floor systems. Utilized concentric braced frames for lateral resistance.

**Boise State University Alumni Center – Boise, ID**

Four-story, 40,100 sq. ft. office and event facility with composite steel floor beams and precast façade.

**Idaho Central Credit Union Headquarters – Chubbuck, ID**

69,000 sq. ft., four-story office structure featuring open floor plans, steel-concrete composite floors, and a moment-resisting frame system for seismic and wind loading.

**Providence Medical Center Expansion – Anchorage, AK**

Five-story, 95,000 sq. ft. hospital addition incorporating both brace frames and steel-plate shear walls to meet stringent seismic design criteria in a critical healthcare facility.

**EDUCATION**

**University of California, Berkeley**

Master of Engineering, Structural Engineering Mechanics and Materials | 1989

**Brigham Young University**

Bachelor of Science, Mathematics | 1983

**LICENSURE & AFFILIATIONS**

**Engineering Licensure by State**

**Idaho:** PE, SE | **Nevada**: SE | **Washington**: PE | **Virginia**: PE

**Professional Affiliations**

**2023 Montana Joint Engineering Conference**

Presenter - "Diaphragm Basics and Beyond"

**National Council of Structural Engineers Associations (NCSEA)**

Presenter - NCSEA Summit Conference (2015): "Design of Buildings with Sloped Diaphragms – A Practical Guide for the Practicing Engineer"

**National Council of Examiners for Engineering and Surveying (NCEES)**
Former Grader for the NCEES Structural Engineering (SE) Exam – two years

**American Iron and Steel Institute (AISI)**
Committee member for the Committee on Specifications – contributor to AISI S100 and related steel design standards used in the International Building Code – two years

**PUBLICATIONS**

***Behavior and Design of Steel Single Plate Shear Connections***
Authors: Abolhassan Astaneh-Asl, Kurt M. McMullin, and **Steven M. Call**
Publication: Journal of Structural Engineering | Volume 119 Issue 8 | Aug. 1, 1993

***Behavior of Single Plate Shear Connections with A325 and A490 Bolts***
Authors: **Steven M. Call** and Abolhassan Astaneh
University of California, Berkeley Department of Civil Engineering Report
Report no. UCB/SEMM-89-04 | April 1989

***Design of Steel Single Plate Shear Connections***
Authors: Abolhassan Astaneh, Kurt M. McMullin, and **Steven M. Call**
Publication: Engineering Journal | Volume 26.1 | First Quarter, 1989

***Design of Steel Single Plate Shear Connections***
Authors: Abolhassan Astaneh, Kurt M. McMullin, and **Steven M. Call**
University of California, Berkeley Department of Civil Engineering Report
Report no. UCB/SEMM-88-12 | December 1988



## CALL ENGINEERING FIRM HISTORY

Call Engineering, PA is a structural engineering firm established in 1997 by Steven M. Call.   A graduate of the University of California, Berkeley with a Masters of Engineering in Structures, Mr. Call is a licensed structural engineer with over 35 years of experience.  Completed projects range in size to over 140,000 square feet and include multi-story office buildings, schools, churches, medical facilities, seismic studies, and various others.  Mr. Call has experience with steel, concrete, masonry, and wood with a special emphasis in steel design.  He is the co-author of several technical articles on steel connection design, one of which is referenced in the current AISC Steel Construction Manual.

Christine E. Zimmerman is a project engineer with Call Engineering. Mrs. Zimmerman graduated from the University of Colorado at Boulder with a Bachelors degree in Environmental Design with an emphasis in Architecture. She went on to complete a Masters degree in Civil Engineering with an emphasis in Structures from Boise State University.  Mrs. Zimmerman has been a member of the design team at Call Engineering since 2013 and received her P.E. in 2018. She has experience in wood, steel, masonry and concrete design.

# <u>Forensic Structural Engineering Report</u>

# Jackson Jet Airport Hangar Collapse

Prepared for:      Enrique G. Serna / Serna & Associates PLLC

Prepared by:      Steven M. Call, PE, SE / Call Engineering PA

Idaho License 7388

Date:      June 30, 2025

Case:      Nancy Xol Rax. Et al., Plaintiffs, vs Big D Builders., et al., Defendants

Case No. 1:24-cv-00319-BLW

U S District Court for the District of Idaho



6/30/25



PLAINTIFF'S
EXHIBIT

**B**

## Summary of Findings

This report contains a summary of the results of an investigation of the Jackson Jet Hangar collapse.  The Jackson Jet Hangar structure, located at 3201 W. Airport Way, Boise, Idaho was under construction when the collapse occurred on January 31, 2024 at about 4:54 PM MST. These findings are the result of a thorough review of the construction documents of the Jackson Jet Hangar as well as extensive on-site investigation of the collapsed structure, both performed by Steven M. Call, PE, SE. Additional information was obtained from copies of texts, emails, statements, and the depositions of Steel Building Systems (SBS), Big D Builders (Big D), and Inland Crane (Inland).

- Based on the shape of the collapsed structure, it is clearly evident that the main rafters buckled sideways which greatly reduced their load carrying capacity and the structure became unstable, resulting in a total building collapse.  The rafters buckled due to a lack of adequate bracing.

- SBS prepared two sets of drawings for the building.  The first set, dated 8/6/23, was the Permit Set which was stamped by the engineer of record and submitted to Boise City to obtain a building permit.  The second set, dated 12/5/23, was the Install Set which was not stamped by the engineer of record, nor was it sent to Boise City for review.  Many of the differences between the two sets deal with the bracing members. The building structure supplied by SBS and MBCI and erected by Big D was significantly different than the building approved by the City of Boise in the permitting process and thus was not in compliance with the building permit which was issued.

- In the Install Set, SBS and Walker Engineering provided a Lifting Support Detail (on page 6 of 12). The purpose of the detail is to keep a pair of rafters plumb during the erection process. It consists of two diagonal cables which run from each rafter bottom chord to the top chord of the other rafter in the pair as well as a compression strut connecting the bottom flanges of the rafters. The high end of each cable was attached to the corresponding rafter by threading the cable through a hole in a knife plate welded to the top flange and web of the rafter. This connection configuration resulted in the cable bearing against the hard corner of the hole and caused a

stress concentration in the cable at that point. The cable failures observed on site resulted from the cable breaking at the knife plate due to the connection configuration. This deficient design resulted in numerous cables breaking during the erection process which allowed the rafters to shift out of plumb and was a significant factor in the collapse.

- On the evening prior to the collapse, SBS participated in a series of texts regarding the failure of at least five cables in lifting supports. SBS knew of the critical nature of these bracing elements. They did not communicate to Big D the need to stop the erection until the problems could be corrected and that failure to do so could result in collapse of the structure.  Further, they knew or should have known that erecting the final rafter would impose more load on the braces which remained thus increasing the likelihood of a collapse.

- At the time of the collapse, Big D had not installed a significant portion of the rod bracing members.  No complete bay of horizontal rod X-bracing along the top flanges of the rafters (the main bracing required to prevent lateral buckling of the rafters) was installed prior to the collapse.  Vertical rod X-bracing between the main frame columns had been installed to near mid height of the columns but the second level of bracing was not installed. The second level of bracing was to extend from mid height of the column up to the top of the rafter. Without the second level of bracing, a complete, direct load path to the foundation did not exist for the bracing forces.  This lack of bracing was typical throughout the building and was in my professional opinion, a major factor in the collapse of the structure.

- In the days prior to the collapse, several bracing elements broke.  Two horizontal, diagonal rod X-braces and at least five cable braces in the lift bracing snapped. The rod braces were not replaced.  Some of the broken cable braces were replaced with nylon straps and come-alongs while others were simply ignored. The tension resulting in the straps and come-alongs due to efforts to bring the rafters into plumb resulted in increased stress in the remaining cables, braces, and rafters. Prior to the collapse, an additional bracing member failed, allowing the rafters to buckle and resulting in the collapse. Big D was responsible for all temporary bracing as well as for the stability of the structure throughout the erection of the building. They were

aware of the failed bracing members and that the horizontal and vertical X-bracing installation was incomplete. They also knew that the rafters were out of plumb. These deficiencies rendered the structure in a very dangerous condition; a fact known by the contractor due to their years of experience in the industry. Rather than correcting the dangerous conditions caused by the bracing issues, they opted to increase the load on the bracing members already in place by erecting the final rafter.  As a result of Big D's failure to adequately brace and stabilize the structure, lateral buckling occurred resulting in the building collapse.

- Big D was cited by OSHA for their actions which failed to maintain the structural stability at all times during the erection process. The citation indicated the violation was willful and serious.

- In my professional opinion, the collapse was the result of the willful, intentional, and negligent actions of Walker Structural Engineering as described above.

- In my professional opinion, the collapse was the result of the willful, intentional, and reckless actions of Steel Building Systems as described above and that the death of the plaintiffs was proximately caused by the willful and reckless acts of Steel Building Systems.  This report contains clear and convincing evidence that Steel Building Systems' officers and employees engaged in conduct knowing that injury or death to the plaintiffs was substantially likely to occur.

- In my professional opinion, the collapse was the result of the willful, intentional, and reckless actions of Big D Builders as described above and that the death of the plaintiffs was proximately caused by the willful and reckless acts of Big D Builders.  This report contains clear and convincing evidence that Big D Builders' officers and employees engaged in conduct knowing that injury or death to the plaintiffs was substantially likely to occur.

- All opinions in this report are rendered to within a reasonable degree of engineering certainty and are based on my knowledge, experience and education in the field of engineering. In addition, all opinions are supported by records generally accepted by the professional engineering community.

- I reserve the right to change my conclusions or amend my report should additional information become available after the preparation of this report.

# Background

The Jackson Jet hangar was a large clear-span structure consisting of seven steel frames spanning 300 feet. These steel frames were supported on concrete footings. The steel frames were typically about 20 feet apart. Roof purlins spanned between the frames to support the steel roof deck which would be installed later in the erection process. The vertical portion of the steel frame is the column and the horizontal portion is referred to as a rafter.

Bracing is used to hold the frame elements in their proper position. When a beam or rafter moves sideways and or twists, its load carrying capacity is reduced. If the movement is excessive, the rafter may collapse under its own weight. Adequate bracing of the rafters and columns is necessary to hold the steel frame in proper position and prevent buckling. The Jackson Jet Hangar structure used three main types of bracing: rod bracing, tube steel bracing, and cable lifting bracing.

Rod bracing occurs near the top of the rafter and at the outside flange of the columns. This bracing works together with the roof purlins to stabilize the top flange of the rafters and prevent lateral buckling. It transfers horizontal loads across the building and down to the supporting footings. Horizontal loads occur as a result of compression forces in the rafter top flange as well as due to wind or earthquake loads. Any interruption in the system of rod braces and purlins makes the total system less effective and results in an increased stress in the rafters.

The tube steel bracing stabilizes the bottom flanges of the rafters where the flanges are in compression due to frame action. The tube steel braces can resist both tension and compression forces. Like the rod braces, the tube steel braces prevent the supported portion of the rafter from moving sideways and buckling.

Cable bracing is utilized to keep the rafters plumb so that the top flange and bottom flange align vertically. If the rafter is not kept plumb, its load carrying capacity is reduced. An extreme offset between the top and bottom flanges can result in the member becoming unstable and collapsing.

The rod braces and the tube steel braces are permanent and are essential to proper structural performance of the structure throughout the life of the building. The cable lifting bracing is generally temporary bracing.  It is essential during the erection process but is not needed after the building erection is complete.  Unlike tube steel bracing, the cables in the lifting bracing can only carry tension loads, therefore they occur in pairs.  If only one cable is present it can only prevent movement away from the cable. Since lateral buckling can occur to either side of the rafter, a brace with only a single cable is usually completely ineffective.

Additional temporary bracing in the form of guy wires is frequently utilized during the erection process to hold members in their proper location and ensure that they do not shift as the erection proceeds.  Other permanent bracing may be required to stabilize local areas.  The design of all permanent bracing and the associated connections is the responsibility of the pre-engineered metal building engineer of record.  Temporary bracing is the responsibility of the building erector both for the design and installation.  Frequently the building erector works with the building designer regarding the design of any temporary bracing used during the lifting process. On this project Big D elected to erect the structure without guy wires or other supplemental temporary bracing by lifting the rafters in pairs connected together by roof purlins and the cables and struts in the lifting support detail (Big D deposition pg 135). By choosing this method, it was critical that Big D ensure the cables and struts in the lifting support remain fully effective.

## Companies Involved

Numerous companies were involved in the design and construction of the failed structure.

Glancey Rockwell Architects – responsible for the architectural aspects of the building. There was no indication found that Glancey Rockwell was in any way responsible for the building collapse.  As the architect, Glancey Rockwell was not responsible for the pre-engineered metal building design, for the means and methods of erection, nor for building safety.

Structural Engineering Consultants (SEC) – responsible for the design of the building foundation which supported the steel structure.  Based on a review of the foundation calculations as well as on-site observations, there was no indication that SEC's work was deficient or contributory to the building collapse.  The connection failures observed at the base of the frame columns were due to anchor rod and or base plate failure rather than failure of the concrete footings.

Steel Building Systems (SBS) – responsible for designing and supplying the pre-engineered metal building structure.  A detailed discussion of SBS's actions which were contributory to the collapse are detailed in a following section.

Walker Structural Engineering P.C. – structural engineer responsible for the design of the pre-engineered metal building structure. A detailed discussion of Walker Engineering's actions which were contributory to the collapse are detailed in a following section. I have been informed by Plaintiffs' counsel that a corporate representative deposition of defendant Walker Engineering will take place in July 2025, and based on that, and other information that might be provided to me in the future, I reserve the right to amend or supplement my opinion.

MBCI – the fabricator of the main structural rafters and columns. At present I have not found any indication of negligence on the part of MBCI. I have been informed by Plaintiffs' counsel that a corporate representative deposition of defendant MBCI will take place in July 2025, and based on that, and other information that might be provided to me in the future, I reserve the right to amend or supplement my opinion.

Big D Builders – as the general contractor and erector, responsible for the stability of the structure throughout the construction process as well as for safety and OSHA compliance. A detailed discussion of Big D's actions which were contributory to the collapse are detailed in a following section.

City of Boise Inspector – responsible for inspecting the construction at certain milestones during the construction process.  At the time of the collapse, the only structural inspection which would have been performed was the foundation inspection.  Since the foundation design did not change between the Permit Set and the Install Set, the inspector would have had no indication that the Permit Set and the Install Set were different.

Inland Crane – responsible for crane operations.  Any items regarding crane operations are outside my area of expertise and are therefore outside the scope of this report. Such items are independently addressed in the report by Dennis Eckstine.

## On Site Observations

In observing the collapsed structure, it was seen that the rafters had buckled horizontally about thirty feet which resulted in a loss of load carrying capacity and a collapse of the building structure (see exhibit A).  As the rafters collapsed, the supporting columns were pulled inward toward the center of the building, resulting in failure of the connections to the concrete foundation. Although some minor spalling of the concrete was observed, this was superficial only and it is evident the observed damage to the concrete was a result of the building collapse and not the cause thereof. The connections at the base of the columns failed either by breaking the anchor rods which attach the column to the concrete footing, or by tearing of the base plate (see exhibit B). No signs of failure of the concrete foundation were observed.

Since rafter buckling is almost always the result of inadequate bracing, a detailed review of all the bracing on the site was performed.  All the tube steel braces indicated on the Install Set were observed to have been installed.  Many of the tube steel braces had buckled due to the collapse.  At one location the weld connecting the tube steel brace to its gusset plate had failed due to poor weld quality (see exhibit C).

During the onsite investigation, every piece of rod bracing throughout the building was accounted for.  Some of the bracing was present and intact at the time of the collapse, some had been installed but then broke prior to the collapse, and some had never been installed.

The vertical diagonal rod X-bracing members used to stabilize the main columns could be seen in place from the base of the columns up to near mid-height of the columns; however, the upper section of vertical diagonal rod X-bracing which was indicated extending from mid-height of the column to the top of the main rafters had not been installed at any of the bays (see exhibit D). No failures of the vertical diagonal rod X-bracing were observed.

The horizontal diagonal rod X-braces near the top flange of the rafters were observed in place.  Many of the bracing members had broken or buckled. It was determined that two of the diagonal rod braces had broken prior to the collapse.  Based on the locations where they were found in relation to their installed position in the structure, it is evident the rods

broke and then someone moved them to their final location before the collapse.  A collapsed roof purlin was observed on top of one of the broken braces (see exhibit E). Further investigation showed that none of the horizontal diagonal rod X-braces located along the ridgeline had been installed. As shown in exhibit F it is clear a brace had been installed on the righthand side but none had been installed on the lefthand side. The braces at the ridgeline had not been installed at the time of the collapse. Exhibits G & H show every piece of diagonal rod X-bracing supporting the rafters and frame columns. The braces shown in green were still in place in the rafters and columns while those in red had never been installed. The two dashed red lines indicate the original installed location of the two pieces of horizontal diagonal rod X-bracing which broke prior to the collapse and had been moved.

The cable bracing in the lifting support detail was observed to have failed at numerous locations throughout the structure. At one location, it was seen that the cable had not failed, instead the welds connecting the cable seat to the horizontal compression strut had failed due to improper welding (see exhibit I). At all other locations where the cables could be seen to have failed, the failure was due to the cable breaking at the high end where it passed through the hole in the knife plate. It could not be determined which cables failed first. At several locations the cables had been replaced by come alongs and straps (see exhibit J).

It was easily seen that the main rafters had been inadequately braced and had buckled sideways to the south. It was not possible to determine which rafter started to buckle first. Since all the rafters were interconnected by the roof purlins, once one rafter started to buckle it pulled the other rafters out of line. As the rafters buckled they lost their capacity to support the vertical load from the weight of the structure and the building collapsed.

**Steel Building Systems (SBS)**

The pre-engineered metal building drawings included as part of the Permit Set submitted to the City of Boise were dated 8/6/23. This set was stamped by the pre-engineered metal building Engineer of Record, Joseph B. Speck, P.E./S.E. of Walker Structural Engineering P.C. Subsequently, modifications were made to numerous drawings and an Install Set dated 12/5/23 was issued. The copy of the Install Set was not stamped by the engineer of record, nor by the Boise City Building Department.

In his deposition (SBS deposition pgs. 17 & 21), Andy Speck, owner of SBS, indicated he designed the Jackson Jet Center Hangar through the use of a Metal Building System program. He input the information which the program used to design the building. He then added "Then an engineer looks over it and makes sure everything is correct and then adds to it, if needed, or whatever, like that." He indicated that he hired Joseph Speck of Walker Structural Engineering P.C. as the engineer.

SBS prepared the Permit Set for the pre-engineered metal building portion of the project which was then sent to Joseph Speck, P.E. / S.E. who reviewed and stamped the drawings and structural calculations. Subsequently the drawings and calculations were included with drawings from the architect and other consultants and submitted to the City of Boise, Planning and Development Services and a building permit was issued. The pre-engineered metal building drawings and calculations submitted as part of the permit application were indicated "For Permit" and were dated August 6, 2023. Sometime after preparing the Permit Set, SBS revised the input for the pre-engineered metal building and prepared an Install Set. The dates on the individual drawing sheets of the Install Set range from August 6, 2023 to October 9, 2023 with the majority being dated September 26th or 28th 2023.

Andy Speck indicated in his deposition (SBS deposition pg. 50), there were three major changes between the Permit Set and the Install Set:

1. The location of the flange braces;
2. The rafter to column connection changed from vertical to horizontal;
3. The addition of a full extra bay of diaphragm bracing.

In a detailed comparison of the two sets of drawings, the following items were found relating to the above noted items:

1.  In addition to changing the location of the flange braces, the number of bays with tube steel braces at frames 3, 4, 5, 6, and 7 was reduced from four bays to three bays and the number of tube steel flange braces indicated in each of the bays was reduced from 14 pairs of tube steel X braces to 12 pairs of tube steel X braces (see exhibit K). In addition, the Permit Set indicated four flange braces A–FB1.5x1/8 standard detail and four flange braces B–FB2x1/8, none of which are indicated on the Install Set.  The Install Set, however, indicates eight LS–1 (or 2) lifting supports consisting of a pair of cables between the top and bottom flanges of adjacent rafters and a 3x3x1/8 tube steel between the bottom flanges of the same rafters.  The size of the tube steel braces was larger in the Install Set but cumulative affect of adjacent braces was lost.

2.  The change of the rafter to column connection from vertical to horizontal introduced a hinge point which was not present in the full height column condition.  This generally requires additional bracing to stabilize the members above and below the connection point.

3.  While the addition of fourth bay of diaphragm (rod) bracing is generally beneficial, in comparing the two drawing sets it is important to note that the size of the braces at the most critical location, close to the columns, was reduced in size from 1" diameter to ¾" diameter.  Thus, the total area of the braces in the critical areas dropped from about 2.35 in$^2$ in the Permit Set to about 1.77 in$^2$ in the Install Set. The Permit Set had about 32.7% more area of steel rod bracing than the Install Set (see exhibit L).

4.  In addition to the above changes, every frame (the combined rafter and columns) in the Install Set was redesigned and weighed less than the same frame in the Permit Set.  Less weight means less steel and therefore less cost.  The total weight difference in all the frames between the Permit Set and the Install Set amounted to 5,384 lbs.

It is not the intent of this report to evaluate if the changes made were adequate from an engineering standpoint but rather to indicate the quantity and significance of changes and

show that every frame column and rafter was modified.  It is also important to note that these changes were not reviewed and stamped by the pre-engineered metal building engineer of record nor approved by the City of Boise.  Thus, the building provided by SBS was not in compliance with the building permit which was issued.

In the Install Set, SBS provided the Lifting Support Detail (see Exhibit P). The purpose of the detail is to keep a pair of rafters plumb during the erection process. It consists of two diagonal cables which run from each rafter bottom chord to the top chord of the other rafter in the pair as well as a compression strut connecting the bottom flanges of the rafters. The high end of each cable is attached to the corresponding rafter by threading the cable through a hole in a knife plate welded to the top flange and web of the rafter. This detail is problematic in at least two ways.  First, at the high end, the cable brace threads through a hole in the steel plate which has a hard corner, resulting in a stress concentration point in the cable. The cable failures observed on site resulted from the cables breaking at the knife plate due to the connection configuration. This deficient design resulted in numerous cables breaking during erection process which allowed the rafters to shift out of plumb and was a significant factor in the collapse. The second problem with the detail is there is no way for the installer to know if the cable is properly installed or what the tension is in the cable. The drawings give no indication of the appropriate tension to be applied to the cable. If a rafter is out of plumb and the contractor attempts to square it up by tightening the long cable, the tension in the shorter cable will also increase making the both cables more susceptible to breaking. Based on text messages between Big D and SBS, at least five cables broke during the erection process in the day prior to the collapse (see exhibit M). Three broken cables mentioned in the text at 2:23 PM and at least two more indicated in the 5:21 PM text referencing more cables cutting in two). Early in the erection process the eye bolts used at the connection at the low end of the cables in the lifting support detail started to come apart and fail. Andy Speck in responding when informed of this texted "Ya. I didn't take into account lifting forces. Dang ok." (see exhibit N). If the lifting forces were not included in the design of the eyebolt, it is likely these forces were not included in other elements of the detail including the diagonal cables and the horizontal compression strut.

SBS fabricated the bracing (SBS deposition pgs. 119-120). The connection of at least one of the tube steel braces failed due to poor weld quality (see exhibit C). The low-end connection of one of the cable lift braces failed due to lack of fusion of the welds at the joint to the HSS3x3 compression strut (see exhibit I). Poor quality welds resulted in a weaker bracing system than anticipated. When the welds connecting the bracing elements failed, the braces no longer stabilized the rafter they were intended to support, resulting in an increased likelihood of the rafter experiencing horizontal buckling.

On the evening prior to the collapse, SBS participated in a series of texts regarding the failure of at least five cables in lifting supports. SBS knew of the critical nature of these bracing elements. They did not communicate to Big D the need to stop the erection until the problems could be corrected and that failure to do so could result in collapse of the structure. Further, they knew or should have known that erecting the final rafter would impose more load on the braces which remained thus increasing the likelihood of a collapse.

SBS was, in my opinion, negligent in the following ways:

- By significantly changing the Install Set from the Permit Set, the steel structure SBS provided was not in compliance with the building permit.
- By providing the lifting support detail in the Install Set which was deficient in its design and contributed to the failure of numerous essential bracing cables.
- By providing several bracing members with welds which were of poor quality (at least two of which failed) eliminating any stabilizing effect from those braces.
- After becoming aware of the numerous bracing failures, by not informing Big D of the need to stop the erection process until the cause of the bracing failures could be determined and appropriate corrective measures taken.

**Walker Structural Engineering P.C.**

Joseph Speck represented Walker Structural Engineering as the engineer of record for the pre-engineered metal building structure and was responsible for the proper design of the structure. In addition to the Permit Set, communications between Walker and SBS clearly indicated Walker Engineering was involved in the preparation of the Install Set even though it was not stamped by Joseph Speck (SBS deposition pgs. 60-61 and exhibits 49 and 53) .  The Install Set provided the Lifting Support Detail (see exhibit P). The purpose of the detail is to keep a pair of rafters plumb during the erection process. It consists of two diagonal cables which run from each rafter bottom chord to the top chord of the other rafter in the pair as well as a compression strut connection the bottom flanges of the rafters. The high end of each cable was attached to the corresponding rafter by threading the cable through a hole in a knife plate welded to the top flange and web of the rafter. This detail is problematic in at least two ways.  First, at the high end, the cable brace threads through a hole in the steel plate which has a hard corner resulting in a stress concentration point in the cable. The cable failures observed on site resulted from the cables breaking at the knife plate due to the connection configuration. This deficient design resulted in numerous cables breaking during the erection process which allowed the rafters to shift out of plumb and was a significant factor in the collapse. The second problem is there is no way for the installer to know if the cable is properly installed or what the tension is in the cable. If a rafter is out of plumb and the contractor attempts to square it up by tightening the long cable, the tension in the shorter cable will also increase making the both cables more susceptible to breaking (see exhibit O). Based on text messages between Big D and SBS, at least five cables broke during the erection process in the day prior to the collapse (see exhibit M). The remaining cables were insufficient to fully brace the rafters and allowed them to shift out of plumb. This was a significant factor in the collapse of the structure.

Walker Structural Engineering P.C. was, in my opinion, negligent in the following ways:
- By failing to review and stamp the Install Set, which differed significantly from the Permit Set.
- By designing or approving the lifting support detail in the Install Set which was deficient in its design and resulted in numerous essential bracing cables failing.

**Big D Builders (Big D)**

Big D Builders was both the general contractor for the project, as well as the steel erector. The following information regarding Big D, their personnel, and their experience both as a company and individually is based on statements given by Dennis Durrant, owner of Big D Builders, during his deposition (Big D deposition pgs. 9-10,14-15, & 32-33). It has not been independently verified for this report. On this project, Dave Stark was the designated job site superintendent and Craig Durrant was the designated steel superintendent. While Dennis Durrant did not have formal training, he had about 30 years of experience in the industry. He is the sole owner of Big D. Dave Stark had only been working for Big D for about one year but had previously worked for a different company as the superintendent on a $100 million hospital project in Montana. Craig Durrant had worked in the industry for about 25 years and had extensive experience.

It was estimated that Big D had completed about 300 projects in the past 30 years, some as large as 1 million square feet. The largest span project indicated was a hangar in Boise for Sky West, which had a span of 363 feet. For the Sky West project, Big D was the steel erector but not the general contractor.

As an experienced contractor Big D was very familiar with the permitting process and knew or should have known that significant changes to the building design necessitated the proposed changes be submitted to the building department for review and approval. The changes between the Permit Set and the Install Set certainly were of such quantity and significance as to require resubmittal to Boise City Building Department. Since the Install Set was not stamped by the engineer of record, Big D should have required a stamped set for resubmittal to the city.

Per Mr. Durrant's deposition (Big D deposition pgs. 87-88), Big D had complete control and responsibility over the erection of the steel structure including the use of temporary bracing or guy wires as well as the sequence in which the bracing elements were installed. When Big D erected the Sky West hangar, guy wires were utilized as temporary bracing to provide additional stability during the erection process. On the Jackson Jet hangar, Big D decided not to use guy wires but rather to erect the rafters in pairs (Big D deposition pg 135). In utilizing this method, Big D knew or should have known, the bracing between the

rafters was critical in keeping the rafters plumb and stable. When installing the horizontal and vertical diagonal rod X-bracing which is essential to keep the rafters from buckling, Big D chose to install only that bracing which could be installed to each half rafter section prior to lifting the section into place and connecting each half together at the ridge line. As a result of that decision, there was no horizontal rod X-bracing which crossed the ridgeline providing the necessary bracing across the two halves (see exhibits F & H). In addition, no vertical rod X-bracing was installed from mid column height to the top of the rafters to complete the load path from the horizontal rod X-bracing down the vertical rod X-bracing to the foundation (see exhibits D & G). Based on their experience and expertise, Big D knew that a complete system of diagonal rod X-bracing across the entire building and from the top of the columns down to the foundation were critical for maintaining stability of the structure. At the time of the collapse, there were not any bays where the horizontal and vertical diagonal rod X-bracing had been fully installed. This was an intentional, deliberate, and reckless choice by Big D which was in my professional opinion a major factor in the collapse of the structure.

During the erection process on January 30th at 2:23 PM MST the following texts were sent between Craig Durrant, Dennis Durrant, and Andy Speck (see exhibit M).

Craig: The bracing failed on this last pick

Dennis: Cables?

Andy: How many?

Craig: 3        It's pulling the other rafters further out of plumb

Andy: I'll be back there in 10 mins

The next text to the group was sent about three hours later at 5:21 PM MST

Craig: Andy it's getting worse. More cable braces are cutting in two. It's now 18" in 40'

Andy: What is going on? Do all the frames follow the same pattern?

Andy's next text was the following morning at 7:10 AM MST

Andy: It is the difference in frame weights. Deflection, and size, the bracing works but only when both frames are deflected. How did it end up last night? Maybe taking out the top 2ea side LS beams until frame 1 deflects more? I can also fab some tube steel members asap to act as stronger braces?

Based on these texts it is clear that by shortly after five the evening of January 30th, at least five cables i.e. essential diagonal braces in the lifting support detail, had broken. Since both diagonal cables are required to make the system effective, there were only 17 out of the original 24 lifting braces that were fully effective in keeping the rafters plumb and stable. Furthermore, since there was no interconnection between pairs of rafters, if all the failures occurred on the same rafter pair, that pair would have lost 62% of the bracing required to keep it plumb and stable. At this point Craig Durrant knew, based on his years of experience and expertise, that the structure was in trouble.

Edgar Garcia in his 2/2/24 witness statement describes his conversation with Craig in their end of the day meeting (see deposition exhibit 25).

"I asked Craig if you want me to come in late on Wednesday so he could talk with the engineer. Craig stated "no, that Inland should be onsite at 0730 to be rigged up by 0800.""

Thus, in spite of the fact that Big D knew that critical bracing had broken and was therefore not properly bracing the structure and keeping the rafters plumb, Big D decided to proceed with the erection. Rather than correcting the dangerous conditions caused by the bracing issues, Big D opted to erect the final rafter, increasing the load on the remaining bracing members which had not failed.

In his text on the morning of Wednesday, January 31st, Andy Speck proposed making some stronger braces to correct the dangerous situation but Big D did not wait; Inland Crane was rigged up to the final rafter by 8 o'clock on the morning of the 31st.

After the final lift was completed three of the four cranes were released and left the site. At about 4:54 that afternoon as Big D workers were attempting to bring the rafters into plumb, an additional bracing member broke and the structure collapsed.

In my professional opinion, Big D acted willfully and recklessly by:

- Failing to install a complete bay of vertical and horizontal diagonal rod X-bracing in any bay prior to erecting the final rafter and releasing the cranes.
- Failing to replace and or strengthen the cable braces that had broken before proceeding to erect the final rafter and releasing the cranes.
- Failing to ensure all rafters were plumb and stable prior to releasing the cranes.

As general contractor and erector, Big D was completely responsible for maintaining the stability of the structure throughout the erection process.  Based on their years of experience and expertise, Big D knew the structure was in a precarious state but proceeded to worsen the condition by placing the final rafter and releasing the cranes supporting it. This reckless action was a major contributor to the collapse of the structure.

**Weather Conditions**

On the day of the collapse, it is estimated that sustained winds of up to 28 miles per hour with gusts of up to 38 miles per hour were experienced at the site (see deposition exhibit 6).  While this may exceed the wind speed allowed for safe use of much of the erection equipment, the building structure itself should have been braced to resist the load resulting from the wind.  ASCE 37-14, Design Loads on Structures during Construction, published by the American Society of Civil Engineers, indicates a structure under construction should be able to resist the load from a wind speed equal to 0.75 times the design wind speed (ASCE 37-14 section 6.2.1). Since the design wind speed for the hangar building was 102 mph, the building should have been braced to resist loads due to about a 75 mile per hour wind. Therefore, in my profession opinion, while the wind may have been a contributing factor in the collapse it was not the main cause of the collapse.

## Conclusions

- In my professional opinion, the collapse was the result of the willful, intentional, and negligent actions of Walker Structural Engineering as described above.

- In my professional opinion, the collapse was the result of the willful, intentional, and reckless actions of Steel Building Systems as described above and that the death of the plaintiffs was proximately caused by the willful and reckless acts of Steel Building Systems.  This report contains clear and convincing evidence that Steel Building Systems' officers and employees engaged in conduct knowing that injury or death to the plaintiffs was substantially likely to occur.

- In my professional opinion, the collapse was the result of the willful, intentional, and reckless actions of Big D Builders as described above and that the death of the plaintiffs was proximately caused by the willful and reckless acts of Big D Builders.  This report contains clear and convincing evidence that Big D Builders' officers and employees engaged in conduct knowing that injury or death to the plaintiffs was substantially likely to occur.

- All opinions in this report are rendered to within a reasonable degree of engineering certainty and are based on my knowledge, experience and education in the field of engineering. In addition, all opinions are supported by records generally accepted by the professional engineering community.

- I reserve the right to change my conclusions or amend my report should additional information become available after the preparation of this report.

# EXHIBIT A



Collapsed structure showing lateral buckling of main rafters.  Picture has been cropped for clarity.

# EXHIBIT B



Failure of connection of column to foundation due to bolt fracture and tearing of base plate.

# EXHIBIT C



Weld failure due to poor weld quality
at connection of tube steel brace.

# EXHIBIT D



No vertical diagonal rod X-bracing installed at upper section.

# EXHIBIT E



Diagonal Rod Bracing which
broke prior to the collapse
and was moved to another
location in the building.



# EXHIBIT F



Main rafter near ridge line of building.  The diagonal
rod X-bracing on the right side was clearly previously
in place while no bracing was ever installed on the left
side.

# EXHIBIT G



Vertical diagonal rod X-bracing at sidewall grid A.  Green lines indicated bracing installed before the collapse, while red lines indicate bracing not installed.



Vertical diagonal rod X-bracing at sidewall grid A.  Green lines indicated bracing installed before the collapse, while red lines indicate bracing not installed.

# EXHIBIT H



Horizontal Diagonal Rod X-Bracing in roof plane.  Bracing shown in green was installed and present at time of collapse.  Bracing shown in dashed red had been installed but broke prior to the collapse.  Bracing shown in solid red was not installed.

# EXHIBIT I



Weld failures at lift cable bracing
lower end connection.



# EXHIBIT J

Some of the come alongs observed, used to replace cable bracing which broke prior to the collapse.



# EXHIBIT K



Tube steel bracing configuration as indicated in the Permit Set (image combined from pages 5 and 6 of Permit Set).



Tube steel bracing configuration as indicated in the Install Set (image taken from page 6 of the Install Set).

# EXHIBIT L



| 1" Ø | 3/4" Ø | 5/8" Ø | 1/2" Ø | | 1/2" Ø | 5/8" Ø | 3/4" Ø | 1" Ø |

| 2.37 | 1.32 | 0.93 | 0.6 | | 0.6 | 0.93 | 1.32 | 2.37 |

Permit Set



| 3/4" Ø | 5/8" Ø | 1/2" Ø | 1/2" Ø | 5/8" Ø | 3/4" Ø |

| 1.76 | 1.24 | 0.8 | 0.8 | 1.24 | 1.76 |

Install Set

Horizontal Diagonal Rod X-Bracing in roof plane per the Permit Set (top) compared to Install Set (bottom). Diameter of rods are shown above the plan, while the total cross-sectional area of the effective braces (in sq. in.) is shown below.

# EXHIBIT M



Text messages between Craig Durant, Dennis Durant, and Andy Speck on Tuesday, Jan. 30, the day prior to the collapse.



# EXHIBIT N



Text messages between Craig Durant and Andy Speck on Friday, Jan. 19 regarding eye bolts at lifting support braces.



# EXHIBIT O



Figure showing diagonal cabling where rafters are out of plumb (meaning not vertical).  If Cable B is tightened to bring the rafters back into plumb (represented by red line B') Cable A must stretch (as shown by the increased length of red line A') resulting in increased tension.

Note that the degree to which the rafters are out of plumb has been exaggerated in this figure to emphasize the principle discussed.

# EXHIBIT P

## LS-X / LIFTING SUPPORT DEATAIL



Lifting support detail provided by SBS and Walker Engineering on page 6 of 12 on the Install Set.