# EXHIBIT B

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO


NANCY XOL RAX, individually, and on    )

behalf of her minor daughter DS;       ) Case No.

ZULEYMAN R. LOPEZ, on behalf of her    ) 1:24-CV-00319-

minor son JS; GLORIA TZI, and PEDRO    ) BLW

SONTAY, JUAN SONTAY, and MARTHA        )

SONTAY, as individual heirs of         )

MARIO SONTAY,                          )

And                                    )

INGRID SUSANA BOTZOC TZI, DORTEAO      )

OCH, EMILIANO COC CHUB, and            )

EMILIANO COC OCH, as individual        )

heirs of MARIANO COC,                  )

                    Plaintiffs,        )


(Caption continued next page.)

DEPOSITION OF STEVE CALL

March 11, 2026


Job No. CS7941217

REPORTED REMOTELY BY:

AMBER S. WILLIAMS, C.S.R. No. 1080

Notary public

Page 2

vs.                                          )

 STEEL BUILDING SYSTEMS, LLC, INLAND   )

CRANE, INC.,                                 )

                    Defendants.        )

                                             )

Page 3

THE DEPOSITION OF STEVE CALL was taken on behalf of the defendants via videoconference, commencing at 10:06 a.m. on March 11, 2026, before Amber S. Williams, Certified Shorthand Reporter and Notary Public within and for the State of Idaho, in the above-entitled matter.

APPEARANCES:

For Plaintiffs via videoconference:

SERNA & ASSOCIATES, PLLC

BY:  ENRIQUE G. SERNA

950 West Bannock Street, Suite 1100

Boise, Idaho  83702

enrique@serna-associates.com

JANE GORDON LAW

BY:  JANE GORDON

1004 West Fort Street

Boise, Idaho  83702

jane@janegordonlaw.com

Page 4

For Defendant Steel Building Systems, LLC, via

videoconference:

GORDON REES SCULLY MANSUKHANI, LLP

BY:  MEREDITH L. THIELBAHR

BY:  GRACE MALDONADO

999 West Main Street, Suite 100

Boise, Idaho  83702

mthielbahr@grsm.com

For Defendant Inland Crane, Inc., via

videoconference:

BETTS, PATTERSON & MINES, P.S.

BY:  JAMES D. NELSON

One Convention Place

701 Pike Street, Suite 1025

Seattle, Washington  98101-3915

jnelson@bpmlaw.com

                              I N D E X

TESTIMONY OF STEVE CALL                                    Page
    Examination by Ms. Thielbahr................     6
    Examination by Mr. Nelson...................    74


                              EXHIBITS

Exhibit 1.    Notice of Deposition of Steve.....     6

              Call

Exhibit 2.    Expert Declaration of Steven......     9

              Call

Exhibit 3.    Supplemental Expert Declaration...    10

              of Steven Call

Exhibit 4.    Photo of Rafters.................    27

Exhibit 8.    Exhibit C, Photo of tube steel....    66

              brace

Page 6

STEVE CALL,

first duly sworn to tell the truth relating to said

cause, testified remotely as follows:

EXAMINATION

BY MS. THIELBAHR:

Q.    Good morning, Mr. Call.  My name is
Meredith Thielbahr.  I represent one of the
defendants in this case, Steel Building Systems, LLC.
I'll often refer to them as SBS.  I am going to
introduce as Exhibit 1 just the notice of your
deposition.  I like to do this on these virtual
depositions just to make sure it's introduced
correctly, you see it, and then that will kind of get
us in the rhythm of exhibits in a virtual world.  So
hold on.

MS. THIELBAHR:  And then, Counsel, I'm just
going to do Exhibit 1 unless you have an objection to
that.

MR. SERNA:  I have no objection.

(Exhibit 1 marked.)

Q.    (BY MS. THIELBAHR):  Okay.  Mr. Call, in
the "Marked Exhibit" folder on Veritext, you should
now see Exhibit 1 called "Notice of Deposition of
Steven Call."

Do you see that?

Page 7

A.    I do not.

Q.    Okay.  Are you in the Veritext Exhibit --

A.    No.  How do I get into that?

Q.    Okay.  Let's go off the record.

(A recess was taken from 10:07 a.m. to 10:11 a.m.)

Q.    (BY MS. THIELBAHR):  Okay.  So, Mr. Call, my name is Meredith Thielbahr.  I represent SBS in this case.  I want to go over briefly the rules of a deposition and then also just talk about the logistics of a remote Zoom deposition.

Have you ever had your deposition taken before?

A.    No.

Q.    Okay.  And we'll get to that a little bit in your CV.  I believe in this deposition, counsel for yourself is Enrique Serna, counsel for Plaintiffs is Enrique Serna and Jane Gordon.  I believe my associate, Grace Maldenado, is here -- she wont' be participating; I will be handling it -- and then James Nelson for Inland Crane.

Am I missing anybody?

Okay.  So from time to time, your counsel, whether it's Enrique or Jane, may object.

Page 8

That's fine.  I will pause and let them note their objections for the record.  Unless they instruct you not to answer, you need to still answer my question.

Do you understand that?

A.    Yes.

Q.    Okay.  And obviously, we're on a Zoom Deposition, but the court reporter is still taking everything down for a written transcript, so nonverbal answers like nodding won't be formally recorded.  So let's just do our best to answer verbally with a yes/no.

Does that make sense?

A.    Yes.

Q.    Okay.  And although this is a Zoom deposition, I'm not having it video-recorded, so there's no pressure on that if you need to look away or you're reading something.  That's not being video-recorded; we're just appearing via Zoom.

Does that make sense?

A.    Yes.

Q.    And I have no problem if you want to take a break.  All I ask is that you don't ask for a break while a question is pending.

And this is a standard question, it kind of sounds weird, but is there any reason that you

Page 9

wouldn't be able to give truthful or accurate testimony today?

A.   No.

Q.   Okay.  Is there any medication that you are on that would impair your ability to understand my questions or answer correctly?

A.   No.

Q.   Okay.  And what did you do to prepare for your deposition today, if anything?

A.   I reviewed my report; I reviewed the information provided in the rebuttal by Zachary Stutts; I've reviewed the deposition of Andy Speck, reviewed photos of the -- that I took of the collapse, and reviewed briefly -- reviewed the expert witness depositions -- or, reports rather provided by Eckstine, the crane expert, and by Bria -- I believe it is the weather expert.

Q.   Okay.  Thank you.  I am introducing Exhibit 2.

(Exhibit 2 marked.)

Q.   (BY MS. THIELBAHR):  If you go the "Marked Exhibits" folder, you should see that now. And I don't think I'm going to ask you about this, but do you recall did you have an initial expert declaration and then do a supplemental declaration?

Page 10

A.   No.  I did a single report.

Q.   Okay.  Does this pleading, though, itself look familiar to you?  It's not your report; it's just a pleading with your CV.

A.   I believe that this was compiled in discussion with Enrique.

Q.   Okay.  What's the date on this pleading? If you -- I can tell you it's on page 4.

A.   June 27th, 2025.

Q.   Okay.  I'm uploading another exhibit, so bear with me.

(Exhibit 3 marked.)

Q.   (BY MS. THIELBAHR):  Okay.  You should now see Exhibit 3 in the folder.  This looks like almost similar/identical to Exhibit 2, but it says "Supplemental Expert Declaration."

Do you know the date on this pleading?

A.   Let me see.  Mine is still loading.

Q.   Okay.

A.   The date that I see on that is June 30th, 2025.

Q.   So three days later?

A.   Yes.

Q.   And if you scroll down -- and we'll go through it -- it's got your CV and your full report.

Page 11

So is this the operative report that you've issued in this lawsuit?

A.   Yes.

Q.   Okay.  All right.  Well, this will be the exhibit we come back to the most.

A.   Okay.

Q.   So when were you first contacted about this case?

A.   I don't remember the exact date.  It was about the 19th or 20th of February 2024.  It was a few days before our first visit to the site.

Q.   Okay.  So it wasn't -- do you recall the date the collapse occurred?

A.   Yes.  That was January 31st, 2024.

Q.   Okay.  So you probably went to the site sometime near the end of February?

A.   Yes.  It was -- I believe it was the 24th of February.

Q.   Okay.  And when Counsel contacted you, what was the explained scope of your engagement for this lawsuit?

A.   It was to determine why the building had collapsed, and associated with that, who was -- what -- who was at fault.

Q.   Okay.  And we can -- we'll go through it

Page 12

when we go through your report, but what -- and correct me if I'm using the wrong nomenclature. You're a structural engineer.  What type of analysis did you do as far as -- I know you said you did site visits -- any sort of forensic analysis, like modeling?  You know, I know you said you take photographs.  What do you do for a case like this when you're doing your engineering analysis?

A.    Okay.  In a case like this, the -- I reviewed the documents that were prepared by SBS and their structural engineer, the calculations associated with that analysis.  I do not have access to the proprietary software that they used to design that, so I am -- I don't have the same access that they would have.  But I reviewed the documents that they prepared and reviewed the compared those documents to what we observed on the site.

Even though it had collapsed, there was -- we were able to determine elements that had portions -- members in the building that had failed, members that had just fallen, members that were present, members that had not yet been installed.  So we compared the condition of the building against the design drawings.

Q.    Okay.  So when you say the "proprietary

Page 13

software that SBS had," are you referring to the modeling software that was cited in Zach Stutts' report?

A.   No.  It appears that Zach Stutts ran some type of separate analysis.  There is software that is used by the designer that would be used by SBS to determine the -- where they would input the load and put in sizes or configuration of the members, the beams and columns, bracing and so on, and it would then analyze the structure.

And typically, this type of software -- I haven't seen their software so I don't know exactly how the interface is -- but typically this type of software will indicate any areas that are overstressed, that don't meet code requirements, and then they would make adjustments to the size of the members, how thick the steel plates were or the frequency of braces, a variety of things like that until they come up with a design that the -- according to the computer analysis, meets all code requirements.

Q.   Do you know what the name of that software is?

A.   I do not.

Q.   Okay.  And have you ever --

Page 14

A.   I don't know whether it is generally available.  Frequently software like that is licensed to a company by another company, and for them to be able to prepare the drawings and -- oftentimes, there's a relationship between those two companies, but I -- I do not know the name of that software.

Q.   Okay.  And you've never used that software, you said?

A.   I have not.

Q.   Okay.  And then if we look at page -- I'm looking at Exhibit 3 and I'm looking at page 2 of your -- the actual Supplemental Expert Declaration, so -- the pleading portion of this document.  And I know we touched on this briefly.  It says, "I have not provided any testimony at trial or depositions."

So are you referring as an expert or in your personal capacity, like in a private lawsuit or either or both?

A.   Either.

Q.   Okay.  So you've never testified as an expert at trial?

A.   Correct.

Q.   And you've never given a deposition before as an expert?

A.   Correct.

Page 15

Q.   Okay.  And paragraph 7 you said, "I personally inspected the hangar site three times after it collapsed."

If you don't know exactly, that's okay, but do you remember the dates of those inspections?

A.   And again, I'm going off of memory.  I did look it up previously so I'm pretty sure on this date.  I might be off by a day or two.  But February I believe it was 24th or 25th, May 9th, and June 5th I believe it was.

Q.   Okay.  And do you recall generally on those three visits was there a certain purpose?  I imagine the February, the initial visit, was to just gauge the entire site and see its existing state, but then as far as May and June, did you have a reason for each of those three visits that you can summarize?  Were you looking at something specifically?

A.   Yes, okay, you're correct.  The first visit in February was much more limited.  At that point, they -- the stability of the wreckage was still somewhat questionable and so they gave us a lot of warnings.  So we were very careful on what we were doing, where we were going.  It was basically very general in nature.

Page 16

The second and third visits -- and I -- we were looking at specific elements.  I believe it was on the third visit we identified every piece of bracing that was or had been attached to the building structure, and we knew that the bracing, based on the configuration of the building when it -- in the collapsed shape, we could tell that there was an issue with bracing.

And so we identified every piece of bracing that had been installed, locations where there was missing bracing.  There were locations where there were -- was bracing that had failed prior to the collapse, and we -- we were going through and identifying each piece.

Q.   Okay.  And when you say "bracing" -- and we'll talk about this -- do you remember what type of bracing?

A.   Okay.  There are basically -- we could divide it up into three types of bracing:  There is the vertical bracing on the two short sides of the building, and that is bracing -- is made up of solid steel rods of various sizes; then there is horizontal bracing that extends between the top flanges -- or, very close to the top flanges of the main beams or rafters.  Those terms I will tend to use those

Page 17

interchangeably.  Those are the large horizontal members that span between the columns on each end. So that's the second type of bracing.

The third type of bracing is to brace the bottom flange of the -- of that rafter, or beam. As we are -- get close to the columns -- that bracing was made of steel tubes, hollow steel tubes.  As we get further towards the center of the building, the center of the rafter center span, those were the -- made of cables, and that was the lift -- lifting detail that they provided.

So there's -- and the bracing, each one has a different purpose, but overall, bracing -- the purpose of bracing is to hold the member in its proper place both vertically and horizontal.

Q.   Okay.  And then the next -- starting in paragraph 3 of Exhibit -- excuse me -- paragraph 13 of Exhibit 3, you get into summaries of your opinions.  Let's skip that for now --

A.   Okay.

Q.   -- and let's go to your CV which I think is on page 8 of 49.  49 is the entire, you know, PDF size.

A.   Okay.

Q.   So it looks like you're a licensed

Page 18

structural engineer; is that correct?

A.   Yes.

Q.   And can you -- I don't want to walk through you education history.  Can you just explain to me what your college degree and any postcollege certifications or degrees are in?

A.   Okay.  My bachelor's degree is in mathematics.  I then studied architecture for three years.  I did not have the creative flair.  My buildings would have been -- would have looked -- stood out really well, but they would have been really ugly.

And so I left I switched from architecture to structural engineer.  I went to the University of California Berkley and earned a master's of engineering at UC Berkley, which is -- the master's of engineer is their two-year thesis degree, and my degree was in structural engineering and mechanics of materials.  "SEMM" was the acronym that they would use.

One of the requirements of the SEMM two-year degree was to have three -- or, nine credit hours of what they call nontechnical breadth, and what they recommended for that was -- for structural engineering was either classes in mathematics or

Page 19

architecture.

Well, I told them I had a bachelor's degree in mathematics, including a number of upper-division classes, and similarly, in architecture, I had a number of upper-division classes. So I asked can I waive that requirement and take additional engineering classes, so they said yes.

So I have three additional engineering classes -- elective engineering classes above and beyond what would be typical for the master's of engineering program.

While there, I was also a teacher assistant in the -- under the steel design professor and did my research in -- my master's thesis testing and research on steel connection design. In fact, with connection, that is one of the most common utilized in the United States.

Q. Okay. And it looks like you have your license -- your engineering license in Idaho, Nevada, Washington, and Virginia.

A. Yes. I have not -- currently, I do not have -- I have not renewed my license in Washington as I haven't practiced there, and I am in the process of -- I am approaching retirement, and so I'm in the

Page 20

process of winding down.

Q.   Well, congratulations.

A.   If I survive things like depositions and so forth, then I will make it to retirement.

Q.   Maybe this will be your first and last deposition.

So if we go -- your CV is broken down into sections.  We've got your professional experience, notable investigations, select design projects.  So is the notable investigations -- is that where you would have listed, like, your, you know, retained expert evaluation such as the case here?

A.   Yes.

Q.   Okay.  So you've got three listed. You've got "Structural Design Deficiencies" in Sun Valley, Idaho, "Insurance Dispute" in Boise, and the third one is "City of Boise Structural Building Permit Reviews"; is that correct?

A.   Yes.  I believe that I did an additional -- well, let me back up.  For the City of Boise, we were hired for a four-year engagement as a consultant to them to perform structural plan reviews to verify code compliance.  So that was an ongoing -- I don't recall.  I have no -- there were dozens of

Page 21

projects that we reviewed as a part of that consulting contract.

The others -- the other two that I mentioned -- and there was a third -- we were hired by the Idaho Board of Professional Engineers and Professional Land Surveyors to investigate complaints that had been filed against engineers -- structural engineers to review their work product and discuss the validity of any complaints, the one in Sun Valley to determine if there were errors and omissions in the drawings.

The second one was an engineer had filed a complaint against the engineer hired by an insurance company regarding a claim. And so he disagreed with the engineer -- the insurance company's engineer and filed a complaint against them. And so I was evaluating his -- what he was claiming as well as the evidence presented by the insurance company's engineer to -- and report it to the board of engineers on these complaints.

Q. Okay. So for the Sun Valley project, it looked like that was a project, you know, structural documentation review for code compliance.

A. Yes.

Q. Okay. And what was the dispute in

Page 22

Boise, the insurance dispute?

A.   There was a partial failure of a building.  The owners of the building filed a claim, and the insurance company denied the claim.  The -- it was the year in Boise where we received an unusually large amount of snow.  So they were claiming that the partial failure was a result of the snow.

The investigation revealed that the failure had been the result of an ongoing issue, that the owner had actually gone in and undermined a wall, changing it from a typical foundation system to a retaining wall system and that that had been part of why the failure had occurred.  That -- the failure had started significantly earlier, and therefore it wasn't the result of the snowstorm.

And the local engineer disagreed and said that, you know, because of what they -- their statements that they were -- got meeting the standard of care required of an engineering firm.  And my findings were that they had been -- had very definitely met their responsibilities, they had been very thorough in their analysis, and that there was -- there was no problem with what they had done; that, in fact, the local engineer was the one who

Page 23

hadn't performed a thorough investigation.

Q.   Okay.  And then the third one I think you touched on initially, your four-year review for the City of Boise, that it looked like, again, it was a project review for compliance with applicable building codes.

A.   Yes.  That was not for a single building; that was for multiple buildings.  So when the building was submitted for permit, they had -- I believe at that time they had either two or three engineering firms that they would use, and so any time a building was submitted for permit that was of any size, they would send it to one of those three firms.

We were one of the three firms, and so we would see maybe two or three a month.  And so we would review those for code compliance and report back issues, then the engineer of record of the building would respond, make corrections, modifications, as required to bring the design into code compliance, and then, basically, when all of the issues had been resolved, we would indicate that to the city so that the permit could be issued.

Q.   Okay.  Have you -- I know in your first page, your professional experience says that you've

Page 24

conducted structural failure evaluations.  What projects have you -- what assignments have you done an evaluation of a structural failure?

A.   The -- the structural failures, there was a residence that had a partial -- it had not collapsed, but the walls had pulled away several inches from the supporting roof structure.  That was one that we did.

We did a -- let's see.  I'm trying to -- I can't think of another failure analysis.  Typically it is -- it has been during the design process checking for code compliance.

Q.   Okay.  Have you ever used any sort of 3D modeling for a structural failure or collapse?

A.   No, not for the -- not for collapse.  We've done it for design.  And so we know what requirements are there to make the building -- for the building to stand up.

Q.   Have you ever done any design or, you know, forensic -- like a civil structural failure analysis, like, for a hangar that was involved here, prior to that lawsuit?

A.   No.

Q.   Have you ever done any analysis for a pre-engineered metal building or structure?

Page 25

A.   I have done the foundation design for the -- for pre-engineered metal building structures. I have not done the design of the superstructure, the steel portion.  I have reviewed those and have on occasion required -- on one occasion determined that the superstructure had deficiencies and required that those be -- that the design be modified to account for -- for those and change to correct those deficiencies.

Q.   And what -- was that listed on your CV, or is that a separate project?

A.   That's a separate project.  Basically, that was a -- early on in my career I was actually employed by another engineering company, and typically the superstructure is not reviewed by the foundation engineer.  They have their own engineers that they hire that is responsible to review the design.

This was an unusual case because the building was part of a campus.  And so we were asked to review the structural engineer -- the structural design of the steel superstructure, and there was a connection of the bracing, it turns out, that didn't look adequate to me.  And so I asked them to provide documentation -- or calculations that was adequate.

Page 26

Excuse me.

It went back and forth.  They said this is industry standard, this is how we always do it.  I said I'm not approving it until you can show me by the numbers that that works.  Again, back and forth.

Finally, I responded, and -- and you've got to remember this is 20-plus years ago so I don't remember exact things.  But, in general, what I said was either you provide me calculations or I will design a connection that I can show by the calculation that works and you'll have to use that.

Finally, after I believe it was more than two months, they sent back revised drawings and said, "We found some research," and they had, in fact, had to modify the connections so that they were code compliant.

That's been the only time that I have had to specifically review a pre-engineered metal building superstructure.

Q.   Okay.  And then just to confirm, like a pre-engineered metal building, whether it's the foundation of a superstructure, other than this lawsuit, you've never done a post collapse --

A.   Correct.

Q.   Okay.

Page 27

A.   Now, if I can add on to that, there is not a significant amount of difference between a pre-engineered metal building and a typical steel structure except as from the design standpoint. Except the -- probably the software is -- that's typically used is somewhat -- is a little bit different, but the design principles are the same.

Q.   Okay.

A.   The methodology is different, and who provides what materials is generally somewhat different.

Q.   Okay.  I'm going to introduce a few photos from your report as separate exhibits, so just give me a couple of minutes.

A.   Okay.

Q.   Okay.  Can you -- if you pull up Exhibit 4, you should see that in there now.  It's called "Photo of Rafters."

(Exhibit 4 marked.)

THE WITNESS:  Yes.

Q.   (BY MS. THIELBAHR):  So I'll represent to you that this is an exhibit in your report.  Does that picture look familiar to you?

A.   Yes.

Q.   Did you take this photograph, do you

Page 28

know, or was it in some of the files you looked at?

A. I did not take that photograph.

Q. Okay.

A. I do not -- it was a -- it was taken I believe using a drone, and special permission had to be received to -- as I understand it, to utilize the drone there at the airport.

Q. Okay.

A. I do not recall where I obtained this picture from.

Q. So I know you said -- going back -- you visited the site three times, and for some of that you were looking at the bracing that's remained intact. Did you take any sort of accounting or index from those site visits in what you did?

A. Yes.

Q. Okay. Would that be in your expert file?

A. It is in the report.

Q. Okay. You mean you just drafted it within the context of the report?

A. No. The -- in one of the exhibits -- let's see. Exhibits G and H specifically, so...

Q. Is this the red and green comparison?

A. Yeah.

Page 29

Q.   Okay.  But did you actually like --

A.   We actually identified every one of these braces.  Any of the green ones were still touching -- were still in the -- in their -- the holes provided for their attachment to the rafters. The ones in red were not -- either had never been installed or had been installed, had broken previous to the collapse.  And -- and we knew that because they had been moved and were now underneath portions of the collapsed structure.

So their positions showed that they just hadn't fallen out of the hole but had actually been moved to a position.  So they must have broken prior to the collapse.

Q.   Okay.  And can you explain to me what -- the function of rod bracing?

A.   Okay.  So the rod bracing -- in this building, there's -- there's the two -- two types of rod bracing:  There's a vertical and there's a horizontal rod bracing.  The purpose of it is to hold -- basically to keep the rafters in their proper position.

You can see from Exhibit A that the centers of those rafters have moved.  They aren't in line with the columns.  They've moved sideways on the

Page 30

order of 20 to 30 feet.  So it is -- I'm trying to do this in a way that it's not having to be an engineering lecture.  That bracing, in order for that to move sideways, it -- back to your basic math:  The shortest distance between two points is a straight line.  So as that tries to move sideways, it is -- the distance increases, so that would mean that the bracing would have to be stretched which would -- in which the steel doesn't want to stretch.  It takes a force to do that.  So it's going to pull that back and -- and to hold that in its proper place.

If it moves sideways, it loses its load-carrying capacity -- which is what happened here:  It moved sideways, lost its load-carrying capacity, fell to the ground and pulled the supporting columns inward, again, as you can see from the Exhibit A, from the photograph.

Q.   And rod bracing is a permanent --

A.   Yes.

Q.   So do you know in this instance who was responsible for the rod bracing?

A.   Responsible in what aspect?  SBS was responsible for the design of the rod bracing.

Q.   And what makes you think that?

A.   That's part of the design of the

Page 31

building.  That -- anything that is permanent is part of the engineer of record -- engineer -- structural engineer's responsibility to design that.

Q.   Right.  And are you aware that SBS was not the structural engineer of record of this project?

A.   Yes, I am aware of that.

Q.   Okay.  Do you know who was?

A.   Yes.  Walker Engineering.

Q.   Okay.  And then do you know if -- who installed the rod bracing?

A.   Yes.  Well, Big D was the -- active as the general contractor and as the erector.  Now, may I elaborate on your question as to who designed the rod bracing?

Q.   Absolutely, if you feel like you need to.

A.   Okay.  SBS prepared the design drawings. They then -- including the design of the rod bracing. They then submitted those to Walker Engineering who reviewed and stamped those.  So the -- the inputting everything into the computer program, the sizes of all of the elements, how they were configured, that is what SBS did.  The computer chews on all of that, performs the analysis, then a -- there's an output

Page 32

that gives the -- the results, the stress levels, and so forth, of the various members that the engineer reviewed along with the -- so, he reviewed the calculations, along with the drawings, and he then stamped the drawings and calculations.

But the initial design -- or -- or -- of where those occurred, the sizes and so forth were input into the program by SBS.

Q.   So in your opinion, what do you think was wrong?  I am aware of your red and green analysis of, you know, the existing state of the structure when it collapsed, right?  Obviously, some of the rod bracing was installed, some of it wasn't.

What was your issue with the rod bracing as designed or manufactured -- whether it was on SBS or Walker, we can agree to disagree -- but what -- with respect to it being an installation issue versus something that was in the control of SBS, what do you take exception with with the actual rod bracing material?

A.   I do not take any exception with the rod bracing material.  In fact, I -- I state in my report that the -- what I take exception with is SBS -- so there were -- there were two sets of drawings that were prepared:  The permit set was prepared, and the

Page 33

date on that, it was prepared and submitted to the city -- I believe it was submitted on -- or, it was stamped by the engineer on August 6th, 2023.

The second set of drawings was the set that was used for installing the -- for the fabricating and installing the -- or, erecting the building, for fabricating it. This would have been the configuration that the actual building was built using, and that was dated -- the final set, there are various dates on it, but there's dates of 9/26/23 and 10/06/2023.

The exception -- the problem that I have with that, with respect to the rod bracing, is SBS had a stamped engineered set of drawings. They changed significantly those drawings in the subsequent set without that -- without those drawings being reviewed and stamped by the engineer.

In my opinion, that in and of itself is negligent to have -- to make a change -- a significant change without having that change reviewed and stamped by the engineer of record. Because SBS is not -- they aren't engineers. They have no training in engineering, they aren't licensed. And so to make the types of changes that they made, to me that was one of their negligent

Page 34

acts. And I -- one of the changes that they made was the -- dealt with the horizontal rod bracing in the -- up near the top flange of the rafters.

(Exhibits 6 and 7 marked.)

Q. (BY MS. THIELBAHR): So can you explain to me -- I introduced as Exhibits 6 and 7 the permit set and the install set if you need to look at them, but can you explain to me the function of a permit set versus an install set?

A. The permit set is submitted for the purpose of obtaining a permit so that it is reviewed by the city. They, actually, in this case sent that out to a licensed engineer -- an engineering firm that had licensed structural engineers who reviewed it for potential issues to make sure -- reviewed it to make sure that the loads and designs were -- were in compliance with code.

The install set is -- basically should be basically the same as the -- or, should be the same as the permit set, but it won't include things like "What are the loads?" Well, the contractor doesn't care what the loads are. The engineer needs those loads to determine if they were proper loads and so forth, but the contractor doesn't need that information.

Page 35

So there is information that is included in the install set -- or, I'm sorry, I misspoke.  The information that is included in the permit set that is not included doesn't need to be included in the install set.  There may also be additional instructions on the install set that's not included in the permit set.

For example, the install set may give an order of doing things or may give them other instructions.  The engineer in reviewing those -- the city -- and -- and preparing the issue with a permit, the engineer reviewing for that purpose, he is not evaluating what's happening during construction how are they going to build this, are they going to put this piece up first or this piece up first.  That is what's called "means and methods," and that is the responsibility of the contractor and his subcontractors, of which SBS would be a subcontractor or a supplier and subcontractor.

So there are -- there's different information on those two sets, but the configuration of the building should be the same.  If it's changed significantly, then the engineer that reviewed that for the city -- that review is meaningless if the size of members, location of members, and so on and

Page 36

so forth has been changed -- then what he reviewed is not what they're building, and so that, in and of itself, is problematic.

Q.   So what -- with respect to the rod bracing, are you saying was incorrectly or just changed between the permit set and the install set?

A.   Okay.  The install and -- let me see. Okay.  Exhibit L, if we were to look at that, the install -- the permit set showed three lines of bracing, and the install set -- so that had four lines of bracing.  However, the bracing in the install set was smaller than the bracing in the permit set.  So they've changed the locations, they've changed the sizes and -- and the configuration.

Because in the permit set, these lines of horizontal bracing lined up with the vertical bracing at the ends.  In the install set, they did not necessarily -- there's one line of -- of this bracing that doesn't have a lot -- vertical bracing at the ends of that.  What effect does that have? That should be reviewed by an engineer to make sure that these -- that the changes that they made were not problematic.

So I'm not -- and then I said this

Page 37

specifically in my report.  I'm not saying that the -- the bracing was improperly designed by SBS; I'm saying they changed an engineered-stamped set without having that -- those revisions reviewed and stamped by the engineer of record.  And that fact alone is in my opinion an act of negligence.  That's why any building -- any commercial building is required by state law to be -- it's my understanding it's state law, it's governed by the state -- is that it has to be stamped by the licensed engineer.  It can't just be done by -- by just anyone.

Q.   Okay.  So if we go to page -- because you just -- if we go to page -- I'm on Exhibit 3 now, and I'm going to go by the PDF numbers because it's easier -- 23 of 49 where you focus on your discussion of steel building systems.  Do you see that?  It's page 11 of 37 of your probation report.

A.   Exhibit 3?

Q.   Page 23 of 49.  It's where you start discussing SBS.

A.   Yeah, I'm waiting for it to load.

Q.   Okay, no rush.

A.   Okay.  What page did you say?

Q.   Page -- it's where you start talking about steel building systems, page 23 of 49, and you

Page 38

got about four pages there dedicated to SBS before you get into Walker.  Do you see that?

A.   Yeah.

Q.   Okay.

MR. SERNA:  Meredith, is that Exhibit 3?

MS. THIELBAHR:  Correct.

MR. SERNA:  All right.

Q.   (BY MS. THIELBAHR):  So, Steve, if you look at the bottom after 4, which is page 24, you say, "It is not the intent of this report to evaluate if the changes made were adequate from an engineering standpoint but rather to indicate the quantity and significance of changes and show that every frame column and rafter was modified.  It is also important to note that these changes were not reviewed and stamped by the pre-engineered metal building engineer of record nor approved by the City of Boise.  Thus, the building provided by SBS was not in compliance with the building permit that was issued."

So that first sentence, can you clarify for me the scope of your evaluation?  Because I think is what you just said is, look, there were exchanges with -- between the permit set and install set, one of them being this rod bracing.  And we can talk about that, but are you noting the significance of

Page 39

the changes made --

A.   I am --

Q.   -- were the cause of the collapse or are you just saying it was negligence which is a legal term for them not to be reviewed and stamped?  I'm just trying to understand the scope of your opinions.

A.   Right.  Okay.  So as far as -- what I'm saying is that I do not have the -- I did not review them to determine "Is this revised design adequate?" I reviewed it -- or, I said the purpose of this -- these comments is to say they made -- they -- their -- just the fact that they changed them was a negligent act.

Q.   Okay.  So you're not saying like -- let's look at paragraph 1 on page 24, and I -- I'm trying to kind of summarize your opinion.

So there you talk about the location of the flange braces, right?  The reduction from four bays to three bays?

A.   Right.

Q.   Are you noting that that was a change, just a step one, from the permit set to the install set, correct?

A.   Yes.

Q.   And you're saying the size of the tube

Page 40

steel braces was larger in the install set -- which I think if I'm understanding you, that's maybe not an issue -- but you're just noting the fact that that change was made and wasn't reviewed by the engineer of record?

A.   That's -- that's what I am noting in this section of the report, yes, that these four -- these four items were specific changes that were made that were not minor.  They were significant changes that, because of the how major of changes that they were, they should have been reviewed by the engineer of record.

Q.   Okay.

A.   That the -- the act itself of making that change without having that reviewed and stamped by the engineer of record was an negligent act.

Q.   Okay.  So --

A.   Whether it was contributory or not, that that was -- that act, in and of itself, was negligent.  We know that the bracing was inadequate because the building collapsed.  Now, the discussion of what -- which "relative negligence" is a different issue -- that, you know, there are multiple parties that were negligent.  To say that this party's negligence was different, you know, I mean, they --

Page 41

they did have different responsibilities in the design and construction process, but SBS did not fulfill its responsibility of -- both in design, because it made changes, and it did not provide the -- the building.  It basically provided the -- the steel that they -- that -- the fabric of the erector then just bolts together.

Q.   Well -- but can you say -- you just said you -- we know the bracing was inadequate because it collapsed, but do we know that?  I mean, wasn't it supposed to be temporarily secured by certain players on the site?  I mean, it wasn't fully erect.  It was one thing if the thing fell over in its complete stage, right?

A.   Right.

Q.   Is there some forensic or structural analysis that you did to say the bracing in itself as designed, whether it was in the install set or the permit set, was not adequate because it collapsed?  Can we actually make that conclusion?

A.   Yes.  By the shape of the -- by the shape of the collapse, we know that the bracing that was there at the time of the collapse was not adequate.

Q.   Well, it wasn't fully installed, right?

Page 42

A.   It was not fully installed, that's correct.  And I point that out in my report that it was not fully installed.  And so -- and so that's why I said I'm not evaluating whether SBS made the -- whether their design -- I'm not saying that their design was incorrect but the fact that they changed it.

I -- I -- I don't know if there was a problem so they -- they put in -- they had three -- originally had three lines of -- of rod bracing. They switched it to four, but they kept three lines of bracing at the ends.  Did that contribute?  Was that fourth line of bracing that wasn't connected at the ends, was that fully active?  I -- I can't -- I don't know that.  The --

Q.   So what you're -- when we go through these bullets -- and we'll go through them and I don't want to keep you here all day -- because I definitely want to understand them, it sounds like what you're saying, you're noting the changes, but you didn't do the analysis to determine whether it was the but-for cause of the collapse.

A.   Whether the change was the cause of the collapse?

Q.   Yes, correct.

Page 43

A.   Correct.

Q.   So do you know -- and let's go through them one by one just so we have a clear record and I understand your position.

So with respect to -- on page 24 of 49, you know, the -- you have the detailed comparison of the two sets -- the following items were found related to the above-noted items.  The first one we talked about was the decision to changing the location of the flange braces, right?  The three bays versus four?

A.   Yes.

Q.   The last sentence there you say, "The size of the tube steel braces was larger in the install set but the cumulative affect of adjacent braces was lost."

I just want to understand what you mean by that last sentence.

A.   Okay.  There were -- there were fewer braces.  And in the permit set, there was a brace on either side of the bottom flange, a diagonal on either side, both of -- so there would be two braces that would resist or prevent that bottom flange from moving.

In the install set, there was a

Page 44

single -- as I recall, a single brace.  Let me -- I'm going to review the -- yes, in the install set there was just a single brace.  And so it would be two braces carrying the load versus one.  So you have the -- not only the size of brace but -- so it's carrying more load, but also the connections at the end points of that brace are carrying more load.

I mean, again, I don't -- I don't have the revised computer analysis for the install set to be able to make an evaluation.  I do know that in the original permit set, Walker Engineering highlighted and made specific notes and instructions in the calculations at -- for the connections of those braces.  So now we have a brace that's carrying a lot more load.  Were the connections for that brace adequate?  I don't know.  That information was never provided and does not appear to have been provided to Walker Engineering.

MR. SERNA:  Hey, very quickly, Meredith -- and I don't mean to interrupt any of you -- I'm about to chime out for about 15, 20 minutes.

MS. THIELBAHR:  Why don't we just take a break.

(A recess was taken from 11:22 a.m. to 11:45 a.m.)

Page 45

Q.   (BY MS. THIELBAHR):  Mr. Call, so let's -- we're coming back from a break.

Let's go back to page 24 of 49 of Exhibit 3, and we were talking about your first opinion in No. 1 on the change and location of the flange braces.

So just to clarify, I understand the changes that you made in the number of bays from three to four, and your position is that it was negligent for SBS or the engineer of record to not get those reviewed and approved, but you didn't do an analysis if that had anything to do with why the structure collapsed?

A.   Correct.  And it -- not -- not "SBS or the engineer," but SBS.  If the engineer made a change, they would stamp it.  And they're the ones that can -- they still should then -- they may need to resubmit that to the city.  But it's their -- once they stamp it, that's their work product.  They're responsible for it.  So they -- they could make changes, but SBS to make changes without the engineering or without the engineer reviewing them and stamping them is the part that I -- I believe is negligent.

Q.   Okay.  And do you know who -- who --

Page 46

well, we -- if it's easier to look through each one of those changes -- do you know if Big D requested this change or how this change came about from the permit to the install set?

A.   I do not.

Q.   Okay.

A.   I do not know how that change came about.  But the changes were made by SBS.

Q.   Okay.

A.   So...

Q.   But just like the permit set, the entire project -- obviously, they're contracted by Big D to put this thing together, right?

A.   Yes.

Q.   Yeah.  Okay.

A.   I believe the contract with SBS was between SBS and Big D.  That is my understanding.

Q.   And does -- who pulls the permit for the project?

A.   I do not know.

Q.   Okay.

A.   I know sometimes that is done by the architect; sometimes that is done by the general contractor.  I don't know who pulled the permit for this project.

Page 47

Q.   Do you know if whoever's responsible to pull the permit, that person, that entity, would be responsible for the city's review and approval of that?  Correct?

A.   That would be -- I'm not sure that I'm following your question.

Q.   Well, if Big D's the general contractor and they pulled the permit on the project, like, they're responsible to coordinate with the city to get it approved, right?  They got the permit?

A.   Well, they -- until it is -- they don't get the permit until it is approved by the city.

Q.   Okay.

A.   Yes.  So the city does whatever review it does, and then after that's all taken care of, then is when they get -- the permit is issued.

Q.   Okay.  And do you have any position on if there's changes to the drawing set that was permitted, if the city needs to review those and reapprove them?

A.   Different jurisdictions have different requirements.  That's why I -- I believe that there -- some -- some cities -- Las Vegas will if you change anything.  They need to see stamped by the engineer the change.  Boise City has not typically

Page 48

been that detailed on it.  But that's why I'm pointing out that these were not minor changes. These were significant changes, and that's why I enumerated the variety of them -- is to indicate the quantity and the significance of -- I mean, the types of changes were significant and the quantity of them was significant that the -- may have justified a revised permitting.

Q.   Okay.  But you didn't look at that specifically here?

A.   No.  That's a judgment call that the city would make --

Q.   Okay.

A.   -- if they were to be asked.

Q.   Okay.  And as far as the -- I understand why you highlighted the -- what you considered more significant or the magnitude of the changes from the -- the permit to the install.

Is there a code or threshold or something that tells you that why they're so significant?  Like, why would it -- why would another change that was made may not be on your list?  Like, what tells you that those are significant?

A.   It's a judgment call.

Q.   Okay.

Page 49

A.   And so to me, the changing the --
this -- the quantity of bracing, the location of
bracing, and the size of bracing is -- that's -- that
is -- the bracing is very significant in
pre-engineered metal buildings, and so those changes
would be significant.

Changing the connection, I mean, the --
of the rafter to the supporting columns, those are
the main connections holding everything in place for
the gravity load.  So that is -- I felt like was very
significant.  And so it is a judgment call, however,
but I -- there were a lot of changes.

Q.   Okay.  So the next one, if you look
at No. 2, you say, "The change of the rafter to
column connection from vertical to horizontal
introduced a hinge point which was not present in the
full height column condition.  This generally
requires additional bracing to stabilize the members
above and below the connection point."

So what change was made that you're
summarizing here from the install to -- excuse me --
the permit to the install set?

A.   Okay.  Under the original design, the
columns, which is the vertical member and the
rafters, which is the horizontal member, the column

Page 50

extended up to the top of the rafter and the rafter was bolted to the side of the column.  That was the original install -- or, the original permit set.

In the install set, the column has a continuous upper piece stopped at the bottom of the rafter.  The rafter extended over the top of the column and was bearing -- it was sitting on top of the column.  Now, Mr. Stutts in his rebuttal indicated that this was a moment connection, which is correct.

In the plane of the frame itself, the rafters and columns, if I'm looking in the direction of that, then this is a moment connection.  But if I'm looking in the direction normal to that, it is a pinned connection.

So there's subtlety there that Mr. Stutts overlooked.  Did SBS consider that?  Well, I would be surprised if they did because that is a very subtle difference.  That is the type of thing where the engineer of record would be expected to look at that and review and analyze is that a problem for this building to have that change made or is there something else that we need to do because of that change.

So that's the type of thing that is the

Page 51

difference between a designer -- what is expected of a designer and a licensed engineer -- is the more subtle effects that may come into play that may not have been considered.

Q.    And you did not do a rebuttal report, correct?

A.    Did not do a rebuttal to Mr. Stutts' rebuttal.  I did not.

Q.    His opening report, yeah?

A.    I did not receive a copy of the -- of his rebuttal until earlier this week.

Q.    Okay.  And as far as the change with the rafter to column connection, you noted the change, but you didn't do any sort of forensic structure analysis of whether it contributed?

A.    That's correct.  On any of these four points, I did not do any additional analysis to say whether or not they were contributory.  All I did was use them as examples to show that there were a lot of changes and they were major changes.

Q.    Okay.  Because like the last two, 3 and 4, one has to do with the -- you know, the extra bay I think it was.  Like you said, it was 32.7 percent more area of steel rod bracing than the install set. That's just an observation?  You're not saying --

Page 52

A.   That is correct.

Q.   Okay.

A.   That is an observation only.

Q.   And then the same with the weight?

A.   Yes.

Q.   Okay.

A.   That's an observation only.  I am not saying that and have not contended that in these elements their design was not code compliant, their design was deficient or so forth in these examples. Now, when we discuss the lifting detail, that's a different -- that's a different story.

Q.   Okay.  Are you referring to your "Summary of Findings"?  If you go back up -- I don't think you discussed them specifically with respect to SBS, at least not down where we were just looking at. But if you go to page 14 of 49 where you talk about -- where you say, "By providing a Lifting Support Detail on the install set which was deficient in its design and contributed to the failure of numerous essential bracing cables," is that what you're referring to?

A.   Yes.  And that's in the summary.  And I discuss it in more detail on page -- actually on page 25 of 49.

Page 53

Q.   Oh, you're correct; I'm wrong.  So where you say "SBS provided the Lifting Support Detail (see Exhibit P)"?

A.   Yes.

Q.   So can you unpack that a little bit? What -- I know these lifting support details are an issue that's been brought up, but what is your opinion of what happened here?

A.   Okay.  The -- all of the bracing -- the purpose of bracing is to keep everything in its proper position.  The lifting support detail was added after the permit set.  It was -- it was added to the install set.  Again, its purpose is to -- they would lift the rafters in pairs and brace them off against each other so that they were more stable when they were in place, and the lifting support detail was a critical part of that system that would hold those two rafters in the proper position with respect to each other, that they wouldn't be too close together, too far apart, and so forth.

So there is -- and I describe that -- I describe the detail in the first part of this and then describe what I see, what I observed on the site.  There were two types of failures that I observed on the site of the lifting support detail.

Page 54

By far, the most common was at the top where it connects to the top of the rafter.  The cable threaded through a hole in a plate that was welded to the rafter and then was knitted back into the cable itself as the connector, and what happened is -- typically the -- with a cable, it is threaded through an eye bolt which is smooth and round.  That's what they used at the lower end.

But at the upper end, they chose to thread it through the -- the plate which has sharp corner around by -- by -- a 90-degree corner.  So that's going to be what bears first.  The cable will bear first on that corner and will get what's called a "stress concentration," and that is where these cables broke.

In the locations that we observed where the cables broke, that was where they broke.  If we would have two cables forming an X between the pairs, one of those cables will go into tension, the other cable, if we had tubes, it would go into compression. But a cable can't resist any compression, so you have the tension member only that's active.  So if one the tension cables broke, the other cable would be -- would remain in tact because it would have been going into compression so there would be no force on that

Page 55

in that cable.

And we saw that throughout that.  One -- in the X-bracing, one cable would break, the other would be still fully connected.  We also saw in at least two locations where the cable was underneath the rafter, and the rafter in the collapsed state was on top of the cable.  That indicates that the cable had to have broken -- or did not break as a result of the fall.  The cable was broken first, went underneath the rafter, and then the rafter hit the ground.

And so a lot of -- many of the cables did break as a result of the fall, but we know that there were a number of them, both from what we observed on the site as well as from communications from January 30th, that a lot of these cables broke prior to the January -- on/or prior to January 30th.

So the -- in my opinion, the design of that lifting cable -- or, lifting detail was defective.  Rather than using the typical eye bolt, which would give us a smooth rounded surface for that cable to support that cable -- for that cable to bear against, we had these corners that introduced the stress concentrations.  So that was one problem with that lifting detail.

Page 56

Second problem is if we compare that detail to braces that were included, the plate braces that were included in the original set, in the permit set, those consisted of a flat piece of steel, a flat bar that had bolt holes in it.  That had a certain -- that forced the rafters to be in a certain configuration with respect to each other to be able to put the bolts in.  It separated them by a certain distance and -- and properly positioned those.

With this lifting detail, it's threaded through, and then the cable is attached at the low end to an eye bolt and threaded back onto itself, and then the nut that attaches that eye bolt to the bottom flange of the rafter, by tightening that, it stretches the cable and induces a -- a tension force there.  There is no way to -- no practical way that I can think of to determine when that cable is properly tensioned or if it was overtensioned.

So from a design problem from a design standpoint, there were problems with the detail, but also from an installation and erection standpoint, there was not a way of determining if the cable was properly installed.  The lifting cables failed.  We know of, based on the text messages that went back and forth on the 30th of January, there that there

Page 57

were at least five of those cables that are reported to have failed.  And -- and -- and by "failed," I mean they snapped.

So there is -- if -- if one cable were to -- were to fail, that might -- I might say, "Well, there's a misinstall there," okay.  I'm a little bit concerned.  If five cables fail, that says -- that really makes me think there's a problem.  As an engineer, if that was my project, I would say, "There's a problem here.  What's going on?"

And investigating that, like I say, the design of the connection itself was not in accordance with industry standard and was inappropriate and partially contributory to the collapse.

Q.   Do you know who requested the lifting support detail?

A.   No, I do not.

Q.   Okay.  Is that -- are the lifting support details temporary or do they stay in the building?

A.   They -- if they are only for lifting -- if their only purpose is for lifting, then once the lifting is completed, they would not be required.  However, the original design had some -- had flat-bar bracing.  It's similar to some of the similar

Page 58

locations as the lifting cable which leads me to believe that bracing of the bottom flange of the rafters was required.  That's generally required if there is uplift due to a major wind event.  You could think of this roof as a giant airplane wing, and as there's wind over the top, it will -- there will be upward pressure on it.  And so there would be -- rather than the typical downward force, there's an upward force, and that bottom-cord bracing is critical for existing -- to stabilize the bottom cord in the event of an uplift situation.

So the -- again, I haven't run the analysis on that.  I do know that they were called for -- the flat-bar bracing was called for in the original permit set.  These appear to have replaced -- because that -- that callout was removed between the permit set and the install set, and the lift bracing detail was included.

So I believe from that that they were utilizing these to replace the flat-bar bracing.  So it would have been in -- at those locations, it would have been permanent bracing for that purpose.  But in either event -- in either case, the fact that they -- SBS included it on their drawings makes it their responsibility even if it was only used for erection.

Page 59

It was their detail, their design.

Q.   But how do you know -- at the end of the day, isn't it -- it's still Big D's responsibility --

A.   No.

Q.   -- on that detail?

A.   Not to design the connection.  SBS provided the detail on their drawings; therefore it is their responsibility.

Q.   So you said a lot of these cables broke during the erection process as opposed to after the building collapsed, right?

A.   Correct.

Q.   But the purpose of these cables is to allow the rafters to stay so they don't shift out of place so they stay plumb, right?

A.   Correct.

Q.   So whose responsibility is it to not release those until they're plumb and safely secured?

A.   I didn't see anything that indicated that they could be released on the install set.  So those would not -- you wouldn't release those -- those cables.

Q.   Okay.

A.   And so that's why I say even though they may have been there as -- if their purpose was for

Page 60

the erection or if they were there as permanent bracing, either way, they included the -- SBS included that detail on their drawings, therefore they are responsible to make sure that that is adequate and that the detail is as properly designed and is adequate for the loads that it will carry.

Q.   Right.   But even if some of these cables broke during the erection process, Big D and Inland Crane are still responsible to hold this thing up until it's fully erect, right?

MR. NELSON:   Object to the form of the question.

THE WITNESS:   What's that?

Q.   (BY MS. THIELBAHR):   You can answer.

A.   They are responsible.   Big D is responsible to have everything in position to and until the building is fully stabilized and everything is in its place.   That is correct, that is one of their responsibilities.

SBS's responsible for the design that they provide on the -- on the drawings.   So if their design is faulty and the cable or the connection fails, then they have culpability for providing a faulty design, okay?   And so there is -- as I stated, I believe that there is negligence on the part of SBS

Page 61

for -- in this case for providing a design that is clearly faulty because it broke under the conditions that it was supposed to be used for, namely lifting and positioning.

So they provided that design, it's on their drawings, they're responsible for it.

Q.    And did you do any analysis if these lifting support cables breaking was the cause of the collapse?

A.    No, I did not do any formal analysis. However, the purpose of the cables is to hold them in proper positions.

Q.    Right.

A.    If those cables are not there, then -- and -- and SBS would know that these -- this bracing is required because if they pull it out in their analysis model, then there would be a warning or a -- some type of indication that the design fails.  So they know specifically which -- they designed that, put them in specifically to overcome certain, like I say, error messages or locations of overstress, to get that analysis model to run without any errors showing up.

So they knew that these are critical. They don't just put -- add in additional items just

Page 62

for the fun of it.  That costs them money, that costs the contractor money.  So one of the things that is generally done, particularly in pre-engineered metal buildings, is to try and minimize the amount of steel, and that's what these -- these programs are used for.  Because that's -- every pound of steel that you save after the contract is signed, that's money in SBS's pocket.

Q.  But you're -- you don't know that that's the reason here?

A.  No, I don't.  I'm not saying that is the reason that they made the change; I'm saying that they don't put in extra stuff just for no reason.

Q.  Right.  But your exception was that they added these after the permit said, so isn't your conclusion a bit contradictory?

A.  No.  They changed these for -- in the permit -- well, in the permit set, they had some permanent bracing shown.  The lifting detail I would assume is for resisting --

Q.  Erection?

A.  -- forces for when they're lifting.

Q.  Right.  So it could have been that they -- Big D asked them to give them that because Big D was having issues?

Page 63

A.   It could be.   But they included it on their drawings.   It's their detail.   It doesn't matter who asked them to provide it or what -- the fact that it is on their drawings makes it their responsibility --

Q.   Okay.

A.   -- I'm saying.

Q.   Okay.   Do you know if diaphragm rods -- if they would have been installed taught, would that have made a difference?

A.   Todd?

Q.   Like tighter?

A.   Oh, if they had been taught?

Q.   Yeah.

A.   Okay.   I did not see.   Because of the -- of the -- the collapsed condition, I could not determine if the rods were -- had -- had been properly tightened or not.   I do know that there were some of the diaphragm rods, the rod X-bracing, near the top of the rafters that had not been installed. I guess we could think of it as a house of -- house of cards:   Which one, if you pull out, you can cause a collapse, but -- when you pull some out, but if this one was -- if I had pulled out A first and then B, would it have collapsed?   Or what if C was there?

Page 64

I mean, I can't determine -- usually can't determine which was the card that was the one that broke the camel's back.  Well, all of them may have come into play.

Q.   Because I think one of your opinions was, at the time of the collapse, that Big D hadn't installed a significant portion of the rod.

A.   That is correct, yes.

Q.   And then -- let's see.

A.   Now, wait.  So along with that, though, the question then comes up:  If the cable bracing hadn't snapped, would the rod bracing that was present, would it have been adequate?

Q.   You don't know because you didn't --

A.   You don't know, that's what I'm saying -- is it's hard -- it's I would say nearly impossible to determine because there's interplay between these members.  So was the -- was the cable bracing the only issue?  Probably not.  Was rod bracing the only issue?  Possibly not.  There's interplay, and these were elements that we know failed prior to the collapse, putting the building in a precarious situation.

Q.   Well, we do.  But you would agree that Big D -- SBS was not contracted for the erection of

Page 65

this?  They are not the --

A.    That is correct.

Q.    That's -- you know --

A.    Right.  So they are not responsible for the erection.

Q.    Yeah.

A.    But they are responsible for the performance of this -- of the member of which they designed, and it failed in at least five places.  So that -- that's the -- that's one of my final points in my opinion -- is I say that I felt like SBS was negligent by providing the lift support detail in the install set which was deficient in its design and contributed to the failure of numerous essential bracing cables.

Q.    Okay.  And I think you have one more.  But, you know, you mentioned the bracing members with welds were of poor quality?

A.    Yes.

Q.    Did you do any forensic analysis -- and I think it's Exhibit C to your report.  I can introduce it.  Did you do any analysis of the welds, like structurally?

A.    No, I did not.  I did -- however, I am not a certified welder inspector.  I have had some

Page 66

additional training in weld inspection.  I took -- it was a multiday -- I'm got going to use the word "class" because it was almost a lab.  It was hands on.  We were performing inspections under the direction of a -- one of the local testing agencies, and they would -- so I do have knowledge in welding.

And the first inspection that is made on any weld, they emphasize "This is a visual inspection."  And by visually looking at that weld, we can see two things:  We can see that the weld is not -- is not uniform.  It's -- it's a very -- anyone who has looked at welds -- and I've looked at a lot of welds in my 36 years of experience -- you can very quickly see is this a good weld or a bad weld.  It doesn't -- you can't say are there imperfections in it or not without a more detailed inspection, but you can very quickly say this is not a good weld.

The other thing that I saw and is clear on the -- the details, there's Exhibit C.  There was also on -- I believe I include on Exhibit I we can see that there was a lack of fusion between the weld and the underlying steel.  It's most clear in --

(Exhibit 8 marked.)

Q.   (BY MS. THIELBAHR):  And I just introduced as Exhibit 8 your Exhibit C which I think

Page 67

you will say is an example of what you think was a poor weld. So if you want to pull that up --

A. Yes.

Q. Okay.

A. Let me pull that up. Okay. And so if we look at this --

Q. Correct me if that's wrong, that's the one you're referring to?

A. Okay. So you don't see uniformity of the weld thickness. We see a lot of variation there, but we also -- excuse me. If we -- if we look closely at this picture, we see that the -- the top of those welds are basically smooth which means that they did not fuse properly with the steel that they were attached to, therefore it's -- it's a poor quality weld.

The -- when -- the molten steel of the weld, it should actually melt the steel that it's being attached to and the two fuse together. We don't see that. Because we see that smooth surface on the top. If we looked at Exhibit I, you can't -- you almost can't even tell that there was ever a weld there. There's no -- almost no residual marks, whereas that should there -- should be weld metal there or a divot there where it pulled the weld metal

Page 68

out.  That would indicate that they had proper fusion.  We don't see that, so we know that the welds were poor quality.  And that's -- that's not by any type of analysis.  That is what we -- a visual inspection is just that you visually look at the weld, and that's all that is required by code for these types of welds -- is a visual inspection:  Did they have proper fusion, and we can see that these did not.

Q.   Do you know who was responsible for the welds?

A.   I do not.  I was told that SBS fabricated these members.  These were -- as I was -- based on what I saw of the drawings provided by MBCI, these were fabricated -- they were not fabricated by MBCI, that they were there -- that they were fabricated by SBS.  That was my understanding.

Q.   Okay.  And that analysis --

A.   And I believe that there was -- actually, let me go back and look.  As I recall that, I thought I saw in one of the deposition questions that, and I don't remember it.

Okay.  Let's see.  On page 14, on the 14th page of my report -- and I don't know what that is, that's probably about 26 -- I state, "SBS

Page 69

fabricated the bracing," and that is based on SBS Deposition pages 119 and 120.  So --

Q.    Okay.

A.    -- based on that, I would -- yes, I would -- I didn't see them fabricate it, but based on the deposition that they gave, I would say that they fabricate it and the bracing and these welds -- performed these welds.

Q.    Okay.  And you didn't do any analysis of whether -- I mean, do you know if these welds broke upon impact prior to -- or any analysis of whether they caused the collapse?  You just did a visual observation of them after the fact?

A.    I did a visual observation, and no, I do not know whether they failed as a result of the collapse or not.  I just stated that they were faulty welds.  They did not make the building -- they did not help the building stand up.

Q.    Okay.  And I don't know where it is in your report, but your opinion is the weather was not the cause of this collapse; is that correct?  Or do you?

A.    No, I didn't -- I didn't -- I don't believe I stated that.

Q.    It's on page 32 of 49.  It's not a large

Page 70

part of your opinion.  I just -- did you do any sort of weather analysis?

A.   I did not.  I am not a weather expert. I did not do an analysis, anything with the weather. There was not a -- I believe I could look and see.  I believe I -- I -- this is my understanding -- if you want me to, I might be able to find it, but buildings are supposed to be designed for certain loads during construction.  It is not assumed that it is a perfectly calm day.

Q.   Right.

A.   So I believe -- what I believe I said and -- is that it was -- the weather was not -- did not exceed the -- did not -- did not cause a greater load on the building than would have been required to have been designed for.  It wasn't like they had a hurricane while something was under construction. That -- the weather conditions did not exceed what should have been -- they should have been -- been able to withstand during construction.

Q.   And then on page 21 of 37, which is page 32 of the PDF, you have your conclusions.  They use a lot of legal terms.  You don't have a law degree, correct?

A.   No.

Page 71

Q.   Okay.  Did you draft this language into your report yourself or did your attorneys do that?

A.   I discussed with the attorneys and --

Q.   Okay.

A.   -- and there are certain terms that have -- I know have specific legal connotation or mean certain things legally, and -- just like there were certain terms in engineering, and so -- I know the engineering terms.  As we discussed them, they would -- they said, "These would be the appropriate terms -- legal terms to use for what you have described."

Q.   Okay.  But you don't know under applicable law what -- you know, what that would be, the standard for willful, intentional and reckless?

A.   There again, those were discussed, and I discussed what they did, what they didn't do and why I felt that this was a problem, and then based on that discussion, they -- Enrique told me what the appropriate legal term would be.

Q.   Okay.  Let me just check my notes really quick.  I think I'm done, but give me -- let's go off the record for one minute.

(A recess was taken from 12:35 p.m. to 12:36 p.m.)

Page 72

MS. THIELBAHR:  SBS does not have any further questions.

THE WITNESS:  May I make one clarifying statement?

MS. THIELBAHR:  Sure.

THE WITNESS:  Okay.  One other -- you know, we were talking about the bracing -- the cable bracing that failed.  The -- SBS is the most knowledgeable -- them and Walker Engineering are the two most knowledgeable about the bracing and what is required.  There was a -- there were texts sent between Big D and SBS where they discussed that these cable braces had failed and -- that a number of them had failed.  So my final conclusion of -- as far as SBS and their negligence is I believe that a -- in any project that I was involved with, if I had a member that failed, I would immediately be concerned. If I had multiple of those members, those same members that failed, I would immediately tell the contractor, "You've got to hold on.  I need to go back and look at this and see what the problem is because they should not be failing."

SBS knew that those were critical members.  SBS knew that they had failed, but they did not do anything to review -- at -- at least from the

Page 73

texts that went back and forth, they didn't ask where -- where in the building -- which ones failed, where were they located, were there any other members that failed. Those are part of the critical system. You've got to make sure that there are -- that those were all in place.

There was no instruction given to Big D to help them understand the critical nature of those members, and when they failed, to -- for them to go back and look and say is there a problem with this. In my opinion, they -- they ignored the problem even though it was part of their design. And a reasonable -- I believe that was unreasonable. I think the prudent thing would be to tell the contractor, "You've got to wait while I look at this. Don't add any more. Don't erect anything else because that will add additional load to these members. They're breaking now. I've got to look and see if there is a problem in the design."

That would be the prudent thing to do. They ignored that and ignored that their design was failing, and so that is I believe also a significant part of their negligence. Even though they are not responsible for the erection, they are responsible for their design.

Page 74

MS. THIELBAHR:  Okay.  I understand what you're saying.  I don't have any further questions.

MR. NELSON:  I have questions.  Is it my turn?

MR. SERNA:  Yeah, James.  Do you mind if we take a break real quick and then we come back to your questions?

MR. NELSON:  That would be great.

(A recess was taken from 12:40 p.m. to 12:45 p.m.)

EXAMINATION

BY MR. NELSON:

Q.   Mr. Call, my name is James Nelson and I'm one of the attorneys for Inland Crane.  Exhibit 2 is your first report, and I believe it's dated June 27, 2025; is that correct?

A.   It would be -- let's see.  I would have to look and see.  That is the -- I believe the preliminary.  The final report was dated 6/30/2025.

Q.   And that was my question:  What happened between June 27 and June 30 to cause you to issue a second report?

A.   I had -- and I'm -- I am entirely going off of memory here.  I believe that there was -- I had been informed that the -- that there was a

Page 75

preliminary that they wanted, you might say a "rough draft" of -- of what I had but that the final report would be issued on the -- on the 30th. So I sent a copy of where I was. I don't believe that there were major changes in findings, as I recall. I believe I modified some of the graphics and that type of thing, but I don't recall that there were any significant changes in the findings of my report.

Q. Okay. How many hours did you work between June 27 and June 30th on this report?

A. I do not know. I couldn't tell you. I don't recall.

Q. Do you keep time records?

A. I generally do in -- not as much as -- as I used to when I was an employee. I don't punch a time -- a time clock when I come in or when I leave.

Q. Can we turn to page 13 of Exhibit 3, please.

A. Okay.

Q. That's also labeled 8 of 37.

A. Okay. 8 of 37. Okay.

Q. It lists Big D builders, City of Boise inspector, and Inland Crane. It's part of your cast or characters, right?

A. Yes.

Page 76

Q.   And under Inland Crane, you say, "Any items regarding crane operations are outside my area of expertise, and therefore, outside the scope of this report."

Do you see that?

A.   Yes.

Q.   Does that remain true today?

A.   I am not a crane expert in any way, shape, or form.  I don't think that I have ever -- I don't recall ever being inside a crane, so I would be so far outside of my area of expertise that I -- yes, I -- that remains true today:  I am not any type of crane expert.

Q.   So you don't have any opinions about Inland Crane?

A.   No.  The -- the -- all I can -- all I can state or give my opinion on is that the building at that point in time, if I would have been there, I would have been very hesitant knowing that the various members had -- cables had snapped and so forth.  I would have been very hesitant to be in under the structure.

Q.   Okay.  A few minutes ago you were asked questions about weather, and would it be a fair summary of your testimony that, in your opinion, the

Page 77

weather did not cause the collapse?

A.   No, that was not what I was trying to allude to.  What I was trying to make clear is that the weather was not so extreme that it should not have been considered in the design of the structure, that there are requirements for a building under construction -- should -- doesn't have to meet 115-mile-an-hour wind speed requirements, but it does have to meet -- and I -- I don't know if this is the correct number, but let's say 65 or 85.  I don't know exactly what that number is, but that is for the structure itself.  That doesn't mean -- so what I was trying to point out with that is that the -- that should have been considered in the design of the structure, and -- and -- so it wasn't that, "Hey, this was beyond anything that we would have expected," they should have -- there should have been some expectation that the building would experience some wind under construction.  But conditions -- erection conditions before it was fully erected, that's where -- what I was trying to state with that.

Q.   I'm going to switch topics on you.

A.   One more.  I don't know -- I have heard that cranes have certain -- they can be used under certain wind conditions, and that under certain wind

Page 78

conditions, they shouldn't be. I have no idea -- that -- my comments had nothing to do with the crane because I don't know what those limits are for the crane. I -- I know what they are supposed to be for the building.

Q. Exhibit 3, your second report, is dated June 30, 2025, right?

A. Yes.

Q. What work have you done since then on this case?

A. It has mainly been reviewing other expert witness statements, and particularly of recent. I reviewed the rebuttal provided by SBS by Stutts -- I can't think of his first name -- their engineer, and that has mainly been the -- I've had very limited work that I've done on it since issuing the report except to refresh my memory in reviewing some of the -- a few of the -- the documents that I received earlier as well as some of the expert witness statements provided after.

Q. Okay. So besides the expert witness statements that were provided, expert -- or, afterward, that is after your report, you haven't reviewed any new information?

A. No.

Q.    Okay.

MR. NELSON:  I have no further questions, Mr. Call.  Thank you very much for your time.

THE WITNESS:  Thank you.

MR. SERNA:  Steve, I'm going to reserve any and all of my questions until the time of trial.  And I thank you for your time.  I don't know if Meredith or James have any further questions, but Plaintiffs have no questions of you at this time.

MS. THIELBAHR:  SBS does not.

(Deposition concluded at 12:55 p.m.)

(Signature requested.)

Page 80

REPORTER'S CERTIFICATE

I, Amber S. Williams, CSR NO. 1080, Certified Shorthand Reporter, certify:

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was put under oath by me.

That the testimony and all objections made were recorded stenographically by me and transcribed by me or under my direction.

That the foregoing is a true and correct record of all testimony given, to the best of my ability.

I further certify that I am not a relative or employee of any attorney or party, nor am I financially interested in the action.

IN WITNESS WHEREOF, I set my hand and seal this 24th day of March, 2026.

*Amber S. Williams*

AMBER S. WILLIAMS, CSR NO. 1080

Notary Public

1109 West Main Street, Suite 220

Boise, Idaho  83702

My commission expires June 1, 2027

Page 81

ENRIQUE G. SERNA, ESQUIRE

enrique@serna-associates.com

March 26, 2026

RE: Xol Rax, Nancy, Et Al v. Steel Building Systems, LLC, Et Al

3/11/2026, Steve Call (#7941217)

The above-referenced transcript is available for review.

Within the applicable timeframe, the witness should read the testimony to verify its accuracy. If there are any changes, the witness should note those with the reason, on the attached Errata Sheet.

The witness should sign the Acknowledgment of Deponent and Errata and return to the deposing attorney. Copies should be sent to all counsel, and to Veritext at erratas-cs@veritext.com

Return completed errata within 30 days from receipt of testimony.

If the witness fails to do so within the time allotted, the transcript may be used as if signed.

Yours,

Veritext Legal Solutions

Page 82

Xol Rax, Nancy, Et Al v. Steel Building Systems, LLC, Et Al

Steve Call (#7941217)

E R R A T A   S H E E T

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

PAGE_____ LINE_____ CHANGE_____

_____

REASON_____

_____   _____

Steve Call                                    Date

Page 83

Xol Rax, Nancy, Et Al v. Steel Building Systems, LLC, Et Al

Steve Call (#7941217)

ACKNOWLEDGEMENT OF DEPONENT

I, Steve Call, do hereby declare that I have read the foregoing transcript, I have made any corrections, additions, or changes I deemed necessary as noted above to be appended hereto, and that the same is a true, correct and complete transcript of the testimony given by me.

_____    _____

Steve Call                          Date

*If notary is required

SUBSCRIBED AND SWORN TO BEFORE ME THIS

_____ DAY OF _____, 20___.

_____

NOTARY PUBLIC

**[& - 9th]**                                                                    Page 1

**&**

**&**   3:9 4:11

**0**

**00319**   1:6

**1**

**1**   5:8 6:10,17
6:20,23 39:15
45:5 80:25
**10**   5:12
**10/06/2023**
33:11
**100**   4:6
**1004**   3:16
**1025**   4:14
**1080**   1:24 80:2
80:21
**10:06**   3:3
**10:07**   7:6
**10:11**   7:7
**11**   1:20 3:3
37:17
**1100**   3:11
**1109**   80:23
**115**   77:8
**119**   69:2
**11:22**   44:24
**11:45**   44:25
**120**   69:2
**12:35**   71:24
**12:36**   71:25
**12:40**   74:9

**12:45**   74:10
**12:55**   79:11
**13**   17:17 75:17
**14**   52:17 68:23
**14th**   68:24
**15**   44:21
**19th**   11:10
**1:24**   1:6

**2**

**2**   5:10 9:19,20
10:15 14:11
49:14 74:14
**20**   26:7 30:1
44:21 83:15
**2023**   33:3
**2024**   11:10,14
**2025**   10:9,21
74:16 78:7
**2026**   1:20 3:3
80:17 81:3
**2027**   80:25
**20th**   11:10
**21**   70:21
**220**   80:23
**23**   37:15,19,25
**24**   38:9 39:15
43:5 45:3
**24th**   11:18 15:9
80:17
**25**   52:25
**25th**   15:9
**26**   68:25 81:3

**27**   5:14 74:16
74:21 75:10
**27th**   10:9

**3**

**3**   5:12 10:12,14
14:11 17:17,18
37:13,18 38:5
45:4 51:21
75:17 78:6
**3/11/2026**   81:5
**30**   30:1 74:21
78:7 81:16
**30th**   10:21
55:16,17 56:25
75:3,10
**31st**   11:14
**32**   69:25 70:22
**32.7**   51:23
**32249**   80:20
**36**   66:13
**37**   37:17 70:21
75:20,21
**3d**   24:13

**4**

**4**   5:14 10:8
27:17,19 38:9
51:22
**49**   17:22,22
37:15,19,25
43:5 45:3
52:17,25 69:25

**5**

**5th**   15:9

**6**

**6**   5:4,8 34:4,6
**6/30/2025**
74:19
**65**   77:10
**66**   5:15
**6th**   33:3

**7**

**7**   15:1 34:4,6
**701**   4:14
**74**   5:5
**7941217**   81:5
82:2 83:2

**8**

**8**   5:15 17:22
66:23,25 75:20
75:21
**83702**   3:12,17
4:7 80:24
**85**   77:10

**9**

**9**   5:10
**9/26/23**   33:10
**90**   54:11
**950**   3:11
**98101-3915**
4:15
**999**   4:6
**9th**   15:9

| a | | | |
|---|---|---|---|
| **a.m.** 3:3 7:6,7 44:24,25 | **acts** 34:1 | **airplane** 58:5 | **appearances** 3:7 |
| **ability** 9:5 80:12 | **actual** 14:12 32:19 33:8 | **airport** 28:7 | **appearing** 8:18 |
| **able** 9:1 12:19 14:4 44:10 56:7 70:7,20 | **actually** 22:11 25:13 29:1,2 29:12 34:12 41:20 52:24 67:18 68:20 | **al** 81:4,4 82:1,1 83:1,1 | **appears** 13:4 |
| **above** 3:6 19:10 43:8 49:19 81:6 83:7 | **add** 27:1 61:25 73:16,17 | **allotted** 81:19 | **appended** 83:7 |
| **absolutely** 31:16 | **added** 53:12,12 62:15 | **allow** 59:14 | **applicable** 23:5 71:14 81:8 |
| **access** 12:12,14 | **additional** 19:7 19:9 20:21 35:5 49:18 51:17 61:25 66:1 73:17 | **allude** 77:3 | **approaching** 19:25 |
| **accordance** 57:12 | **additions** 83:6 | **amber** 1:24 3:4 80:2,21 | **appropriate** 71:10,20 |
| **account** 25:7 | **adequate** 25:24 25:25 38:11 39:9 41:19,24 44:16 60:5,6 64:13 | **amount** 22:6 27:2 62:4 | **approval** 47:3 |
| **accounting** 28:14 | **adjacent** 43:15 | **analysis** 12:3,5 12:8,12 13:5 13:20 22:23 24:10,21,24 31:25 32:10 41:17 42:21 44:9 45:12 51:15,17 58:13 61:7,10,17,22 65:20,22 68:4 68:18 69:9,11 70:2,4 | **approved** 38:17 45:11 47:10,12 |
| **accuracy** 81:9 | **adjustments** 13:16 | **analyze** 13:10 50:21 | **approving** 26:4 |
| **accurate** 9:1 | **affect** 43:15 | **andy** 9:12 | **architect** 46:23 |
| **acknowledge...** 83:3 | **afterward** 78:23 | **answer** 8:3,3 8:10 9:6 60:14 | **architecture** 18:8,14 19:1,5 |
| **acknowledg...** 81:12 | **agencies** 66:5 | **answers** 8:9 | **area** 51:24 76:2 76:11 |
| **acronym** 18:19 | **ago** 26:7 76:23 | **anybody** 7:23 | **areas** 13:14 |
| **act** 37:6 39:13 40:14,16,19 | **agree** 32:16 64:24 | **apart** 53:20 | **asked** 19:6 25:20,24 48:14 62:24 63:3 76:23 |
| **action** 80:15 | | **appear** 44:17 58:15 | **aspect** 30:22 |
| **active** 31:12 42:14 54:22 | | | **assignments** 24:2 |
| | | | **assistant** 19:14 |
| | | | **associate** 7:20 |
| | | | **associated** 11:23 12:12 |

associates  3:9

associates.com
 3:13 81:2

assume  62:20

assumed  70:9

attached  16:4
 56:11 67:15,19
 81:11

attaches  56:13

attachment
 29:5

attorney  80:14
 81:13

attorneys  71:2
 71:3 74:14

august  33:3

available  14:2
 81:6

aware  31:4,7
 32:10

**b**

b  63:25

bachelor's  18:7
 19:2

back  11:5
 20:21 23:18
 26:2,5,13
 28:11 30:4,10
 45:2,3 52:14
 54:4 56:12,24
 64:3 68:20
 72:21 73:1,10
 74:6

bad  66:14

bannock  3:11

bar  56:5 57:24
 58:14,20

based  16:5
 56:24 68:14
 69:1,4,5 71:18

basic  30:4

basically  15:24
 16:18 23:21
 25:12 29:21
 34:18,19 41:5
 67:13

bay  51:22

bays  39:19,19
 43:10 45:8

beam  17:5

beams  13:9
 16:24

bear  10:11
 54:13 55:22

bearing  50:7

bears  54:12

behalf  1:5,6 3:2

believe  7:17,20
 9:16 10:5
 11:17 15:9,10
 16:2 20:20
 23:10 26:12
 28:5 33:2
 45:23 46:16
 47:22 58:2,19
 60:25 66:20
 68:19 69:24

70:5,6,12,12
 72:15 73:13,22
 74:15,18,24
 75:4,5

berkley  18:15
 18:16

best  8:10 80:11

betts  4:11

beyond  19:11
 77:16

big  31:12 46:2
 46:12,17 47:7
 59:3 60:8,15
 62:24,25 64:6
 64:25 72:12
 73:7 75:22

bit  7:17 27:6
 53:5 57:6
 62:16

blw  1:7

board  21:5,20

boise  3:12,17
 4:7 20:17,18
 20:22 22:1,5
 23:4 38:17
 47:25 75:22
 80:24

bolt  54:7 55:20
 56:5,12,13

bolted  50:2

bolts  41:7 56:8

bottom  17:5
 38:9 43:21,23
 50:5 56:14

58:2,9,10

botzoc  1:12

bpmlaw.com
 4:16

brace  5:16 17:4
 43:20 44:1,3,5
 44:7,14,15
 53:14

braces  13:18
 29:3 39:18
 40:1 43:10,14
 43:16,20,22
 44:4,14 45:6
 56:2,2 72:13

bracing  13:9
 16:4,5,8,10,11
 16:12,15,17,19
 16:20,21,23
 17:3,4,6,12,13
 17:14 25:23
 28:13 29:16,17
 29:19,20 30:3
 30:8,18,21,23
 31:11,15,19
 32:13,14,19,22
 33:13 34:2
 36:5,10,11,11
 36:12,17,18,20
 36:20 37:2
 38:24 40:20
 41:9,17,22
 42:10,12,13
 49:2,3,3,4,18
 51:24 52:21

**[bracing - certified]**

53:9,10 55:3 57:25 58:2,9 58:14,18,20,22 60:2 61:15 62:19 63:19 64:11,12,19,20 65:15,17 69:1 69:7 72:7,8,10

**breadth** 18:23

**break** 8:22,23 44:23 45:2 55:3,8,13 74:6

**breaking** 61:8 73:18

**bria** 9:16

**briefly** 7:10 9:14 14:14

**bring** 23:20

**broke** 54:15,17 54:17,23 55:16 59:9 60:8 61:2 64:2 69:10

**broken** 20:7 29:7,13 55:8,9

**brought** 53:7

**build** 35:14

**builders** 75:22

**building** 2:2 4:1 6:8 11:22 12:20,23 16:4 16:6,21 17:8 20:18 22:3,3 23:6,8,9,12,19 24:17,18,25

25:2,20 26:19 26:21 27:3 29:18 31:1 33:7,8 35:22 36:2 37:7,7,16 37:25 38:16,18 38:19 40:21 41:5 50:22 57:20 59:11 60:17 64:22 69:17,18 70:15 73:2 76:17 77:6,18 78:5 81:4 82:1 83:1

**buildings** 18:10 23:8 49:5 62:4 70:7

**built** 33:8

**bullets** 42:17

**c**

**c** 5:15 63:25 65:21 66:19,25

**c.s.r.** 1:24

**cable** 54:2,4,6 54:12,20,21,23 55:1,3,5,7,7,9 55:19,22,22,22 56:11,15,17,22 57:4 58:1 60:22 64:11,18 72:7,13

**cables** 17:10 52:21 54:15,17

54:18,19,23 55:12,16 56:23 57:1,7 59:9,13 59:22 60:7 61:8,11,14 65:15 76:20

**calculation** 26:11

**calculations** 12:11 25:25 26:9 32:4,5 44:13

**california** 18:15

**call** 1:19 3:1 5:3,9,11,13 6:1 6:6,21,24 7:9 18:23 45:1 48:11,24 49:11 74:13 79:3 81:5 82:2,24 83:2,4,12

**called** 6:23 27:18 35:16 54:13 58:13,14

**callout** 58:16

**calm** 70:10

**camel's** 64:3

**campus** 25:20

**capacity** 14:17 30:13,15

**caption** 1:18

**card** 64:2

**cards** 63:22

**care** 22:20 34:22 47:15

**career** 25:13

**careful** 15:23

**carry** 60:6

**carrying** 30:13 30:14 44:4,6,7 44:14

**case** 1:5 6:8 7:10 11:8 12:7 12:9 20:12 25:19 34:12 58:23 61:1 78:10

**cast** 75:23

**cause** 6:3 39:3 42:22,23 61:8 63:22 69:21 70:14 74:21 77:1

**caused** 69:12

**center** 17:8,9,9

**centers** 29:24

**certain** 15:12 41:11 56:5,6,8 61:20 70:8 71:5,7,8 77:24 77:25,25

**certificate** 80:1

**certifications** 18:6

**certified** 3:4 65:25 80:3

**[certify - complete]** Page 5

**certify** 80:3,13
**change** 25:8
33:19,20,20
39:21 40:4,15
42:23 45:5,16
46:3,3,7 47:24
47:25 48:22
49:14,20 50:22
50:24 51:12,13
62:12 82:4,7
82:10,13,16,19
**changed** 33:15
35:22 36:1,6
36:13,14 37:3
39:12 42:6
62:17
**changes** 33:24
34:1 36:23
38:11,13,15
39:1 40:8,9,10
41:4 42:20
45:8,21,21
46:2,8 47:18
48:2,3,6,17
49:5,12 51:20
51:20 75:5,8
81:10 83:6
**changing** 22:12
43:9 49:1,7
**characters**
75:24
**check** 71:21
**checking** 24:12

**chews** 31:24
**chime** 44:21
**chose** 54:9
**chub** 1:13
**cited** 13:2
**cities** 47:23
**city** 20:18,21
23:4,23 33:2
34:12 35:11,24
38:17 45:18
47:9,12,14,19
47:25 48:12
75:22
**city's** 47:3
**civil** 24:20
**claim** 21:14
22:3,4
**claiming** 21:18
22:7
**clarify** 38:20
45:7
**clarifying** 72:3
**class** 66:3
**classes** 18:25
19:4,6,7,10,10
**clear** 43:3
66:18,22 77:3
**clearly** 61:2
**clock** 75:16
**close** 16:24
17:6 53:19
**closely** 67:12
**coc** 1:13,14,15

**code** 13:15,20
20:24 21:23
23:17,21 24:12
26:16 34:17
48:19 52:9
68:6
**codes** 23:6
**collapse** 9:14
11:13 16:13
24:14,15 26:23
29:8,14 39:3
41:22,23 42:22
42:24 57:14
61:9 63:23
64:6,22 69:12
69:16,21 77:1
**collapsed** 11:23
12:18 15:3
16:7 24:6
29:10 32:12
40:21 41:10,19
45:13 55:6
59:11 63:16,25
**college** 18:5
**column** 38:14
49:15,17,25
50:2,4,7,8
51:13
**columns** 13:9
17:2,6 29:25
30:16 49:8,24
50:12
**come** 11:5
13:19 51:3

64:3 74:6
75:16
**comes** 64:11
**coming** 45:2
**commencing**
3:3
**comments**
39:11 78:2
**commercial**
37:7
**commission**
80:25
**common** 19:17
54:1
**communicati...**
55:15
**companies** 14:5
**company** 14:3
14:3 21:14
22:4 25:14
**company's**
21:16,19
**compare** 56:1
**compared**
12:16,23
**comparison**
28:24 43:6
**compiled** 10:5
**complaint**
21:13,16
**complaints**
21:6,9,20
**complete** 41:13
83:8

**[completed - crane]**                                          Page 6

**completed**
  57:23 81:16
**compliance**
  20:24 21:23
  23:5,17,21
  24:12 34:17
  38:18
**compliant**
  26:16 52:9
**compression**
  54:20,21,25
**computer**
  13:20 31:22,24
  44:9
**concentration**
  54:14
**concentrations**
  55:24
**concerned** 57:7
  72:17
**concluded**
  79:11
**conclusion**
  41:20 62:16
  72:14
**conclusions**
  70:22
**condition** 12:23
  49:17 63:16
**conditions** 61:2
  70:18 77:19,20
  77:25 78:1
**conducted** 24:1

**configuration**
  13:8 16:6 33:8
  35:21 36:15
  56:7
**configured**
  31:23
**confirm** 26:20
**congratulations**
  20:2
**connected**
  42:13 55:4
**connection**
  19:16,17 25:23
  26:10 49:7,15
  49:19 50:9,13
  50:15 51:13
  57:12 59:6
  60:22
**connections**
  26:15 44:6,13
  44:15 49:9
**connector** 54:5
**connects** 54:2
**connotation**
  71:6
**consider** 50:17
**considered**
  48:16 51:4
  77:5,14
**consisted** 56:4
**construction**
  35:13 41:2
  70:9,17,20
  77:7,19

**consultant**
  20:23
**consulting** 21:2
**contacted** 11:7
  11:19
**contended** 52:8
**context** 28:21
**continued** 1:18
**continuous**
  50:5
**contract** 21:2
  46:16 62:7
**contracted**
  46:12 64:25
**contractor**
  31:13 34:21,24
  35:17 46:24
  47:7 62:2
  72:20 73:15
**contradictory**
  62:16
**contribute**
  42:12
**contributed**
  51:15 52:20
  65:14
**contributory**
  40:18 51:18
  57:14
**control** 32:18
**convention**
  4:13
**coordinate**
  47:9

**copies** 81:14
**copy** 51:10
  75:4
**cord** 58:9,10
**corner** 54:11
  54:11,13
**corners** 55:23
**correct** 12:2
  14:22,25 15:19
  18:1 20:19
  25:8 26:24
  38:6 39:23
  42:2,25 43:1
  45:14 47:4
  50:10 51:6,16
  52:1 53:1
  59:12,16 60:18
  64:8 65:2 67:7
  69:21 70:24
  74:16 77:10
  80:10 83:8
**corrections**
  23:19 83:6
**correctly** 6:13
  9:6
**costs** 62:1,1
**counsel** 6:16
  7:18,18,25
  11:19 81:14
**couple** 27:14
**court** 1:1 8:7
**crane** 2:3 4:9
  7:22 9:16 60:9
  74:14 75:23

76:1,2,8,10,13 76:15 78:2,4

**cranes** 77:24

**creative** 18:9

**credit** 18:22

**critical** 53:17 58:10 61:24 72:23 73:4,8

**cs** 81:15

**cs7941217** 1:22

**csr** 80:2,21

**culpability** 60:23

**cumulative** 43:15

**currently** 19:22

**cv** 1:6 7:17 10:4 10:25 17:21 20:7 25:10

**d**

**d** 4:12 5:1 31:12 46:2,12 46:17 60:8,15 62:24,25 64:6 64:25 72:12 73:7 75:22

**d's** 47:7 59:3

**date** 10:7,17,20 11:9,13 15:8 33:1 82:24 83:12

**dated** 33:9 74:15,19 78:6

**dates** 15:5 33:10,10

**daughter** 1:5

**day** 15:8 42:18 59:3 70:10 80:17 83:15

**days** 10:22 11:11 81:16

**dealt** 34:2

**decision** 43:9

**declaration** 5:10,12 9:25 9:25 10:16 14:12

**declare** 83:4

**dedicated** 38:1

**deemed** 83:6

**defective** 55:20

**defendant** 4:1,9

**defendants** 2:4 3:2 6:8

**deficiencies** 20:16 25:6,9

**deficient** 52:10 52:19 65:13

**definitely** 22:22 42:19

**degree** 18:5,7 18:18,18,22 19:3 54:11 70:23

**degrees** 18:6

**denied** 22:4

**deponent** 81:13 83:3

**deposing** 81:13

**deposition** 1:19 3:1 5:8 6:11,23 7:11,12,13,17 8:7,15 9:9,12 14:23 20:6 68:21 69:2,6 79:11

**depositions** 6:12 9:15 14:15 20:3

**describe** 53:21 53:22,23

**described** 71:12

**design** 12:13,24 13:19 19:14,16 20:9,16 23:20 24:11,16,19 25:1,3,7,18,22 26:10 27:4,7 30:23,25 31:3 31:18,19 32:6 39:9 41:2,3 42:5,6 49:23 52:9,10,20 55:18 56:19,19 57:12,24 59:1 59:6 60:20,22 60:24 61:1,5 61:18 65:13 73:12,19,21,25

77:5,14

**designed** 31:14 32:15 37:2 41:18 60:5 61:19 65:9 70:8,16

**designer** 13:6 51:1,2

**designs** 34:16

**detail** 17:11 52:11,19,24 53:2,11,16,22 53:25 55:19,25 56:2,10,20 57:16 58:18 59:1,5,7 60:3,5 62:19 63:2 65:12

**detailed** 43:6 48:1 66:16

**details** 53:6 57:19 66:19

**determine** 11:22 12:19 13:7 21:10 34:23 39:9 42:21 56:17 63:17 64:1,1 64:17

**determined** 25:5

**determining** 56:22

**[diagonal - engineers]**                                                     Page 8

**diagonal** 43:21
**diaphragm**
63:8,19
**difference** 27:2
50:19 51:1
63:10
**different** 17:13
27:7,9,11
35:20 40:22,25
41:1 47:21,21
52:12,12
**direction** 50:12
50:14 66:5
80:9
**disagree** 32:16
**disagreed**
21:15 22:17
**discuss** 21:8
52:11,24
**discussed** 52:15
71:3,9,16,17
72:12
**discussing**
37:20
**discussion** 10:6
37:15 40:21
71:19
**dispute** 20:17
21:25 22:1
**distance** 30:5,7
56:9
**district** 1:1,2
**divide** 16:19

**division** 19:4,5
**divot** 67:25
**document**
14:13
**documentation**
21:23 25:25
**documents**
12:10,15,17
78:18
**doing** 12:8
15:24 35:9
**dorteao** 1:12
**downward**
58:8
**dozens** 20:25
**draft** 71:1 75:2
**drafted** 28:20
**drawing** 47:18
**drawings** 12:24
14:4 21:11
26:13 31:18
32:4,5,24 33:4
33:14,15,16
58:24 59:7
60:3,21 61:6
63:2,4 68:14
**drone** 28:5,7
**ds** 1:5
**due** 58:4
**duly** 6:2

**e**

**e** 5:1 82:3,3,3

**earlier** 22:15
51:11 78:19
**early** 25:13
**earned** 18:15
**easier** 37:15
46:1
**eckstine** 9:16
**education** 18:4
**effect** 36:21
**effects** 51:3
**either** 14:18,19
18:25 23:10
26:9 29:6
43:21,22 58:23
58:23 60:2
**elaborate** 31:14
**elective** 19:10
**elements** 12:19
16:2 31:23
52:9 64:21
**emiliano** 1:13
1:14
**emphasize** 66:8
**employed**
25:14
**employee** 75:15
80:14
**ends** 36:18,21
42:12,14
**engagement**
11:20 20:22
**engineer** 12:3
12:11 18:1,14
18:17 21:12,13

21:15,16,19
22:17,25 23:18
25:16,21 31:2
31:2,5 32:2
33:3,17,21
34:13,22 35:10
35:12,23 36:22
37:5,10 38:16
40:4,11,16
45:10,15,15,22
47:25 50:20
51:2 57:9
78:15
**engineer's** 31:3
**engineered**
24:25 25:2
26:18,21 27:3
33:14 37:3
38:16 49:5
62:3
**engineering**
12:8 18:16,18
18:25 19:7,9
19:10,12,20
22:20 23:11
25:14 30:3
31:9,20 33:23
34:13 38:11
44:11,18 45:22
71:8,9 72:9
**engineers** 21:5
21:7,8,20
25:16 33:22
34:14

**[enrique - fail]** <span style="float:right">Page 9</span>

**enrique** 3:10,13 7:18,19,25 10:6 71:19 81:1,2
**entire** 15:14 17:22 46:11
**entirely** 74:23
**entitled** 3:6
**entity** 47:2
**enumerated** 48:4
**erect** 41:12 60:10 73:16
**erected** 77:20
**erecting** 33:6
**erection** 56:21 58:25 59:10 60:1,8 62:21 64:25 65:5 73:24 77:20
**erector** 31:13 41:7
**errata** 81:11,13 81:16
**erratas** 81:15
**error** 61:21
**errors** 21:10 61:22
**esquire** 81:1
**essential** 52:21 65:14
**et** 81:4,4 82:1,1 83:1,1

**evaluate** 38:10
**evaluating** 21:17 35:13 42:4
**evaluation** 20:12 24:3 38:21 44:10
**evaluations** 24:1
**event** 58:4,11 58:23
**evidence** 21:18
**exact** 11:9 26:8
**exactly** 13:12 15:4 77:11
**examination** 5:4,5 6:4 74:11
**example** 35:8 67:1
**examples** 51:19 52:10
**exceed** 70:14 70:18
**except** 27:4,5 78:17
**exception** 32:19,21,23 33:12 62:14
**exchanges** 38:22
**excuse** 17:17 26:1 49:21 67:11

**exhibit** 5:8,10 5:12,14,15,15 6:10,17,20,22 6:23 7:3 9:19 9:20 10:10,12 10:14,15 11:5 14:11 17:17,18 27:17,19,22 29:23 30:17 36:8 37:13,18 38:5 45:4 53:3 65:21 66:19,20 66:23,25,25 67:21 74:14 75:17 78:6
**exhibits** 5:7 6:14 9:22 27:13 28:22,23 34:4,6
**existing** 15:14 32:11 58:10
**expectation** 77:18
**expected** 50:20 51:1 77:17
**experience** 20:9 23:25 66:13 77:18
**expert** 5:10,12 9:14,16,17,24 10:16 14:12,16 14:21,24 20:12 28:17 70:3 76:8,13 78:12

78:19,21,22
**expertise** 76:3 76:11
**expires** 80:25
**explain** 18:4 29:15 34:5,8
**explained** 11:20
**extended** 50:1 50:6
**extends** 16:23
**extra** 51:22 62:13
**extreme** 77:4
**eye** 54:7 55:20 56:12,13

**f**

**fabric** 41:6
**fabricate** 69:5 69:7
**fabricated** 68:13,15,15,17 69:1
**fabricating** 33:6,7
**fact** 19:16 22:25 26:15 32:22 37:5 39:12 40:3 42:6 58:23 63:4 69:13
**fail** 57:5,7

**[failed - further]**                                                    Page 10

**failed**  12:20 16:12 56:23 57:2,2 64:22 65:9 69:15 72:8,13,14,17 72:19,24 73:2 73:4,9

**failing**  72:22 73:22

**fails**  60:23 61:18 81:18

**failure**  22:2,7 22:10,14,14 24:1,3,10,14,20 52:20 65:14

**failures**  24:4 53:24

**fair**  76:24

**fall**  55:9,13

**fallen**  12:21 29:12

**familiar**  10:3 27:23

**far**  12:4 15:15 39:7 48:15 51:12 53:20 54:1 72:14 76:11

**fault**  11:24

**faulty**  60:22,24 61:2 69:16

**february**  11:10 11:16,18 15:8 15:13,20

**feel**  31:16

**feet**  30:1

**fell**  30:15 41:13

**felt**  49:10 65:11 71:18

**fewer**  43:19

**file**  28:18

**filed**  21:7,12,16 22:3

**files**  28:1

**final**  33:9 65:10 72:14 74:19 75:2

**finally**  26:6,12

**financially**  80:15

**find**  70:7

**findings**  22:21 52:14 75:5,8

**fine**  8:1

**firm**  22:20 34:13

**firms**  23:11,14 23:15

**first**  6:2 11:7 11:11 15:19 20:5 23:24 35:15,15 38:20 43:8 45:4 53:22 54:12,13 55:9 63:24 66:7 74:15 78:14

**five**  57:1,7 65:9

**flair**  18:9

**flange**  17:5 34:3 39:18 43:10,21,23 45:6 56:14 58:2

**flanges**  16:23 16:24

**flat**  56:4,4 57:24 58:14,20

**focus**  37:15

**folder**  6:22 9:22 10:14

**following**  43:7 47:6

**follows**  6:3

**force**  30:10 54:25 56:15 58:8,9

**forced**  56:6

**forces**  62:22

**foregoing**  80:4 80:10 83:5

**forensic**  12:5 24:20 41:16 51:14 65:20

**form**  60:11 76:9

**formal**  61:10

**formally**  8:9

**forming**  54:18

**fort**  3:16

**forth**  20:4 26:2 26:5 32:2,7 34:24 36:1 52:10 53:20 56:25 73:1 76:21 80:5

**found**  26:14 43:7

**foundation**  22:12 25:1,16 26:22

**four**  20:22 23:3 36:10 38:1 39:18 40:7,8 42:11 43:11 45:9 51:16

**fourth**  42:13

**frame**  38:13 50:11

**frequency**  13:18

**frequently**  14:2

**fulfill**  41:3

**full**  10:25 49:17

**fully**  41:12,25 42:1,3,14 55:4 60:10,17 77:20

**fun**  62:1

**function**  29:16 34:8

**further**  17:8 72:1 74:2 79:2 79:8 80:13

**[fuse - improperly]**

fuse 67:14,19
fusion 66:21
  68:2,8

**g**

g 3:10 28:23
  81:1
gauge 15:14
general 15:25
  26:8 31:13
  46:23 47:7
generally 14:1
  15:11 27:10
  49:17 58:3
  62:3 75:14
giant 58:5
give 9:1 27:14
  35:8,9 55:21
  62:24 71:22
  76:17
given 14:23
  73:7 80:11
  83:9
gives 32:1
gloria 1:7
go 7:5,10 9:21
  10:24 11:25
  12:1 17:21
  20:7 37:12,13
  37:14 42:16,17
  43:2 45:3
  52:14,17 54:19
  54:20 68:20
  71:22 72:20

73:9
going 6:9,17
  9:23 15:6,24
  16:13 27:12
  28:11 30:10
  35:14,14 37:14
  44:2 54:12,24
  57:10 66:2
  74:23 77:22
  79:5
good 6:6 66:14
  66:17
gordon 3:14,15
  4:3 7:19
governed 37:9
grace 4:5 7:20
graphics 75:6
gravity 49:10
great 74:8
greater 70:14
green 28:24
  29:3 32:10
ground 30:15
  55:11
grsm.com 4:8
guess 63:21

**h**

h 28:23 82:3
hand 80:16
handling 7:21
hands 66:3
hangar 15:2
  24:21

happened
  30:13 53:8
  54:5 74:20
happening
  35:13
hard 64:16
heard 77:23
height 49:17
heirs 1:9,15
help 69:18 73:8
hereto 83:7
hesitant 76:19
  76:21
hey 44:19
  77:15
highlighted
  44:11 48:16
hinge 49:16
hire 25:17
hired 20:22
  21:4,13
history 18:4
hit 55:10
hold 6:15 17:14
  29:21 30:11
  53:17 60:9
  61:11 72:20
holding 49:9
hole 29:12 54:3
holes 29:5 56:5
hollow 17:7
horizontal
  16:22 17:1,15
  29:20 34:2

36:17 49:15,25
hour 77:8
hours 18:23
  75:9
house 63:21,21
hurricane
  70:17

**i**

idaho 1:2 3:5
  3:12,17 4:7
  19:20 20:17
  21:5 80:24
idea 78:1
identical 10:15
identified 16:3
  16:9 29:2
identifying
  16:14
ignored 73:11
  73:21,21
imagine 15:13
immediately
  72:17,19
impact 69:11
impair 9:5
imperfections
  66:15
important
  38:14
impossible
  64:17
improperly
  37:2

**inadequate** 40:20 41:9

**inappropriate** 57:13

**inches** 24:7

**include** 34:20 66:20

**included** 35:1,3 35:4,4,6 56:2,3 58:18,24 60:2 60:3 63:1

**including** 19:3 31:19

**incorrect** 42:6

**incorrectly** 36:5

**increases** 30:7

**index** 28:14

**indicate** 13:14 23:22 38:12 48:4 68:1

**indicated** 50:9 59:19

**indicates** 55:7

**indication** 61:18

**individual** 1:9 1:14

**individually** 1:4

**induces** 56:15

**industry** 26:3 57:13

**information** 9:11 34:25 35:1,3,21 44:16 78:24

**informed** 74:25

**ingrid** 1:12

**initial** 9:24 15:13 32:6

**initially** 23:3

**inland** 2:2 4:9 7:22 60:8 74:14 75:23 76:1,15

**input** 13:7 32:8

**inputting** 31:21

**inside** 76:10

**inspected** 15:2

**inspection** 66:1 66:7,9,16 68:5 68:7

**inspections** 15:5 66:4

**inspector** 65:25 75:23

**install** 34:7,9 34:18 35:2,5,6 35:8 36:6,7,9 36:10,12,18 38:23 39:22 40:1 41:18 43:15,25 44:2 44:9 46:4 48:18 49:21,22 50:3,4 51:24

52:19 53:13 58:17 59:20 65:13

**installation** 32:17 56:21

**installed** 12:22 16:10 29:7,7 31:11 32:13 41:25 42:1,3 56:23 63:9,20 64:7

**installing** 33:5 33:6

**instance** 30:20

**instruct** 8:2

**instruction** 73:7

**instructions** 35:6,10 44:12

**insurance** 20:17 21:14,15 21:19 22:1,4

**intact** 28:14

**intent** 38:10

**intentional** 71:15

**interchangea...** 17:1

**interested** 80:15

**interface** 13:13

**interplay** 64:17 64:21

**interrupt** 44:20

**introduce** 6:10 27:12 65:22

**introduced** 6:12 34:6 49:16 55:23 66:25

**introducing** 9:18

**investigate** 21:6

**investigating** 57:11

**investigation** 22:9 23:1

**investigations** 20:9,10

**involved** 24:21 72:16

**inward** 30:16

**issue** 16:8 22:10 32:14,17 35:11 40:3,23 53:7 64:19,20 74:21

**issued** 11:1 23:23 38:19 47:16 75:3

**issues** 23:18,22 34:15 62:25

**issuing** 78:16

**items** 40:8 43:7 43:8 61:25 76:2

**[james - load]** Page 13

**j**

**james** 4:12 7:22 74:5,13 79:8
**jane** 3:14,15,18 7:19,25
**janegordonla...** 3:18
**january** 11:14 55:16,17,17 56:25
**jnelson** 4:16
**job** 1:22
**js** 1:7
**juan** 1:8
**judgment** 48:11,24 49:11
**june** 10:9,21 15:9,15 74:16 74:21,21 75:10 75:10 78:7 80:25
**jurisdictions** 47:21
**justified** 48:7

**k**

**keep** 29:21 42:18 53:10 75:13
**kept** 42:11
**kind** 6:13 8:24 39:16
**knew** 16:5 29:8 61:24 72:23,24

**knitted** 54:4
**know** 10:17 12:4,6,6 13:12 13:22 14:1,6 14:14 15:4 17:22 20:12 21:22 22:18 23:24 24:16,20 28:1,11 30:20 31:8,10 32:11 40:20,23,25 41:9,10,22 42:8,15 43:2,6 44:10,16 45:25 46:2,7,20,22,24 47:1 51:22 53:6 55:13 56:24 57:15 58:13 59:2 61:15,19 62:9 63:8,18 64:14 64:15,21 65:3 65:17 68:2,10 68:24 69:10,15 69:19 71:6,8 71:13,14 72:6 75:11 77:9,10 77:23 78:3,4 79:7
**knowing** 76:19
**knowledge** 66:6
**knowledgeable** 72:9,10

**l**

**l** 4:4 36:8
**lab** 66:3
**labeled** 75:20
**lack** 66:21
**land** 21:6
**language** 71:1
**large** 17:1 22:6 69:25
**larger** 40:1 43:14
**las** 47:23
**law** 3:14 37:8,9 70:23 71:14
**lawsuit** 11:2,21 14:17 24:22 26:23
**leads** 58:1
**leave** 75:16
**lecture** 30:3
**left** 18:13
**legal** 39:4 70:23 71:6,11 71:20 81:23
**legally** 71:7
**levels** 32:1
**license** 19:20 19:20,23
**licensed** 14:2 17:25 33:24 34:13,14 37:10 51:2

**lift** 17:10 53:14 58:18 65:12
**lifting** 17:10 52:11,18 53:2 53:6,11,16,25 55:19,19,25 56:10,23 57:15 57:18,21,22,23 58:1 61:3,8 62:19,22
**limited** 15:20 78:16
**limits** 78:3
**line** 29:25 30:6 36:19 42:13 82:4,7,10,13,16 82:19
**lined** 36:17
**lines** 36:9,11,16 42:10,11
**list** 48:22
**listed** 20:11,15 25:10
**lists** 75:22
**little** 7:16 27:6 53:5 57:6
**llc** 2:2 4:1 6:8 81:4 82:1 83:1
**llp** 4:3
**load** 13:8 30:13 30:14 37:21 44:4,6,7,15 49:10 70:15 73:17

**[loading - members]**                                    Page 14

| | | | |
|---|---|---|---|
| **loading** 10:18 | 66:9 | **make** 6:12 8:12 | **materials** 18:19 |
| **loads** 34:16,21 | **looks** 10:14 | 8:19 13:16 | 27:10 |
| 34:22,23,23 | 17:25 19:19 | 20:4 23:19 | **math** 30:4 |
| 60:6 70:8 | **lopez** 1:6 | 24:17 33:19,24 | **mathematics** |
| **local** 22:17,25 | **loses** 30:12 | 34:15,16 36:22 | 18:8,25 19:3 |
| 66:5 | **lost** 30:14 | 41:20 44:10 | **matter** 3:6 63:3 |
| **located** 73:3 | 43:16 | 45:20,21 48:12 | **mbci** 68:14,16 |
| **location** 35:25 | **lot** 15:22 36:20 | 60:4 69:17 | **mean** 28:20 |
| 39:17 43:10 | 44:14 49:12 | 72:3 73:5 77:3 | 30:7 40:25 |
| 45:5 49:2 | 51:19 55:12,16 | **makes** 30:24 | 41:10,12 43:17 |
| **locations** 16:10 | 59:9 66:12 | 57:8 58:24 | 44:8,20 48:5 |
| 16:11 36:13 | 67:10 70:23 | 63:4 | 49:7 57:3 64:1 |
| 54:16 55:5 | **low** 56:11 | **making** 40:14 | 69:10 71:7 |
| 58:1,21 61:21 | **lower** 54:8 | **maldenado** | 77:12 |
| **logistics** 7:12 | **m** | 7:20 | **meaningless** |
| **look** 8:16 10:3 | | **maldonado** 4:5 | 35:24 |
| 14:10 15:7 | **made** 16:21 | **mansukhani** | **means** 35:16 |
| 25:24 27:23 | 17:7,10 33:25 | 4:3 | 67:13 |
| 34:7 36:8 38:9 | 34:1 36:23 | **manufactured** | **mechanics** |
| 38:22 39:15 | 38:11 39:1,11 | 32:15 | 18:19 |
| 46:1 48:9 | 40:4,8 41:4 | **march** 1:20 3:3 | **medication** 9:4 |
| 49:13 50:21 | 42:4 44:12 | 80:17 81:3 | **meet** 13:15 |
| 67:6,11 68:5 | 45:8,15 46:8 | **mariano** 1:15 | 77:7,9 |
| 68:20 70:5 | 48:22 49:20 | **mario** 1:10 | **meeting** 22:19 |
| 72:21 73:10,15 | 50:22 62:12 | **marked** 6:20 | **meets** 13:20 |
| 73:18 74:18 | 63:10 66:7 | 6:22 9:20,22 | **melt** 67:18 |
| **looked** 18:10 | 80:7 83:5 | 10:12 27:19 | **member** 17:14 |
| 21:22 23:4 | **magnitude** | 34:4 66:23 | 49:24,25 54:22 |
| 28:1 66:12,12 | 48:17 | **marks** 67:23 | 65:8 72:17 |
| 67:21 | **main** 4:6 16:24 | **martha** 1:8 | **members** 12:20 |
| **looking** 14:11 | 49:9 80:23 | **master's** 18:16 | 12:21,21,22 |
| 14:11 15:17 | **major** 40:10 | 18:17 19:11,15 | 13:9,17 17:2 |
| 16:2 28:13 | 51:20 58:4 | **material** 32:20 | 32:2 35:25,25 |
| 50:12,14 52:16 | 75:5 | 32:22 | 49:18 64:18 |

65:17 68:13 72:18,19,24 73:3,9,18 76:20

**memory** 15:6 74:24 78:17

**mentioned** 21:4 65:17

**meredith** 4:4 6:7 7:9 38:5 44:19 79:7

**messages** 56:24 61:21

**met** 22:22

**metal** 24:25 25:2 26:18,21 27:3 38:16 49:5 62:3 67:24,25

**methodology** 27:9

**methods** 35:16

**mile** 77:8

**mind** 74:5

**mine** 10:18

**mines** 4:11

**minimize** 62:4

**minor** 1:5,7 40:9 48:2

**minute** 71:23

**minutes** 27:14 44:21 76:23

**misinstall** 57:6

**missing** 7:23 16:11

**misspoke** 35:2

**model** 61:17,22

**modeling** 12:6 13:2 24:14

**modifications** 23:20

**modified** 25:7 38:14 75:6

**modify** 26:15

**molten** 67:17

**moment** 50:9 50:13

**money** 62:1,2,8

**month** 23:16

**months** 26:13

**morning** 6:6

**move** 30:4,6

**moved** 29:9,13 29:24,25 30:14

**moves** 30:12

**moving** 43:24

**mthielbahr** 4:8

**multiday** 66:2

**multiple** 23:8 40:23 72:18

**n**

**n** 5:1

**name** 6:6 7:9 13:22 14:6 74:13 78:14

**nancy** 1:4 81:4 82:1 83:1

**nature** 15:25 73:8

**near** 11:16 34:3 63:19

**nearly** 64:16

**necessarily** 36:19

**necessary** 83:6

**need** 8:3,16 31:16 34:7,24 35:4 45:17 47:24 50:23 72:20

**needs** 34:22 47:19

**negligence** 37:6 39:4 40:22,25 60:25 72:15 73:23

**negligent** 33:19 33:25 39:13 40:16,20,24 45:10,24 65:12

**nelson** 4:12 5:5 7:22 60:11 74:3,8,12,13 79:2

**nevada** 19:20

**never** 14:7,20 14:23 26:23 29:6 44:16

**new** 78:24

**nine** 18:22

**nodding** 8:9

**nomenclature** 12:2

**nontechnical** 18:23

**nonverbal** 8:9

**normal** 50:14

**notable** 20:9,10

**notary** 1:25 3:5 80:22 83:13,19

**note** 8:1 38:15 81:10

**noted** 43:8 51:13 83:7

**notes** 44:12 71:21

**notice** 5:8 6:10 6:23

**noting** 38:25 39:21 40:3,6 42:20

**number** 19:3,5 45:8 55:14 72:13 77:10,11

**numbers** 26:5 37:14

**numerous** 52:21 65:14

**nut** 56:13

**[oath - paragraph]**

| o | | | |
|---|---|---|---|
| **oath**  80:6 | 15:11,19 16:15 | **once**  45:18 | **overlooked** |
| **object**  7:25 | 16:18 17:16,20 | 57:22 | 50:17 |
| 60:11 | 17:24 18:7 | **ones**  29:3,6 | **overstress** |
| **objection**  6:17 | 19:19 20:15 | 45:16 73:2 | 61:21 |
| 6:19 | 21:21,25 23:2 | **ongoing**  20:24 | **overstressed** |
| **objections**  8:2 | 23:24 24:13 | 22:10 | 13:15 |
| 80:7 | 26:20,25 27:8 | **opening**  51:9 | **overtensioned** |
| **observation** | 27:12,15,16 | **operations**  76:2 | 56:18 |
| 51:25 52:3,7 | 28:3,8,17,20 | **operative**  11:1 | **own**  25:16 |
| 69:13,14 | 29:1,15,17 | **opinion**  32:9 | **owner**  22:11 |
| **observed**  12:17 | 31:8,10,18 | 33:18 37:6 | **owners**  22:3 |
| 53:23,25 54:16 | 36:7,8 37:12 | 39:16 45:5 | |
| 55:15 | 37:22,23 38:4 | 53:8 55:18 | p |
| **obtained**  28:9 | 39:7,14 40:13 | 65:11 69:20 | **p**  53:3 |
| **obtaining** | 40:17 43:19 | 70:1 73:11 | **p.m.**  71:24,25 |
| 34:11 | 45:25 46:6,9 | 76:17,25 | 74:9,10 79:11 |
| **obviously**  8:6 | 46:15,21 47:13 | **opinions**  17:19 | **p.s.**  4:11 |
| 32:12 46:12 | 47:17 48:9,13 | 39:6 64:5 | **page**  1:18 5:3 |
| **occasion**  25:5,5 | 48:15,25 49:13 | 76:14 | 10:8 14:10,11 |
| **occurred**  11:13 | 49:23 51:12,21 | **opposed**  59:10 | 17:22 23:25 |
| 22:14 32:7 | 52:2,6,13 53:9 | **order**  30:1,3 | 37:12,13,17,19 |
| **och**  1:13,14 | 57:6,18 59:23 | 35:9 | 37:23,24,25 |
| **oftentimes**  14:4 | 60:24 63:6,8 | **original**  44:11 | 38:9 39:15 |
| **oh**  53:1 63:13 | 63:15 65:16 | 49:23 50:3,3 | 43:5 45:3 |
| **okay**  6:21 7:2,5 | 67:4,5,9 68:18 | 56:3 57:24 | 52:17,24,24 |
| 7:8,16,24 8:6 | 68:23 69:3,9 | 58:15 | 68:23,24 69:25 |
| 8:14 9:4,8,18 | 69:19 71:1,4 | **originally** | 70:21,21 75:17 |
| 10:2,7,10,13,19 | 71:13,21 72:6 | 42:10 | 82:4,7,10,13,16 |
| 11:4,6,12,15,19 | 74:1 75:9,19 | **output**  31:25 | 82:19 |
| 11:25 12:9,25 | 75:21,21 76:23 | **outside**  76:2,3 | **pages**  38:1 69:2 |
| 13:25 14:7,10 | 78:21 79:1 | 76:11 | **pairs**  53:14 |
| 14:20 15:1,4 | **omissions** | **overall**  17:13 | 54:18 |
| | 21:10 | **overcome** | **paragraph** |
| | | 61:20 | 15:1 17:17,17 |

39:15
**part** 21:1 22:13 25:20 30:25 31:1 45:23 53:17,22 60:25 70:1 73:4,12 73:23 75:23
**partial** 22:2,7 24:5
**partially** 57:14
**participating** 7:21
**particularly** 62:3 78:12
**parties** 40:23
**party** 80:14
**party's** 40:24
**patterson** 4:11
**pause** 8:1
**pdf** 17:22 37:14 70:22
**pedro** 1:7
**pending** 8:23
**percent** 51:23
**perfectly** 70:10
**perform** 20:23
**performance** 65:8
**performed** 23:1 69:8
**performing** 66:4
**performs** 31:25

**permanent** 30:18 31:1 58:22 60:1 62:19
**permission** 28:5
**permit** 20:19 23:9,12,23 32:25 34:6,8 34:10,11,20 35:3,7,11 36:6 36:9,13,16 38:19,23 39:22 41:19 43:20 44:11 46:4,11 46:18,24 47:2 47:8,10,12,16 48:18 49:22 50:3 53:12 56:3 58:15,17 62:15,18,18
**permitted** 47:19
**permitting** 48:8
**person** 47:2
**personal** 14:17
**personally** 15:2
**photo** 5:14,15 27:18
**photograph** 27:25 28:2 30:17

**photographs** 12:7
**photos** 9:13 27:13
**picture** 27:23 28:10 67:12
**piece** 16:3,9,14 35:15,15 50:5 56:4
**pike** 4:14
**pinned** 50:15
**place** 4:13 17:15 30:11 49:9 53:16 59:15 60:18 73:6 80:5
**places** 65:9
**plaintiffs** 1:16 3:8 7:19 79:8
**plan** 20:23
**plane** 50:11
**plate** 54:3,10 56:2
**plates** 13:17
**play** 51:3 64:4
**players** 41:11
**pleading** 10:2,4 10:7,17 14:13
**please** 75:18
**pllc** 3:9
**plumb** 59:15,18
**plus** 26:7
**pocket** 62:8

**point** 15:21 42:2 49:16,19 76:18 77:13
**pointing** 48:2
**points** 30:5 44:7 51:17 65:10
**poor** 65:18 67:2,15 68:3
**portion** 14:13 25:4 64:7
**portions** 12:20 29:9
**position** 29:13 29:22 43:4 45:9 47:17 53:11,18 60:16
**positioned** 56:9
**positioning** 61:4
**positions** 29:11 61:12
**possibly** 64:20
**post** 26:23
**postcollege** 18:5
**potential** 34:15
**pound** 62:6
**practical** 56:16
**practiced** 19:24
**pre** 24:25 25:2 26:18,21 27:3 38:16 49:5 62:3

**[precarious - quickly]**

**precarious** 64:23
**preliminary** 74:19 75:1
**prepare** 9:8 14:4
**prepared** 12:10 12:16 31:18 32:25,25 33:1
**preparing** 35:11
**present** 12:22 49:16 64:13
**presented** 21:18
**pressure** 8:16 58:7
**pretty** 15:7
**prevent** 43:23
**previous** 29:7
**previously** 15:7
**principles** 27:7
**prior** 16:12 24:22 29:13 55:17,17 64:22 69:11
**private** 14:17
**probably** 11:15 27:5 64:19 68:25
**probation** 37:17
**problem** 8:21 22:24 33:12

42:9 50:21 55:24 56:1,19 57:8,10 71:18 72:21 73:10,11 73:19
**problematic** 36:3,24
**problems** 56:20
**proceedings** 80:4
**process** 19:24 20:1 24:11 41:2 59:10 60:8
**product** 21:8 45:19
**professional** 20:8 21:5,6 23:25
**professor** 19:14
**program** 19:12 31:22 32:8
**programs** 62:5
**project** 21:21 21:22 23:5 25:11,12 31:6 46:12,19,25 47:8 57:9 72:16
**projects** 20:10 21:1 24:2
**proper** 17:15 29:21 30:11 34:23 53:11,18

61:12 68:1,8
**properly** 56:9 56:17,23 60:5 63:18 67:14
**proprietary** 12:13,25
**provide** 25:24 26:9 41:4 60:21 63:3
**provided** 9:11 9:15 14:15 17:11 29:5 38:18 41:5 44:17,17 53:2 59:7 61:5 68:14 78:13,20 78:22
**provides** 27:10
**providing** 52:18 60:23 61:1 65:12
**prudent** 73:14 73:20
**public** 1:25 3:5 80:22 83:19
**pull** 27:16 30:10 47:2 61:16 63:22,23 67:2,5
**pulled** 24:6 30:15 46:24 47:8 63:24 67:25

**pulls** 46:18
**punch** 75:15
**purpose** 15:12 17:13,14 29:20 34:11 35:12 39:10 53:10,13 57:22 58:22 59:13,25 61:11
**put** 13:8 35:14 42:9 46:13 56:8 61:20,25 62:13 80:6
**putting** 64:22

**q**

**quality** 65:18 67:16 68:3
**quantity** 38:12 48:5,6 49:2
**question** 8:3,23 8:24 31:14 47:6 60:12 64:11 74:20
**questionable** 15:22
**questions** 9:6 68:21 72:2 74:2,3,7 76:24 79:2,6,8,9
**quick** 71:22 74:6
**quickly** 44:19 66:14,17

**[r - requirement]**

| r | | | |
|---|---|---|---|
| **r** 1:6 82:3,3 | **reasonable** 73:13 | **reduction** 39:18 | **replaced** 58:16 |

**r** 1:6 82:3,3
**rafter** 17:5,9 38:14 49:8,14 50:1,1,6,6 51:13 54:2,4 55:6,6,10,10 56:14
**rafters** 5:14 16:25 27:18 29:5,21,24 34:3 49:25 50:12 53:14,18 56:6 58:3 59:14 63:20
**ran** 13:4
**rather** 9:15 38:12 55:20 58:8
**rax** 1:4 81:4 82:1 83:1
**read** 81:9 83:5
**reading** 8:17
**real** 74:6
**really** 18:11,12 57:8 71:21
**reapprove** 47:20
**reason** 8:25 15:15 62:10,12 62:13 81:11 82:6,9,12,15,18 82:21

**reasonable** 73:13
**rebuttal** 9:11 50:8 51:5,7,8 51:11 78:13
**recall** 9:24 11:12 15:11 20:25 28:9 44:1 68:20 75:5,7,12 76:10
**receipt** 81:17
**receive** 51:10
**received** 22:5 28:6 78:19
**recent** 78:13
**recess** 7:6 44:24 71:24 74:9
**reckless** 71:15
**recommended** 18:24
**record** 7:5 8:2 23:18 31:2,5 33:21 37:5 38:17 40:5,12 40:16 43:3 45:10 50:20 71:23 80:11
**recorded** 8:10 8:15,18 80:8
**records** 75:13
**red** 28:24 29:6 32:10

**reduction** 39:18
**rees** 4:3
**refer** 6:9
**referenced** 81:6
**referring** 13:1 14:16 52:13,22 67:8
**refresh** 78:17
**regarding** 21:14 76:2
**related** 43:8
**relating** 6:2
**relationship** 14:5
**relative** 40:22 80:13
**release** 59:18 59:21
**released** 59:20
**remain** 54:24 76:7
**remained** 28:13
**remains** 76:12
**remember** 11:9 15:5 16:16 26:7,8 68:22
**remote** 7:12
**remotely** 1:23 6:3
**removed** 58:16
**renewed** 19:23
**replace** 58:20

**replaced** 58:16
**report** 9:10 10:1,3,25 11:1 12:1 13:3 21:19 23:17 27:13,22 28:19 28:21 32:22 37:1,17 38:10 40:7 42:2 51:5 51:9 65:21 68:24 69:20 71:2 74:15,19 74:22 75:2,8 75:10 76:4 78:6,17,23
**reported** 1:23 57:1
**reporter** 3:4 8:7 80:3
**reporter's** 80:1
**reports** 9:15
**represent** 6:7 7:9 27:21
**requested** 46:2 57:15 79:12
**required** 22:20 23:20 25:5,6 37:8 57:23 58:3,3 61:16 68:6 70:15 72:11 83:13
**requirement** 19:6

| | | | |
|---|---|---|---|
| **requirements** 13:15,21 18:21 24:17 47:22 77:6,8 | **resubmit** 45:18 **result** 22:7,10 22:16 55:8,13 69:15 | **reviews** 20:19 20:23 **revised** 26:13 39:9 44:9 48:8 | **rush** 37:22 |
| | | | **s** |
| **requires** 49:18 **research** 19:15 19:16 26:14 **reserve** 79:5 **residence** 24:5 **residual** 67:23 **resist** 43:23 54:21 **resisting** 62:20 **resolved** 23:22 **respect** 32:17 33:13 36:4 43:5 52:15 53:18 56:7 **respond** 23:19 **responded** 26:6 **responsibilities** 22:22 41:1 60:19 **responsibility** 31:3 35:17 41:3 58:25 59:3,8,17 63:5 **responsible** 25:17 30:21,22 30:23 45:20 47:1,3,9 60:4,9 60:15,16,20 61:6 65:4,7 68:10 73:24,24 | **results** 32:1 **retained** 20:12 **retaining** 22:13 **retirement** 19:25 20:4 **return** 81:13,16 **revealed** 22:9 **review** 21:8,23 23:3,5,17 25:17,21 26:18 35:24 39:8 44:2 47:3,14 47:19 50:21 72:25 81:7 **reviewed** 9:10 9:10,12,13,14 9:14 12:10,15 12:16 21:1 25:4,15 31:21 32:3,3 33:17 33:21 34:11,14 34:15 35:23 36:1,22 37:4 38:15 39:5,10 40:4,11,15 45:11 78:13,24 **reviewing** 35:10,12 45:22 78:11,17 | **revisions** 37:4 **rhythm** 6:14 **right** 11:4 31:4 32:12 38:7 39:7,18,20 41:14,15,25 43:10 46:13 47:10 59:11,15 60:7,10 61:13 62:14,23 65:4 70:11 75:24 78:7 **rod** 29:16,17,19 29:20 30:18,21 30:23 31:11,15 31:19 32:12,14 32:19,21 33:13 34:2 36:4 38:24 42:10 51:24 63:19 64:7,12,19 **rods** 16:22 63:8 63:17,19 **roof** 24:7 58:5 **rough** 75:1 **round** 54:7 **rounded** 55:21 **rules** 7:11 **run** 58:12 61:22 | **s** 1:24 3:4 80:2 80:21 82:3 **safely** 59:18 **save** 62:7 **saw** 55:2,4 66:18 68:14,21 **saying** 36:5 37:1,3 39:4,8 39:14,25 42:5 42:20 51:25 52:8 62:11,12 63:7 64:16 74:2 **says** 10:15 14:14 23:25 57:7 **sbs** 6:9 7:10 12:10 13:1,7 30:22 31:4,18 31:24 32:8,15 32:18,23 33:13 33:22 35:18 37:2,20 38:1 38:18 41:2 42:4 45:10,14 45:15,21 46:8 46:16,17 50:17 52:16 53:2 58:24 59:6 60:2,25 61:15 64:25 65:11 |

**[sbs - sizes]**

68:12,17,25
69:1 72:1,8,12
72:15,23,24
78:13 79:10
**sbs's** 60:20
62:8
**scope** 11:20
38:21 39:6
76:3
**scroll** 10:24
**scully** 4:3
**seal** 80:16
**seattle** 4:15
**second** 16:1
17:3 21:12
33:4 56:1
74:22 78:6
**section** 40:7
**sections** 20:8
**secured** 41:11
59:18
**see** 6:13,23,25
9:22 10:14,18
10:20 15:14
23:16 24:9
27:17 28:23
29:23 30:16
36:7 37:16
38:2 47:24
53:2,23 59:19
63:15 64:9
66:10,10,14,21
67:9,10,12,20
67:20 68:2,8

68:23 69:5
70:5 72:21
73:19 74:17,18
76:5
**seen** 13:12
**select** 20:9
**semm** 18:19,21
**send** 23:13
**sense** 8:12,19
**sent** 26:13
34:12 72:11
75:3 81:14
**sentence** 38:20
43:13,18
**separate** 13:5
25:11,12 27:13
**separated** 56:8
**serna** 3:9,10,13
6:19 7:18,19
38:5,7 44:19
74:5 79:5 81:1
81:2
**set** 32:25 33:4,4
33:9,14,16
34:7,7,9,9,10
34:18,20 35:2
35:3,5,6,7,8
36:6,6,9,10,12
36:13,16,18
37:3 38:23,23
39:22,23 40:1
41:18,19 43:15
43:20,25 44:2
44:9,11 46:4

46:11 47:18
49:22 50:3,4
51:24 52:19
53:12,13 56:3
56:4 58:15,17
58:17 59:20
62:18 65:13
80:5,16
**sets** 32:24
35:21 43:7
**several** 24:6
**shape** 16:7
41:21,22 76:9
**sharp** 54:10
**sheet** 81:11
**shift** 59:14
**short** 16:20
**shortest** 30:5
**shorthand** 3:4
80:3
**show** 26:4,10
38:13 51:19
**showed** 29:11
36:9
**showing** 61:23
**shown** 62:19
**side** 43:21,22
50:2
**sides** 16:20
**sideways** 29:25
30:4,6,12,14
**sign** 81:12
**signature** 79:12
80:20

**signed** 62:7
81:19
**significance**
38:13,25 48:5
**significant** 27:2
33:20 40:9
48:3,6,7,17,21
48:23 49:4,6
49:11 64:7
73:22 75:7
**significantly**
22:15 33:15
35:23
**similar** 10:15
57:25,25
**similarly** 19:4
**single** 10:1 23:7
44:1,1,3
**site** 11:11,15
12:4,17 15:2
15:14 28:12,15
41:12 53:24,25
55:15
**sitting** 50:7
**situation** 58:11
64:23
**size** 13:16
17:23 23:13
35:25 39:25
43:14 44:5
49:3
**sizes** 13:8 16:22
31:22 32:7
36:14

**[skip - subcontractor]**

| | | | |
|---|---|---|---|
| **skip** 17:19 | 48:10 52:15 | 77:21 | **stopped** 50:5 |
| **smaller** 36:12 | 61:19,20 | **stated** 60:24 | **story** 52:12 |
| **smooth** 54:7 | **speck** 9:12 | 69:16,24 | **straight** 30:5 |
| 55:21 67:13,20 | **speed** 77:8 | **statement** 72:4 | **street** 3:11,16 |
| **snapped** 57:3 | **stability** 15:21 | **statements** | 4:6,14 80:23 |
| 64:12 76:20 | **stabilize** 49:18 | 22:19 78:12,20 | **stress** 32:1 |
| **snow** 22:6,8 | 58:10 | 78:22 | 54:14 55:24 |
| **snowstorm** | **stabilized** | **states** 1:1 19:18 | **stretch** 30:9 |
| 22:16 | 60:17 | **stay** 57:19 | **stretched** 30:8 |
| **software** 12:13 | **stable** 53:15 | 59:14,15 | **stretches** 56:15 |
| 13:1,2,5,11,12 | **stage** 41:14 | **steel** 2:2 4:1 | **structural** 12:3 |
| 13:14,23 14:2 | **stamp** 45:16,19 | 5:15 6:8 13:17 | 12:11 18:1,14 |
| 14:6,8 27:5 | **stamped** 31:21 | 16:22 17:7,7 | 18:18,24 20:16 |
| **solid** 16:21 | 32:5 33:3,14 | 19:14,16 25:4 | 20:18,23 21:7 |
| **solutions** 81:23 | 33:17,21 37:3 | 25:22 27:3 | 21:22 24:1,3,4 |
| **somewhat** | 37:5,10 38:16 | 30:9 37:16,25 | 24:14,20 25:21 |
| 15:22 27:6,10 | 39:5 40:15 | 40:1 41:6 | 25:21 31:2,5 |
| **son** 1:7 | 47:24 | 43:14 51:24 | 34:14 41:16 |
| **sontay** 1:8,8,9 | **stamping** 45:23 | 56:4 62:5,6 | **structurally** |
| 1:10 | **stand** 24:18 | 66:22 67:14,17 | 65:23 |
| **sorry** 35:2 | 69:18 | 67:18 81:4 | **structure** 13:10 |
| **sort** 12:5 24:13 | **standard** 8:24 | 82:1 83:1 | 16:5 24:7,25 |
| 28:14 51:14 | 22:19 26:3 | **stenographic...** | 27:4 29:10 |
| 70:1 | 57:13 71:15 | 80:8 | 32:11 45:13 |
| **sounds** 8:25 | **standpoint** | **step** 39:22 | 51:14 76:22 |
| 42:19 | 27:4 38:12 | **steve** 1:19 3:1 | 77:5,12,15 |
| **span** 17:2,9 | 56:20,21 | 5:3,8 6:1 38:8 | **structures** 25:2 |
| **special** 28:5 | **start** 37:19,24 | 79:5 81:5 82:2 | **studied** 18:8 |
| **specific** 16:2 | **started** 22:15 | 82:24 83:2,4 | **stuff** 62:13 |
| 40:8 44:12 | **starting** 17:16 | 83:12 | **stutts** 9:12 13:2 |
| 71:6 | **state** 3:5 15:14 | **steven** 5:10,13 | 13:4 50:8,17 |
| **specifically** | 32:11,22 37:8 | 6:24 | 51:7 78:14 |
| 15:18 26:18 | 37:9,9 55:6 | **stood** 18:11 | **subcontractor** |
| 28:23 37:1 | 68:25 76:17 | | 35:18,19 |

**[subcontractors - thing]**

**subcontractors** 35:18

**submitted** 23:9 23:12 31:20 33:1,2 34:10

**subscribed** 83:14

**subsequent** 33:16

**subtle** 50:19 51:3

**subtlety** 50:16

**suite** 3:11 4:6 4:14 80:23

**summaries** 17:18

**summarize** 15:17 39:16

**summarizing** 49:21

**summary** 52:14 52:23 76:25

**sun** 20:16 21:9 21:21

**superstructure** 25:3,6,15,22 26:19,22

**supplemental** 5:12 9:25 10:16 14:12

**supplier** 35:19

**support** 52:19 53:2,6,11,16,25 55:22 57:16,19

61:8 65:12

**supporting** 24:7 30:16 49:8

**supposed** 41:11 61:3 70:8 78:4

**sure** 6:12 15:7 34:15,16 36:22 47:5 60:4 72:5 73:5

**surface** 55:21 67:20

**surprised** 50:18

**surveyors** 21:6

**survive** 20:3

**susana** 1:12

**switch** 77:22

**switched** 18:13 42:11

**sworn** 6:2 83:14

**system** 22:12 22:13 53:17 73:4

**systems** 2:2 4:1 6:8 37:16,25 81:4 82:1 83:1

**t**

**t** 82:3,3

**tact** 54:24

**take** 8:22 12:6 19:7 27:25

28:2,14 32:19 32:21,23 44:22 74:6

**taken** 3:1 7:6 7:13 28:4 44:24 47:15 71:24 74:9 80:4

**takes** 30:9

**talk** 7:11 16:16 38:24 39:17 52:17

**talked** 43:9

**talking** 37:24 45:4 72:7

**taught** 63:9,13

**teacher** 19:13

**tell** 6:2 10:8 16:7 67:22 72:19 73:14 75:11

**tells** 48:20,23

**temporarily** 41:11

**temporary** 57:19

**tend** 16:25

**tension** 54:19 54:22,23 56:15

**tensioned** 56:18

**term** 39:5 71:20

**terms** 16:25 70:23 71:5,8,9 71:11,11

**testified** 6:3 14:20

**testimony** 5:3 9:2 14:15 76:25 80:7,11 81:9,17 83:8

**testing** 19:15 66:5

**text** 56:24

**texts** 72:11 73:1

**thank** 9:18 79:3 79:4,7

**thesis** 18:17 19:15

**thick** 13:17

**thickness** 67:10

**thielbahr** 4:4 5:4 6:5,7,16,21 7:8,9 9:21 10:13 27:21 34:5 38:6,8 44:22 45:1 60:14 66:24 72:1,5 74:1 79:10

**thing** 41:13,13 46:13 50:19,25 60:9 66:18 73:14,20 75:6

**things**  13:18 20:3 26:8 34:20 35:9 62:2 66:10 71:7
**think**  9:23 17:21 23:2 24:10 30:24 32:9 38:21 40:2 51:23 52:15 56:17 57:8 58:5 63:21 64:5 65:16,21 66:25 67:1 71:22 73:14 76:9 78:14
**third**  16:1,3 17:4 20:18 21:4 23:2
**thorough**  22:23 23:1
**thought**  68:21
**thread**  54:10
**threaded**  54:3 54:6 56:10,12
**three**  10:22 15:2,12,16 16:19 18:8,22 19:9 20:15 23:10,13,15,16 28:12 36:9 39:19 42:9,10 42:11 43:10

45:9
**threshold** 48:19
**tightened**  63:18
**tightening** 56:14
**tighter**  63:12
**time**  7:24,24 23:10,12 26:17 41:23 64:6 75:13,16,16 76:18 79:3,6,7 79:9 80:5,6 81:18
**timeframe**  81:8
**times**  15:2 28:12
**today**  9:2,9 76:7,12
**todd**  63:11
**together**  41:7 46:13 53:20 67:19
**told**  19:2 68:12 71:19
**took**  9:13 66:1
**top**  16:23,24 34:3 50:1,6,7 54:1,2 55:7 58:6 63:20 67:12,21
**topics**  77:22
**touched**  14:14 23:3

**touching**  29:4
**towards**  17:8
**training**  33:23 66:1
**transcribed** 80:8
**transcript**  8:8 81:6,19 83:5,8
**trial**  14:15,21 79:6
**tries**  30:6
**true**  76:7,12 80:10 83:8
**truth**  6:2
**truthful**  9:1
**try**  62:4
**trying**  24:9 30:1 39:6,16 77:2,3,13,21
**tube**  5:15 39:25 43:14
**tubes**  17:7,7 54:20
**turn**  74:4 75:17
**turns**  25:23
**two**  14:5 15:8 16:20 18:17,22 21:3 23:10,16 26:13 29:18,18 30:5 32:24 35:21 43:7,22 44:3 51:21 53:18,24 54:18 55:5 66:10

67:19 72:10
**type**  12:3 13:5 13:11,13 16:16 17:3,4 50:19 50:25 61:18 68:4 75:6 76:12
**types**  16:19 29:18 33:24 48:5 53:24 68:7
**typical**  19:11 22:12 27:3 55:20 58:8
**typically**  13:11 13:13 24:10 25:15 27:6 47:25 54:6
**tzi**  1:7,12

**u**

**uc**  18:16
**ugly**  18:12
**under**  19:14 49:23 61:2 66:4 70:17 71:13 76:1,22 77:6,19,24,25 80:6,9
**underlying** 66:22
**undermined** 22:11

**[underneath - welds]**

| | | | |
|---|---|---|---|
| **underneath** 29:9 55:5,10 | **used** 12:13 13:6 13:6 14:7 24:13 27:6 33:5 54:8 58:25 61:3 62:6 75:15 77:24 81:19 | **versus** 32:17 34:9 43:11 44:4 | **wall** 22:11,13 |
| **understand** 8:4 9:5 28:6 39:6 42:19 43:4,17 45:7 48:15 73:8 74:1 | | **vertical** 16:20 29:19 36:17,20 49:15,24 | **walls** 24:6 |
| | | | **want** 7:10 8:21 18:3 30:9 42:18,19 43:17 67:2 70:7 |
| **understanding** 37:8 40:2 46:17 68:17 70:6 | **using** 12:2 28:5 33:9 55:20 | **vertically** 17:15 | **wanted** 75:1 |
| | **usually** 64:1 | **video** 8:15,18 | **warning** 61:17 |
| | **utilize** 28:6 | **videoconfere...** 3:2,8 4:2,10 | **warnings** 15:23 |
| **uniform** 66:11 | **utilized** 19:18 | **virginia** 19:21 | **washington** 4:15 19:21,23 |
| **uniformity** 67:9 | **utilizing** 58:20 | **virtual** 6:11,14 | |
| | **v** | **visit** 11:11 15:13,20 16:3 | **way** 30:2 56:16 56:16,22 60:2 76:8 |
| **united** 1:1 19:18 | **v** 81:4 82:1 83:1 | **visited** 28:12 | **we've** 20:8 24:16 |
| **university** 18:15 | **validity** 21:9 | **visits** 12:5 15:12,16 16:1 28:15 | **weather** 9:17 69:20 70:2,3,4 70:13,18 76:24 77:1,4 |
| **unpack** 53:5 | **valley** 20:17 21:9,21 | | |
| **unreasonable** 73:13 | **variation** 67:10 | **visual** 66:8 68:4,7 69:12 69:14 | |
| | **variety** 13:18 48:4 | | **week** 51:11 |
| **unusual** 25:19 | | **visually** 66:9 68:5 | **weight** 52:4 |
| **unusually** 22:6 | **various** 16:22 32:2 33:10 76:20 | **vs** 2:1 | **weird** 8:25 |
| **uplift** 58:4,11 | | **w** | **weld** 66:1,8,9 66:10,14,14,17 66:21 67:2,10 67:16,18,22,24 67:25 68:6 |
| **uploading** 10:10 | **vegas** 47:23 | **wait** 64:10 73:15 | |
| **upper** 19:4,5 50:5 54:9 | **verbally** 8:11 | | |
| | **verify** 20:24 81:9 | **waiting** 37:21 | |
| **upward** 58:7,9 | | **waive** 19:6 | **welded** 54:3 |
| **use** 16:25 18:20 23:11 26:11 51:19 66:2 70:22 71:11 | **veritext** 6:22 7:2 81:14,23 | **walk** 18:3 | **welder** 65:25 |
| | | **walker** 31:9,20 32:16 38:2 44:11,18 72:9 | **welding** 66:6 |
| | **veritext.com** 81:15 | | **welds** 65:18,22 66:12,13 67:13 68:2,7,11 69:7 |

**[welds - zuleyman]**                                                    Page 26

69:8,10,17
**went** 11:15
18:14 26:2
55:9 56:24
73:1
**west** 3:11,16
4:6 80:23
**whereof** 80:16
**whoever's** 47:1
**willful** 71:15
**williams** 1:24
3:4 80:2,21
**wind** 58:4,6
77:8,19,25,25
**winding** 20:1
**wing** 58:5
**withstand**
70:20
**witness** 9:15
27:20 60:13
72:3,6 78:12
78:20,21 79:4
80:6,16 81:8
81:10,12,18
**word** 66:2
**work** 21:8
45:19 75:9
78:9,16
**works** 26:5,11
**world** 6:14
**wreckage**
15:21
**written** 8:8

**wrong** 12:2
32:10 53:1
67:7

**x**

**x** 5:1 54:18
55:3 63:19
**xol** 1:4 81:4
82:1 83:1

**y**

**yeah** 28:25
37:21 38:3
46:15 51:9
63:14 65:6
74:5
**year** 18:17,22
20:22 22:5
23:3
**years** 18:9 26:7
66:13

**z**

**zach** 13:2,4
**zachary** 9:11
**zoom** 7:12 8:6
8:14,18
**zuleyman** 1:6

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.